JOHN FITZGERALD, FOR HIMSELF AND ON BEHALF OF ALL OTHER STOCKHOLDERS OF THE FITZGERALD & MALLORY CONSTRUCTION COMPANY, APPELLANT, V. FITZGERALD & MALLORY CONSTRUCTION COMPANY AND THE MISSOURI PACIFIC RAILWAY COMPANY, APPELLEES.

FILED JUNE 26, 1894. No. 5309.

1. Corporations: ABUSE OF TRUST BY OFFICERS INTERESTED IN RIVAL COMPANY: ACTION BY STOCKHOLDERS FOR BENEFIT OF CORPORATION. Where the officers of a corporation responsible for its management are shown to have abused their trust to the great damage of such corporation in the interest of another corporation of which they were then and still remain managing officers, any stockholder of the corporation wronged may bring an action in his own name for the benefit of the wronged corporation against the other corporation above referred to, for the redress of such grievance and for an accounting between said corporations, and for these purposes may properly join both corporations as defendants.

2. ———: ———: ———: PARTIES: FOREIGN RECEIVER. 'A receiver appointed by a court in another state than Nebraska is not a necessary party in this state to a suit on behalf of or against the corporation for which such receiver was so appointed.

3. ———: LIABILITY FOR TORTS OF OFFICERS. A corporation is liable civilly for all damages occasioned by the torts of its officers or agents committed within the scope of their employment as such.

4. ———: ACQUIESCENCE OF STOCKHOLDERS IN FRAUD OF OFFICERS. The acquiescence of a stockholder will not preclude a recovery in an action brought by him in a proper case for the benefit of such corporation in respect of wrongs committed by the managing officers of said corporation against it for the benefit of another corporation in which they are also officers. In such case, while the stockholder is nominally the plaintiff, he is only nominally so; the action is in reality between the corporations joined as defendants,—the one as the party wronged, the other as the party which profited by the wrong.

5. ———: CONSTRUCTION CONTRACT: COMMUTATION OF CONTRACT RATE: CONSIDERATION. The agreement of a construction company to commute its contract rate of compensation for finished work to a lower rate because of the work not being completed as agreed, in consideration of which commutation the other contracting party consented to presently accept the work in its unfinished condition, afforded a sufficient consideration to sustain the stipulated reduction as a compromise between the parties.

6. ———: ———: ———: ———. Where a construction company had contracted to build a certain railroad line, and had completed the work according to contract, an agreement by its president, without authority, to accept payment at less than the contract price was without consideration and did not release the other contracting party from liability for payment at the full rate fixed by the original contract.

7. ———: PURCHASE OF BONDS AT DISCOUNT BY OFFICERS INTERESTED IN RIVAL COMPANY. In an action on behalf of a corporation to recover the discount at which certain bonds held by said corporation had been by its board of directors ostensibly authorized to be sold to the stockholders of said corporation, resulting, however, in such sale only to the individual directors who voted to authorize it, and to parties in privity with them in wrongfully making such sale, held, that the burden of proof strongly devolved upon the purchasers of said bonds at the dis-

count authorized to show affirmatively that the price paid was the fair value of such bonds; and the proofs, as well as the finding of the trial court, having been adverse to such showing, *held further*, that the discount was properly recoverable.

8. ———: CONSTRUCTION CONTRACT: SURVEYS MADE TO INDUCE MUNICIPAL DONATIONS. Where the contract of a construction company contemplated only the building of a specified line of railroad, the expenses incidental to preliminary surveys made by the construction company with a view to the location of other lines where municipal donations could readily and freely be secured, in large part, for the benefit of the said construction company, are not properly recoverable by said construction company as against the railroad company for which the work of construction was being done, even though some of the officers of the said railroad company, by their conversation, in a measure, countenanced the making of said surveys for the purposes above stated.

9. Contracts in Writing: PAROL EVIDENCE OF SUBSEQUENT MODIFICATION. A written contract for the construction of a line of railroad alone does not render incompetent oral evidence of a subsequent contract for supplying the cattle yards, a telegraph line, turn-tables, etc., necessary or proper for the equipment or operation of such line of railroad when completed. The same rule applies as to furnishing nut fasteners and extra ties not within the terms of the original written contract.

10. Breach of Contract to Procure Right of Way: EVIDENCE: DAMAGES. Proof of a defective compliance with the laws of congress as to acquiring a railroad right of way across the public domain, without more, cannot be made a ground for the recovery of damages as against the party whose duty it was to properly secure such right of way.

11. Interstate Commerce Act. The act of congress entitled "An act to regulate commerce," when it took effect, abrogated all existing contracts with common carriers for special interstate commercial rates, and especially vested in the federal tribunals described in that act exclusive jurisdiction to inquire into and adjust such interstate rates as are alleged to be unfair or discriminative.

12. Foreign Laws: PRESUMPTIONS. In the entire absence of proof upon the subject, it is presumed that the rate of interest in another state is the same as that fixed by the statutes of Nebraska.

APPEAL from the district court of Lancaster county. Heard below before TIBBETS, J.

The case is stated in the opinion of Commissioner Ryan.

*Marquett, Deweese & Hall,* for appellant:

The Construction Company should be allowed for the full amount agreed upon in bonds for building the first one hundred and fifty miles of road. The findings touching these two items are, in substance, that after the road was completed according to contract, they then modified it and threw off a thousand dollars a mile. There is no consideration for this pretended modification. The rule is well-established that where the facts show clearly a certain sum to be due from one person to another, a release of the entire sum on a payment of a part is without consideration, and the creditor may still sue and recover the residue. (*Fire Insurance Association v. Wickham,* 141 U. S., 577; *United States v. Bostwick,* 94 U. S., 53–67; *Lingenfelder v. Wainwright Brewery Co.,* 15 S. W. Rep. [Mo.], 848; *Ayres v. Chicago, R. I. & P. R. Co.,* 52 Ia., 478; *Sherwin v. Brigham,* 39 O. St., 137; *Laidlow v. Hatch,* 75 Ill., 11; *Wimer v. Overseers of the Poor,* 104 Pa. St., 307; *Vanderbilt v. Schreyer,* 91 N. Y., 392; *Tulane v. Clifton,* 20 Atl. Rep. [N. J.], 1086.)

The court below found: "On the 15th day of June, 1886, the said Construction Company had ten miles of said road completed and ready for delivery to the Missouri Pacific Company; that on the 15th of July, 1886, the Construction Company had thirty miles of said road completed and ready for such delivery." The contract was that the bonds were to be delivered as each ten-mile section was built. There were no bonds issued for nine and one-half months after the first ten miles were built, and for eight and one-half months after the first thirty miles were built. For the non-delivery of the bonds the Construction Company should be allowed damages. The measure of damages is interest from the time they were

due until they were delivered. (2 Sutherland, Damages, sec. 534; *Hinckley v. Pittsburgh Bessemer Steel Co.*, 121 U. S., 264; *McMahon v. New York & E. R. Co.*, 20 N. Y., 463; *Skagit Railway & Lumber Co. v. Cole*, 26 Pac. Rep. [Wash.], 535; *Booth v. Spuyten Duyvil Rolling Mill Co.*, 60 N. Y., 487; *Richardson v. Chynoweth*, 26 Wis., 656.)

The sale by the directors, and purchase by the stockholders, of the Missouri Pacific bonds at a discount was a fraud. Neither directors of a company nor its stockholders can buy its property for less than its value, or sell it for less than its value, without making themselves and all those concerned in it liable for the true value of the property. (*Farmers Loan & Trust Co. v. San Diego Street Car Co.*, 45 Fed. Rep., 527; *Koehler v. Black River Falls Iron Co.*, 2 Black [U. S.], 721; *Goodin v. Cincinnati & Whitewater Canal Co.*, 18 O. St., 169; *Woodroof v. Howes*, 26 Pac. Rep. [Cal.], 111.)

Without the aid of the Missouri Pacific this fraud in the sale of bonds could not have been committed. At a time when the Construction Company borrowed of Gould for sale $2,500,000 of bonds, there was due from the Missouri Pacific $3,170,000 of bonds. Gould had to act for the Missouri Pacific in withholding the $3,170,000 in order to loan his $2,500,000. The perpetration was the joint act of Gould and the Missouri Pacific. The Missouri Pacific acted with its directors and the stockholders of the Construction Company. The resolution by which the bonds were sold was passed for its benefit as well as theirs. It got part of the fruits of the sale, and cannot make defense by claiming that the acts by which the wrongs have been committed are not within the corporate powers conferred upon them. A corporation can be guilty of a conspiracy to defraud. (Cook, Stockholders, 698; *Denver & R. G. R. Co. v. Harris*, 122 U. S., 608; *Hussey v. King*, 3 S. E. Rep. [N. Car.], 923; *Jackson v. Ludeling*, 21 Wall. [U. S.], 628; *Wayne Pike Co. v. Hammons*, 27 N. E. Rep. [Ind.],

487; *Barr v. New York, L. E. & W. R. Co.*, 96 N. Y.,
444; *Ervin v. Oregon Railway & Navigation Co.*, 27 Fed.
Rep., 627; *Peck v. Ellis*, 2 Johns. Ch. [N. Y.], 131; *Miller v. Fenton*, 11 Paige Ch. [N. Y.], 18; *Heath v. Erie R.
Co.*, 8 Blatch. [U. S.], 347; *Wilkinson v. Parry*, 4 Russ.
[Eng.], 271.)

The conspiracy and wrong must be viewed as a whole.
If the Missouri Pacific did anything to aid the conspirators
in this sale of bonds, it is responsible for the whole damages, or, after it has received the fruits, the money realized wrongfully, it is liable. A corporation may be a
party to a conspiracy. (Cooley, Torts, 127, 133; *Magill
v. Kauffman*, 4 Serg. & R. [Pa.], 318; *Grand Rapids
Safety Deposit Co. v. Cincinnati Safe Lock Co.*, 45 Fed.
Rep., 671; *Russell v. Post*, 138 U. S., 425; *Buffalo Lubricating Oil Co. v. Standard Oil Co. of New York*, 42
Hun [N. Y.], 153; *Morton v. Metropolitan Life Ins. Co.*,
34 Hun [N. Y.], 367; *Reed v. Home Savings Bank*, 130
Mass., 443; *Krulevitz v. Eastern R. Co.*, 140 Mass., 573;
*Craigie v. Hadley*, 1 N. E. Rep. [N. Y.], 537; *McCartney
v. Berlin*, 31 Neb., 411.)

By the act of conspiring together for the purposes alleged, the conspirators assumed to themselves the attributes
of individuality, so far as regards the prosecution of the
common design, thus rendering what was said or done by
any one in furtherance of the design the acts of all. (*Walls
v. State*, 125 Ind., 400; *Fogg v. Blair*, 139 U. S., 126.)

Fitzgerald never received any benefits and never acquiesced in the settlement. In order to constitute one a
wrong doer by ratification the original act must have been
done in his interest, or intended to further some purpose of
his own. No majority of a corporation, however large, can
misapply the funds of a corporation. A single dissenting
voice can frustrate the objects of the majority. (Cooley,
Torts, 187*; 1 Morawetz, Private Corporations, sec., 249;
*Woodroof v. Howes*, 26 Pac. Rep. [Cal.], 111.)

The court found that the majority of the directors and stockholders, in all matters where the interests of the Missouri Pacific and the interests of the Construction Company conflicted, acted for the benefit and interest of the Missouri Pacific. In other words, during all these transactions the Construction Company was in the hands of those hostile to it. In cases of this kind laches and acquiescence do not apply. (1 Morawetz, Private Corporations, sec. 531; *Pacific R. Co. v. Missouri P. R. Co.,* 111 U. S., 521.)

On the issue of overcharges for materials hauled by the railway company for the Construction Company there was an agreement for a rate of three-quarters of a cent per ton per mile. The railway company claims exemption for itself from this agreement by published schedules of rates which it says it charged. It will thus be seen that what they claim to be their scheduled rates were in writing, and the only proof would be the printed schedule of what that rate was. It is necessary that the printed schedule should be produced. (*Myers v. Bealer,* 30 Neb., 281; *Wiseman v. Northern P. R. Co.,* 26 Pac. Rep. [Ore.], 272; *American Life Insurance & Trust Co v. Rosenagle,* 77 Pa. St., 514; *Houser v. Austin,* 10 Pac. Rep. [Idaho], 37.)

The verbal agreement is good, and is unaffected by the rate established in the printed schedule. (*Holly v. Blackman,* 10 S. E. Rep. [S. Car.], 774; *Snow v. Alley,* 23 N. E. Rep. [Mass.], 576.)

The court erred in allowing interest at only six per cent. The regular rate in Kansas and Nebraska was seven per cent. The contract was to be performed in Kansas. If a contract is made with reference to the laws of another state the interest is to be calculated according to the place where the work is to be performed. (1 Sutherland, Damages, sec. 357; *Boyce v. Edwards,* 4 Pet. [U. S.], 111; *Lefler v. Dermotte,* 18 Ind., 246; *Von Hemert v. Porter,* 11 Met. [Mass.], 210; *Healy v. Gorman,* 15 N. J. Law, 328.)

There is no proof of what the interest rate is in Kansas

or in New York. It is therefore presumed to be the same as it is in Nebraska. (*Wenger v. Taylor*, 39 Kan., 757.)

As to the right of a stockholder to commence a suit of this kind: The corporation is under the control of the wrong-doers, George Gould, Russell Sage, Sidney Dillon, and Jay Gould, who own a controlling interest in both corporations, and virtually hold the purse-strings of both of them. A demand would be ordinarily nugatory under the circumstances, and it would be wholly contrary to established principles of justice to permit the authors of a wrong to conduct a litigation against themselves as agents of the injured complainants. (1 Morawetz, Private Corporations, sec. 252; *Peabody v. Flint*, 6 Allen [Mass.], 54; *Brewer v. Proprietors of Boston Theatre*, 104 Mass., 378; *Wilcox v. Bickel*, 11 Neb., 154; *Ryan v. Leavenworth, A. & N. R. Co.*, 21 Kan., 365; *Barr v. New York, L. E. & W. R. Co.*, 96 N. Y., 454.)

The majority of stockholders cannot combine against the minority. If they do, they are responsible for every wrong committed by that combination to the minority stockholders. (*Ervin v. Oregon Railway & Navigation Co.*, 27 Fed. Rep., 625.)

*B. P. Waggener* and *A. R. Talbot*, for appellees:

No sufficient showing has been made to entitle the plaintiff as a stockholder to maintain this action. The cause of action set forth in his petition is not a cause of action in favor of Fitzgerald, but in favor of the Construction Company. The refusal of the board of directors to act is essential to give a stockholder any standing in court. (*Hawes v. Oakland*, 104 U. S., 450–460; *Detroit v. Dean*, 106 U. S., 541; *Quincy v. Steel*, 120 U. S., 246; *Dimpfell v. Ohio & M. R. Co.*, 110 U. S., 210; *Ivinson v. Hutton*, 98 U. S., 79; *Memphis City v. Dean*, 8 Wall. [U. S.], 64; *Cogswell v. Bull*, 39 Cal., 320; *Talbot v. Scripps*, 31 Mich., 268; *Ware v. Bazemore*, 58 Ga., 318; *Doud v. Wisconsin P. & S. R. Co.*, 65 Wis., 108.)

The Construction Company was formed for the express purpose of giving to the directors of the Missouri Pacific Company a controlling interest in the stock, to secure their influence to make an advantageous contract with the Missouri Pacific Company to sell to it the stock and bonds which the Construction Company might receive from the Denver Company.   The officers and directors of the Missouri Pacific Railway Company being so largely interested in the Construction Company, a court of equity will not permit the contract of May 4, 1886, to be made the basis of any action. (*Wardell v. Union P. R. Co.*, 103 U. S., 651–659; *Thomas v. Brownville, Ft. K. & P. R. Co.*, 109 U. S., 524, s. c. 2 Fed. Rep., 878; *Wardell v. Union P. R. Co.*, 4 Dill. [U. S.], 337, 338; *Ryan v. Leavenworth, A. & N. R. Co.*, 21 Kan., 366; *Gilman C. & S. R. Co. v. Kelly*, 77 Ill., 426; *Thomas v. Brownville, Ft. K. & P. R. Co.*, 1 McCrary [U. S.], 392; *Stewart v. Lehigh Valley R. Co.*, 38 N. J. Law, 505; *Paine v. Lake Erie & L. R. Co.*, 31 Ind., 283; *Port v. Russell*, 36 Ind., 60; *European & N. A. R. Co. v. Poor*, 59 Me., 277; *Koehler v. Black River Falls Iron Co.*, 2 Black [U. S.], 715; *Jones v. Morrison*, 31 Minn., 140; *Hoyle v. Plattsburgh & M. R. Co.*, 54 N. Y., 315; *Pickett v. School District No. 1 of Town of Wiota*, 25 Wis., 551–559; *Memphis & C. R. Co. v. Woods*, 88 Ala., 630; *Langan v. Sankey*, 55 Ia., 54; *Blake v. Buffalo Creek R. Co.*, 56 N. Y., 485; *Bestor v. Wathen*, 60 Ill., 138, 139; *Berryman v. Trustees of Cincinnati S. R. Co.*, 14 Ky., 755; *Pearson v. Concord Railroad Corporation*, 13 Am. & Eng. R. Cases [N. H.], 102; *Guild v. Parker*, 43 N. J. Law, 430; *Davis v. Rock Creek Lumber, Flume & Mining Co.*, 55 Cal., 359; *Ward v. Davidson*, 89 Mo., 445; *Parker v. Nickerson*, 112 Mass., 195; *Munson v. Syracuse, G. & C. R. Co.*, 103 N. Y., 58; *Duncomb v. New York, H. & N. R. Co.*, 84 N. Y., 190; *People v. Township Board of Overyssel*, 11 Mich., 222; *Flint & P. M. R. Co. v. Dewey*, 14 Mich., 477; *Blair Town Lot & Land Co. v. Walker*, 50 Ia.,

376; *Boyd v. Blankman*, 29 Cal., 19; *Bent v. Priest*, 10 Mo. App., 544; *Cook v. Sherman*, 20 Fed. Rep., 167; *Coleman v. Second Avenue R. Co.*, 38 N. Y., 202; *Butts v. Wood*, 37 N. Y., 317–319; *Ogden v. Murray*, 39 N. Y., 202; *Bliss v. Matteson*, 45 N. Y., 22; *Covington & L. R. Co. v. Bowler*, 9 Bush [Ky.], 468; *Cook v. Berlin Woolen Mill Co.*, 43 Wis., 433; *Abbot v. American Hard Rubber Co.*, 33 Barb. [N. Y.], 578; *Jewett v. Miller*, 10 N. Y., 402; *Samuels v. Oliver*, 130 Ill., 73; *Clarke v. Omaha & S. W. R. Co.*, 5 Neb., 314.)

The item of $150,000 claimed arises out of a compromise, whereby the railway accepted one hundred and fifty miles of road in an incomplete condition at the rate of $10,000 per mile, instead of requiring it to be completed and then paying $11,000 per mile. It was a contract that both companies had a right to make—a fair compromise and settlement of a controversy. The plaintiff, with knowledge of the facts, acquiesced in the settlement and accepted the benefits thereof, and is now estopped to object to the corporate acts or claim the right to rescind that contract. (*Ashhurst's Appeal*, 60 Pa. St., 290; *Taylor v. South & N. A. R. Co.*, 4 Woods [U. S.], 575; *Twin-Lick Oil Co. v. Marbury*, 91 U. S., 592; *Union Gold Mining Co v. Rocky Mountain National Bank*, 96 U. S., 640; *Indianapolis Rolling Mill v. St. Louis, Ft. S. & W. R. Co.*, 120 U. S., 256; *Pneumatic Gas Co. v. Berry*, 113 U. S., 322–327; *Shelton Hat Blocking Co. v. Eickemeyer Hat Blocking Machine Co.*, 90 N. Y., 607; *Parks v. Evansville, I. & C. S. L. R. Co.* 23 Ind., 567; *Graham v. Birkenhead L. & C. J. R. Co.*, 2 M. & Gord. [Eng.], 156; *Kitchen v. St. Louis, K. C. & N. R. Co.*, 69 Mo., 226; *Weed v. Little Falls & D. R. Co.*, 31 Minn., 154; *Bell v. Keepers*, 39 Kan., 105; *Gregory v. Patchett*, 33 Beav. [Eng.], 595; *Banks v. Judah*, 8 Conn., 145; *Boston & P. R. Co. v. New York & N. E. R. Co.*, 13 R. I., 260; *Aurora Agricultural & Horticultural Society of Aurora v. Paddock*, 80 Ill., 263; *Stewart v. Erie &*

*Western Transportation Co.*, 17 Minn., 372; *Goodin v. Evans*, 18 O. St., 150; *McLaughlin v. Detroit & M. R. Co.*, 8 Mich., 100; *Peabody v. Flint*, 88 Mass., 54; *Royal Bank of Liverpool v. Grand Junction Railroad & Depot Co.*, 125 Mass., 490; *Thompson v. Lambert*, 44 Ia., 239; *Terry v. Eagle Lock Co.*, 47 Conn., 141; *Craig v. Bradley*, 26 Mich., 354; *Tyrell v. Cairo & St. L. R. Co.*, 7 Mo. App., 294–299; *Chouteau v. Allen*, 70 Mo. 290; *Perkins v. Portland S. &. P. R. Co.*, 47 Me., 591; *Dunks v. Fuller*, 32 Mich., 245; 1 Morawetz, Private Corporations, secs. 262, 264; 2 Morawetz, Private Corporations, secs. 630, 631; *Clarke v. Omaha & S. W. R. Co.*, 4 Neb., 467; *Thomas v. Brownville, Ft. K. &. P. R. Co.*, 109 U. S., 524.)

The Construction Company could not maintain an action to rescind the contract of settlement without offering to put the defendant *in statu quo* by returning the bonds received as the consideration of that settlement. (*Estes v. Reynolds*, 75 Mo., 563; *Allegheny City v. McClurkan*, 14 Pa. St., 83; *Rich v. State Nat. Bank of Lincoln*, 7 Neb., 209; *Melton v. Smith*, 65 Mo., 315; *Harvey v. Morris*, 63 Mo., 475.)

The constructive fraud, and the vice with which this settlement is alleged to be tainted, is the same vice which condemns the contracts of May 4, 1886; and the petition and evidence as to the making of the original contracts disclose facts which preclude a court of equity from affording plaintiff any relief. (*Gilman C. & S. R. Co. v. Kelly*, 77 Ill., 426–437; *Flint & P. M. R. Co. v. Dewey*, 14 Mich., 479.)

It was an executed contract of compromise, as a result of controversy over disputed facts. The work to be done was not completed. It was subject to the approval of the chief engineer of the Missouri Pacific, who had not approved it. This provision was binding, and the settlement was made before any sum was due, and is a valid, executed contract. (*De Graff v. St. Paul & P. R. Co.*, 23 Minn., 146; *Delaware Hudson Canal Co. v. Pennsylvania Coal*

Co., 50 N. Y., 258; *Jackson v. Cleveland*, 19 Wis., 400*;
*Hudson v. McCartney*, 33 Wis., 341; *United States v. Rob-
eson*, 9 Pet. [U. S.], 327; *Reynolds v. Caldwell*, 51 Pa. St.,
305; *Snell v. Brown*, 71 Ill., 142; *Humaston v. Telegraph
Co.*, 20 Wall. [U. S.], 27; *Denver, S. P. & P. R. Co. v.
Riley*, 7 Col., 494; *Denver & New Orleans Construction Co.
v. Stout*, 8 Col., 65; *Mercer v. Harris*, 4 Neb., 77; *How-
ard v. Allegheny V. R. Co.,* 69 Pa. St., 489; *Vanderwerker
v. Vermont C. R. Co.*, 27 Vt., 126; *School District No. 27,
Sarpy County, v. Randall*, 5 Neb., 408; *Kidwell v. Balti-
more & O. R. Co.*, 11 Gratt. [Va.], 676.)

The item of $36,000, claimed on account of Larned
Branch, was improperly allowed by the court below.    The
work had not been done.    The building of that line had
been abandoned.    A proposition to permit the Construc-
tion Company to build it at $10,000 per mile was accepted,
the road built, and settlement made on this basis.    The
acquiescence of the Construction Company and all its
stockholders in this settlement precludes them from any
right to relief on this item. (*Indianapolis Rolling Mill v.
St. Louis, Ft. S. & W. R. Co.*, 120 U. S., 256.)

The road having been abandoned, the Missouri Pacific
had the right to pay all damages occasioned by the breach
of its contract, if valid, rather than build thirty-six miles
of road at $11,000.    The consideration for renewing oper-
ations was the proposal of the Construction Company to
build the road for $10,000 per mile.    This was a valid
agreement based on a sufficient consideration. (*Hale v.
Hess*, 30 Neb., 42; *Cleveland & P. R. Co. v. Kelley*, 5 O.
St., 180; *Crowley v. Genesee Mining Co.*, 55 Cal., 273.)

The contract provided for payment in bonds.    In any
event the measure of damages would be the market value
of the bonds at date of demand, and in no case could the
action be maintained without first making demand for de-
livery of the bonds. (*Wyatt v. Bailey*, 1 Mor. [Ia.], 396*;
*Bradley v. Farrington*, 4 Ark., 533; *Martin v. Chauvin,* 7

29

Mo., 277; *State v. Mooney*, 65 Mo., 494; *Widner v. Walsh*, 3 Col., 548.)

The agreement for special rates, made between Mallory, as president of the Construction Company, and Gould, as president of the railway company, under which the court below allowed to the Construction Company the sum of $318,763.56 claimed as rebates on account of overcharges on interstate shipments, was made prior. to May 4, the date of the written contract. The written contract covered the question of transportation. The contract of May 4, 1886, merged all antecedent agreements and stipulations, whether oral or written, and oral evidence was inadmissible to vary or modify its terms. (*Mills v. Miller*, 4 Neb., 443; *Hamilton v. Thrall*, 7 Neb., 219; *Delaney v. Linder*, 22 Neb., 280; *McNish v. Reynolds*, 95 Pa. St., 483; *Dodge v. Kiene*, 28 Neb., 221; *Cornell v. St Louis, K. & A. R. Co.*, 25 Kan., 615; *Hopkins v. St. Louis & S. F. R. Co.*, 16 Am. & Eng. R. Cases [Kan.], 131; *Frost v. Blanchard*, 97 Mass., 155; *Pilmer v. Branch of State Bank, Des Moines*, 16 Ia., 321; *Emery v. Mohler*, 69 Ill., 221; *Davis v. Symonds*, 1 Cox's Ch. [Eng.], 402; *Savercool v. Farwell*, 17 Mich., 308; *Long v. New York C. R. Co.*, 50 N. Y., 76; *Baker v. Higgins*, 21 N. Y., 397; *Merchants Mutual Ins. Co. v. Lyman*, 15 Wall. [U. S.], 664; *Riley v. City of Brooklyn*, 46 N. Y., 444; *Purinton v. Northern I. R. Co.*, 46 Ill., 297; *Thurston v. Ludwig*, 6 O. St., 1–4; *Hills v. Rix*, 43 Minn., 543; *Gilbert v. Stockman*, 76 Wis., 62; *Harrison v. McCormick*, 89 Cal., 327; *State v. Hoshaw*, 98 Mo., 358.)

In the absence of a showing that Mr. Gould, as president of the Missouri Pacific, had authority to make a contract for a special rate, the law does not imply authority in him, from the position he held, to enter into such a contract. (*Blen v. Bear River & Auburn Water Mining Co.*, 20 Cal., 602; *Templin v. Chicago, B. & P. R. Co.*, 73 Ia., 548; Taylor, Corporations, sec. 236; *Adriance v. Roome*, 52

Barb. [N. Y.], 399; *Griffith v. Chicago, B. & P. R. Co.*,
74 Ia., 85; *Getty 'v. Barnes Milling Co.*, 40 Kan., 281;
*Farmers Bank of Bucks County v. McKee*, 2 Pa. St., 318.)

After April 1, 1887, the bills of lading stated on their
face the amount of freight that was charged, and parol evi-
dence was incompetent to contradict or change the terms
and conditions of the bill of lading or shipping receipt.
(*Louisville & N. R. Co. v. Fulgham*, 8 So. Rep. [Ala.],
803; *Long v. New York C. R. Co.*, 50 N. Y., 76; *Mer-
chants Mutual Ins. Co. v. Lyman*, 15 Wall. [U. S.], 664;
*Hopkins v. St. Louis & S. F. R. Co.*, 16 Am. & Eng. R.
Cases [Kan.], 131; *Clyde v. Graver*, 54 Pa. St., 251.)

Mallory and Fitzgerald had notice of payment of the
freight charges. A resolution of the board of directors of
the Construction Company recognized the indebtedness.
There was no disapproval of the act of the treasurer in
making the payment. The payment will now be presumed
to have been ratified. (*Indianapolis Rolling Mill v. St.
Louis, Ft. S. & W. R. Co.*, 120 U. S. 256; *Twin-Lick Oil
Co. v. Marbury*, 91 U. S., 592; *Badger v. Badger*, 2 Wall.
[U. S.], 87; *Harwood v. Air-Line R. Co.*, 17 Wall. [U.
S.], 78; *Marsh v. Whitmore*, 21 Wall. [U. S.], 178;
*Union Gold-Mining Co. v. Rocky Mountain Nat. Bank*, 96
U. S., 640.)

Whether the right to a special or reduced rate was based
on custom or contract, the interstate commerce act, which
took effect April 4, 1887, ended the custom and annulled
the contract, and recovery on this item can only be had on
the basis of a violation of a positive act of congress. (*Ken-
tucky & Indiana Bridge Co. v. Louisville & N. R. Co.*, 2
Inter. Com. Rep. [Ky.], 162; *Knox v. Lee*, 12 Wall.
[U. S.], 457; *Southern Wire Co. v. St. Louis B. & T. R.
Co.*, 38 Mo. App., 191; *Atkinson v. Ritchie*, 10 East
[Eng.], 530; *Kentucky & Indiana Bridge Co. v. Louisville
& N. R. Co.*, 34 Am. & Eng. R. Cases [Ky.], 630; *Sco-
field v. Lake Shore & M. S. R. Co.*, 43 O. St., 571; *Dillon

*v. Allen,* 46 Ia., 299; *Bishop v. Palmer,* 146 Mass., 474; *Riley v. Jordan,* 122 Mass., 233; *Hanauer v. Doane,* 12 Wall. [U. S], 342; *Valentine v. Stewart,* 15 Cal., 388; *Widoe v. Webb,* 20 O. St., 431; *Ludlow v. Hardy,* 38 Mich., 690; *Everingham v. Meighan,* 55 Wis., 354; *Melchoir v. McCarty,* 31 Wis., 252; *Hutchins v. Weldin,* 114 Ind., 80; *Caldwell v. Bridal,* 48 Ia., 15; *United States Bank v. Owens,* 2 Pet. [U. S.], 527; *Suit v. Woodhall,* 113 Mass., 391; *Hobbie v. Zaepffel,* 17 Neb., 536; *Gould v. Kendall,* 15 Neb., 549.)

By the express provisions of the interstate commerce act all special rates and agreements for rebates were annulled. On and after April 4, 1887, in the absence of any notice, the presumption is that the Construction Company delivered the goods to be shipped in accordance with the provisions of that law. (*Kirkland v. Dinsmore,* 62 N. Y., 171; *United States Bank v. Dandridge,* 12 Wheat. [U. S.], 70; *Hartwell v. Root,* 19 Johns. [N. Y.], 346; *Fitzgerald v. Grand Trunk R. Co.,* 22 Atl. Rep. [Vt.], 76; *Messenger v. Pennsylvania R. Co.,* 36 N. J. Law, 407; *Audenried v. Philadelphia & R. R. Co.,* 68 Pa. St., 370; *McDuffee v. Portland & R. R. Co.,* 52 N. H., 430; *New England Express Co. v. Maine C. R. Co.,* 57 Me., 188.)

The payment by the Construction Company of the sum claimed by the railway company for freight charges was a voluntary payment, made under claim of right, and as such cannot be recovered back. (*Kenneth v. South Carolina R. Co.,* 15 Rich. [S. C.], 284; *Claflin v. McDonough,* 33 Mo., 412; *Bucknall v. Story,* 46 Cal., 599; *Brumagim v. Tillinghast,* 18 Cal., 265; *Beecher v. Buckingham,* 18 Conn., 110; *Stevens v. Head,* 9 Vt., 174; *Morris v. Tarin,* 1 Dallas [U. S.], 148; *Hall v. Shultz,* 4 Johns. [N. Y.], 240; *Lathrope v. McBride,* 31 Neb., 289; *City of Muscatine v. Keokuk Northern Line Packet Co.,* 45 Ia., 185; *Town of Sullivan v. McCammon,* 51 Ind., 264; *Dawson v. Mann,* 49 Ia., 596; *Regan v. Baldwin,* 126 Mass., 485; *Ferguson v.*

*Hirsch*, 54 Ind., 338; *Lamborn v. County Commissioners*, 97 U. S. 185; *Gerecke v. Campbell*, 24 Neb., 306.)

The Missouri Pacific is not liable for telegraph line, turntables, fences, and extra work done on the line of the Denver, Memphis & Atlantic by the Construction Company. The contract for the construction of the road was with the Denver Company, in which the Missouri Pacific, by its purchase of stock and bonds under its contract with the Construction Company, became merely a controlling stockholder. As stockholder of the Denver Company, the Missouri Pacific did not become liable primarily for its debts. (*Pullman Palace Car Co. v. Missouri P. R. Co.*, 115 U.S., 596; *Fitzgerald v. Missouri P. R. Co.*, 45 Fed. Rep., 818; *Atchison, T. & S. F. R. Co. v. Cochran*, 23 Pac. Rep. [Kan.], 155; *Atchison, T. & S. F. R. Co. v. Davis*, 34 Kan., 209; *Ohio & M. R. Co. v. Indianapolis & C. R. Co.*, 5 Am. Law Reg. n. s., [O.], 733; *State v. Atchison & N. R. Co.*, 24 Neb., 143; *Pennsylvania R. Co. v. St. Louis, A. & T. H. R. Co.*, 118 U. S., 290–309; 1 Cook, Stockholders, sec. 241; *Myers v. Irwin*, 2 Serg. & R. [Pa.], 371; *Ferry v. Little*, 101 U. S., 216; *Spense v. Iowa Valley Construction Co.*, 36 Ia., 407; *Liverpool Ins. Co. v. Massachusetts*, 10 Wall. [U. S.], 566; *New England Commercial Bank v. Stockholders of Newport Steam Factory*, 6 R. I., 188; *Walker v. Lewis*, 49 Tex., 123; *Green v. Beckman*, 59 Cal., 545; *Jones v. Jarman*, 34 Ark., 323; *Windham Provident Institution for Savings v. Sprague*, 43 Vt., 502; *Woods v. Wicks*, 7 Lea [Tenn.], 40; *Great Falls & C. R. Co. v. Copp*, 38 N. H., 124; *Chase v. Lord*, 77 N. Y., 1; *Harper v. Union Mfg. Co.*, 100 Ill., 225; *First Nat. Bank of Garrettsville v. Green*, 64 Ia., 445; *Wright v. McCormack*, 17 O. St., 86; *Stewart v. Lay*, 45 Ia., 604; *Means' Appeal*, 85 Pa. St., 75; *Bayliss v. Swift*, 40 Ia., 648; *McClaren v. Franciscus*, 43 Mo., 452; *Terry v. Anderson*, 95 U. S., 636; *Baldwin v. Canfield*, 26 Minn., 43; *Button v. Hoffman*, 61 Wis., 20; *Murphy v. Hanrahan*, 50 Wis., 485;

*Bundy v. Ophir Iron Co.*, 38 O. St., 300; *Frank v. Drenk-hahn,* 76 Mo., 508; *Alexander v. Cauldwell,* 83 N. Y., 480.)

The Missouri Pacific had no authority under its charter to build or acquire such a line, and is not liable for extras. Persons dealing with the managers of a corporation must take notice of the limitations imposed upon their authority by the act of association. (*Central Transportation Co. v. Pullman Palace Car Co.*, 139 U. S., 41; Morawetz, Corporations, sec. 591; *Ohio & M. R. Co. v. Indianapolis & C. R. Co.*, 5 Am. Law Reg., n. s., 733; *Chicago City R. Co. v. Allerton*, 18 Wall. [U. S.], 233; *Davis v. Old Colony R. Co.*, 131 Mass., 258; *Colman v. Eastern Counties R. Co.*, 10 Beav. [Eng.], 1; *Bagshaw v. Eastern Union R. Co.*, 7 Hare [Eng.], 114; *Commonwealth v. Erie C. N. E. R. Co.*, 27 Pa. St., 339; *Pacific R. Co. v. Seely,* 45 Mo., 212; *Pearce v. Madison & I. R. Co.*, 21 How. [U. S.], 442.)

The $62,500 interest for loan of bonds paid Jay Gould, September, 1887, was paid by the treasurer on a voucher approved by the president of the Construction Company. It was a voluntary payment, and a transaction in which the railway company had no interest. The finding of the lower court that the loan of bonds should be treated as a payment by the railway company to the Construction Company is unsupported by the evidence. There were then no bonds due. The bonds of the Denver Company were required to be first certified, by the trustee and delivered to the Missouri Pacific before the delivery of the Missouri Pacific bonds to the Construction Company. This was a condition precedent which had not been complied with. A condition precedent must be strictly performed to entitle a party to recover. (*Oakley v. Morton,* 11 N. Y., 25; *Livesey v. Omaha Hotel Co.*, 5 Neb., 50; *Estabrook v. Omaha Hotel Co.*, 5 Neb., 76; *Boehme v. Omaha Hotel Co.*, 5 Neb., 80; *Snell v. Cheney*, 88 Ill., 258–260; *Toombs v. Consolidated Poe Mining Co.*, 15 Nev., 444; *Webb v. Smith,* 6 Col., 366;

Bishop, Contracts, sec. 1422; Dermott v. Jones, 2 Wall. [U. S.], 1; Larimore v. Tyler, 88 Mo., 667; Moore v. Campbell, 111 Ind., 328; Barney v. Giles, 120 Ill., 155; People v. Glann, 70 Ill., 232; Denver, S. P. & P. R. Co. v. Riley, 7 Col., 495; Robinson v. Harbour, 42 Miss., 795; Nashville & N. W. R. Co v. Jones, 2 Cold. [Tenn.], 574; Cullum v. Wagstaff, 48 Pa. St., 300.)

The item of $500,000 claimed as discount on bonds sold was properly disallowed. If there was any fraud on the part of the members of the board, they, and not the railway company, should account to the Construction Company. (Ambler v. Choteau, 107 U. S., 586; United States v. Union P. R. Co., 98 U. S., 569.)

The court below found that plaintiff acquiesced in the sale of bonds of July 28 and September 22, 1887, and the declaration of said dividend to stockholders. By such acquiescence plaintiff is estopped to claim any relief on this item. (Kitchen v. St. Louis, K. C. & N. R. Co., 69 Mo., 224; Clark v. Saline County, 9 Neb., 516; Brown v. City of Atchison, 39 Kan., 37; Sheldon v. Eickmeyer, 90 N. Y., 616; Taylor v. South & N. A. R. Co., 4 Woods [U. S. C. C.], 575; Twin-Lick Oil Co. v. Marbury, 91 U. S., 592; Allen v. Wilson, 28 Fed. Rep., 677; Craig v. Bradley, 26 Mich., 354; Dunks v. Fuller, 32 Mich., 245; Wood v. Carpenter, 101 U. S., 141.)

The Construction Company was a party to the transaction and cannot complain while retaining the benefits. (Mississippi & M. R. Co. v. Howard, 7 Wall. [U. S.], 413; Taylor v. South & N. A. R. Co. 4 Woods [U. S.]; 575; Twin-Lick Oil Co. v. Marbury, 91 U. S., 592; Union Gold Mining Co. v. Rocky Mountain Nat. Bank, 96 U. S., 644; Indianapolis Rolling Mill Co. v. St. Louis, F. S. & W. R. Co., 120 U. S., 256; Pneumatic Gas Co. v. Berry, 113 U. S., 322; Parks v. Evansville, I. & C. R. Co. 23 Ind., 567; Weed v. Little Falls & D. R. Co., 31 Minn., 154; Bell v. Keepers, 39 Kan., 105; Banks v. Judah, 8

Conn., 145; *Boston & P. R. Co. v. New York & N. E. R. Co.*, 13 R. I., 260; *Aurora Agricultural & Horticultural Society of Aurora v. Paddock*, 80 Ill., 263; *Goodin v. Evans*, 18 O. St., 150; *Terry v. Eagle Lock Co.*, 47 Conn., 141; *Craig v. Bradley*, 26 Mich., 354; *Tyrell v. Cairo & St. L. R. Co.*, 7 Mo. App., 294; *Chouteau v. Allen*, 70 Mo., 290; *Perkins v. Portland, S. & P. R. Co.* 47 Me., 591; *Wood v. Carpenter*, 101 U. S., 141.)

The Missouri Pacific Railroad Company is not bound by the acts of its own officers while they are acting as officers and members of the Construction Company. There was no competent evidence of the existence of any conspiracy. All the statements of Sage, Dillon, Hopkins, and Cross, while acting as directors of the Construction Company, were incompetent and should have been excluded. Declarations of an officer, to be binding on the corporation, must be shown to have been made while in performance of his duties as such officer. (*Moore v. Towers Hardware Co.*, 87 Ala., 206; *Union Mutual Life Ins. Co. v. Mowry*, 96 U. S., 547; *Whits v. Ashton*, 51 N. Y., 280; Bigelow, Estoppel, 437, 441; *White v. Walker*, 31 Ill., 422; *Faxton v. Faxon*, 28 Mich., 159; *Merchants Bank v. Rudolph*, 5 Neb., 536; *Kalamazoo Novelty Mfg. Co. v. McAlister*, 36 Mich., 327; *East River Bank v. Hoyt*, 41 Barb. [N. Y.], 441; *Chicago & N. W. R. Co v. James*, 22 Wis., 191; *Tripp v. Metallic Packing Co.*, 137 Mass., 502; *Alexander v. Cauldwell*, 83 N. Y., 485; Angell & Ames, Corporations, 288–391; *Ricketts v. Birmingham Street R. Co.*, 5 So. Rep. [Ala.], 353; *Dunner Land & Loan Co. v. Stonewall Ins. Co.*, 77 Ala., 184; *Peek v. Detroit Novelty Works*, 29 Mich., 313; *Grayville & M. R. Co. v. Burns*, 92 Ill., 302; *Florida M. & G. R. Co. v. Varnedoe*, 7 S. E. Rep. [Ga.], 129; *Farmers Bank v. McKee*, 2 Pa. St., 318; *Hackney v. Allegheny Mutual Ins. Co.*, 4 Barr [Pa.], 185; *Custar v. Titusville Gas & Water Co.*, 63 Pa. St., 386; *First Nat. Bank of Allentown v. Hock*, 89 Pa. St., 324; *Ladd v. Couzins*,

35 Mo., 516; *McDermott v. Hanibal & St. J. R. Co.*, 73 Mo., 516; *National Bank v. Norton*, 1 Hill [N. Y.], 579; *Adriance v. Roome*, 52 Barb. [N. Y.], 399; *Hoyt v. Thompson*, 5 N. Y., 334; *Crump v. United States Mining Co.*, 7 Gratt. [Va.], 353; *Polleys v. Ocean Ins. Co.*, 14 Me., 141; *Ruby v. Abyssinian Society*, 15 Me., 306; *Winchester v. Baltimore & S. R. R. Co.*, 4 Md., 232; *Leggett v. New Jersey Mfg. & Bank Co.*, 1 N. J. Eq., 553; *Barnes v. Trenton Gas Light Co.*, 27 N. J. Eq., 33; *Titus v. Cairo & F. R. Co.*, 37 N. J. Law, 102; *First Nat. Bank of Davenport v. Gifford*, 47 Ia., 575; *Langan v. Iowa & Minnesota Construction Co.*, 49 Ia., 317; *Allemony v. Simmons*, 23 N. E. Rep. [Ind.], 768; *Manhattan Brass Co. v. Webster Glass & Queensware Co.*, 37 Mo. App., 145; *Blen v. Bear River Mining Co.*, 20 Cal., 602; *Soper v. Buffalo & R. R. Co.*, 19 Barb. [N. Y.], 310; *Columbus Co. v. Hurford*, 1 Neb., 161; *Clarke v. Omaha & S. W. R. Co.*, 5 Neb., 320; *Gregory v. Lamb*, 16 Neb., 205; *Ward v. Davidson*, 89 Mo., 445; *Spyker v. Spence*, 8 Ala., 339; *Henry v. Northern Bank of Alabama*, 63 Ala., 527; *Baldwin v. Canfield*, 26 Minn., 54; *Davis Improved Wrought Iron Wagon Wheel Co. v. Davis Wrought Iron Wagon Co.*, 20 Fed. Rep., 699; 1 Morawetz, Corporations, sec. 517; *Wardell v. Union P. R. Co.*, 4 Dill. [U. S.], 330; *Blair Town Lot & Land Co. v. Walker*, 50 Ia., 376.)

The Missouri Pacific received no consideration for the seventeen miles of road constructed over the government land. The Denver Company acquired no title to its right of way for this portion of its road, and its stock and bonds issued thereon were invalid and worthless because of its failure to comply with the act of congress of March 3, 1875, granting railroads right of way through public lands. (*Savannah, F. & W. R. Co. v. Davis*, 7 So. Rep. [Fla.], 29; *Van Wyck v. Knevals*, 106 U. S., 360; *Kansas P. R. Co. v. Dunmeyer*, 113 U. S., 629, 634; *Grinnell v. Chicago, R. I. & P. R. Co.*, 103 U. S., 739; *Easley v. Kellom*, 14 Wall.

[U. S.], 279; *United States v. Fitzgerald*, 15 Pet. [U. S.], 407.)

*John L. Webster*, also for appellees:

Before a stockholder in a corporation can be permitted to maintain a suit in equity in his own name for the benefit of other stockholders it must be made to appear that the plaintiff has made an earnest effort to obtain redress at the hands of the directors and shareholders of the corporation, and that such effort has been without avail. (*Hawes v. Oakland*, 104 U. S., 450; *Quincy v. Steel*, 120 U. S., 241; *Dimpfell v. Ohio & M. R. Co.*, 110 U. S., 211; *Allan v. Wilson*, 28 Fed. Rep., 677; *Dunphy v. Travelers Newspaper Association*, 146 Mass., 495; *Brewer v. Boston Theatre Co.*, 104 Mass., 378; *Boyd v. Sims*, 87 Tenn., 771.)

The petition is multifarious, in that it contains several causes of action which cannot properly be prosecuted together, and some of which cannot properly lie against the Missouri Pacific Railway Company. (*Pullman Palace Car Co. v. Missouri P. R. Co.*, 115 U. S., 596; *Atchison, T. & S. F. R. Co. v. Cochran*, 43 Kan., 225; *Button v. Hoffman*, 61 Wis., 20.)

The plaintiffs have no standing in a court of equity to seek any relief under the contract with the Fitzgerald & Mallory Construction Company, for the reason that said contract is tainted with such vice as forbids a court of equity lending its aid to the enforcement of any of its provisions, between the contracting parties, in this: that the same persons held a controlling interest in the stock of the two companies, and controlled the boards of directors of the two respective companies. (*Wardell v. Union P. R. Co.*, 103 U. S., 651; *Thomas v. Brownville, Ft. K. & P. R. Co.*, 109 U. S., 522; *Gilman, C. & S. R. Co. v. Kelly*, 77 Ill., 426; *People v. Township Board of Overyssel*, 11 Mich., 222; *Pickett v. School District*, 25 Wis., 551; *Cook v. Sherman*, 20 Fed. Rep., 167; *Ryan v. Leavenworth, A. & N.*

*R. Co.*, 21 Kan., 365; *Pearson v. Concord R. Co.*, 13 Am. & Eng. R. Cases [N. H.], 102; *Michoud v. Girod*, 4 How. [U. S.], 503.)

The agreement by which the Fitzgerald & Mallory Construction Company agreed to accept payment for one hundred and fifty miles of the Denver, Memphis & Atlantic railway at the rate of $10,000 per mile was a compromised settlement acquiesced in by all the parties and cannot be disturbed. Courts of equity are slow to set aside compromise settlements, and will never do so unless the parties can be put *in statu quo*. (*Estes v. Reynolds,* 75 Mo., 567; *McMichael v. Kilmer*, 76 N. Y., 46; *Hammond v. Pennock*, 61 N. Y., 145; *Houghton v. Nash*, 64 Me., 477; *Van Trott v. Wiese*, 36 Wis., 439; *Jarrett v. Morton*, 44 Mo., 275.)

The doctrine of acquiescence forbids the plaintiff to recover from the Missouri Pacific Company the amount of the ten per cent discount at which the bonds were sold. (*Twin-Lick Oil Co. v. Marbury*, 91 U. S., 592; *Badger v. Badger*, 2 Wall. [U. S.], 87; *Harwood v. Air-Line R. Co.*, 17 Wall. [U. S.], 78; *Marsh v. Whitmore*, 21 Wall. [U. S.], 178; *Vigers v. Pike*, 8 C. & F. [Eng.], 650; *Wentworth v. Lloyd*, 32 Beav. [Eng.], 467; *Follansbe v. Kilbreth*, 17 Ill., 522; Beach, Corporations, sec. 887; *Sheldon Hat Blocking Co. v. Eickemeyer Hat Blocking Machine Co.*, 90 N. Y., 616; *Pneumatic Gas Co. v. Berry*, 113 U. S., 327; *Allen v. Wilson*, 28 Fed. Rep., 677; *Union Gold Mining Co. v. Rocky Mountain Nat. Bank*, 96 U. S., 644; *Kitchen v. St. Louis, K. C. & N. R. Co.*, 69 Mo., 226; *Terry v. Eagle Lock Co.*, 47 Conn., 141.)

The claim of plaintiff to recover $318,000 freight charges cannot be maintained. The previous parol understanding of the parties cannot be considered or allowed to prevail against the provisions in the written contract. (*Mills v. Miller*, 4 Neb., 441; *Hamilton v. Thrall*, 7 Neb., 219; *Delaney v. Linder*, 22 Neb., 274; *McNish v. Reynolds*, 95 Pa. St., 483; *Dodge v. Kiene*, 28 Neb., 221; *Cor-*

*nell v. St. Louis, K. & A. R. Co.*, 25 Kan., 615; *Hopkins v. St. Louis & S. F. R. Co.*, 16 Am. & Eng. R. Cases [Kan.], 126; *Emery v. Mohler*, 69 Ill., 221; *Davis v. Symonds*, 1 Cox's Ch. [Eng.], 402; *Savercool v. Farwell*, 17 Mich., 308; *Long v. New York C. R. Co.*, 50 N. Y., 76.)

The plaintiffs, in so far as they seek to recover for items that went into the construction of the Denver, Memphis & Atlantic Railway Company, cannot recover in this action for the reason that the Denver, Memphis & Atlantic Company is not made a party defendant. (*Pullman Palace Car Co. v. Missouri P. R. Co.*, 115 U. S., 596; *Atchison, T. & S. F. R. Co. v. Davis*, 34 Kan., 209.)

RYAN, C.

1. In the district court of Lancaster county, Nebraska, John Fitzgerald, on behalf of himself and all other stockholders of the Fitzgerald & Mallory Construction Company, filed his petition against said Construction Company and the Missouri Pacific Railway Company as defendants. This petition stated that the capital stock of the aforesaid Construction Company amounted to $1,500,000, divided into shares of $100 each; that of these, at the time of bringing suit, John Fitzgerald was the owner of 1,500 shares, Jay Gould of 4,000 shares, Sidney Dillon of 1,000 shares, Morton, Bliss & Co. of 2,000 shares, Russell Sage of 2,700 shares, George J. Gould of 500 shares, and S. H. Mallory of 1,500 shares. The matters complained of in the petition, for the most part, arose out of a written contract made between the said Construction Company and the Denver, Memphis & Atlantic Railroad Company, whereby was undertaken by the Construction Company the building of the line of road of the railroad company. Following this contract there was entered into another between the aforesaid Construction Company and the Missouri Pacific Railway Company, whereby the last named company be-

came entitled to the stock and bonds of the Denver, Memphis & Atlantic Railroad Company to be issued to the Construction Company in consideration of its construction of the railroad aforesaid.   The other matters which gave rise to this controversy had their origin in the construction by said Construction Company of the line of railroad of the Pueblo & State Line railroad, and the subsequent ownership of the stock and bonds of said Pueblo & State Line Railroad Company issued to the Construction Company, and by said Construction Company turned over to the Missouri Pacific Railway Company.   For the stock and bonds of both railroads to be constructed as aforesaid the Missouri Pacific Railway Company agreed to give to the Construction Company first mortgage bonds of the said Missouri Pacific Railway Company equal to $11,000 per mile of the railroads completely constructed by the said Construction Company as aforesaid.   The petition averred that payment in bonds was in fact only made at the rate of $10,000 per mile, though the roads had been fully constructed; that the Missouri Pacific bonds received at that rate were purchased by certain named officers of the Missouri Pacific Railway Company at a discount of ten per cent, though said bonds were worth par; that though the agreed rate at which the Missouri Pacific Railway Company was to transport material necessary for the construction of the work aforesaid was at the rate of three-fourths of a cent per ton per mile, in fact for a large amount of said material there was charged and collected from the Construction Company payment at the rate of three cents per ton per mile, which excess, the said petition alleged, was still due the said Construction Company; that said Missouri Pacific Railway Company's officers, by collecting interest which was not in fact due, and upon other unfounded pretenses, had exacted and withheld from the Construction Company large sums of money, for which said Missouri Pacific Railway Company ought to be held to account.   There were other mat-

ters complained of in the petition, but for our present purpose the above described causes of action are amply sufficient.

That it might appear that the suit was brought by Mr. Fitzgerald as a stockholder of the Construction Company, he made the following averments in reference to certain of the matters above described:

"Complainant says that shortly after said contracts were made, those owning a controlling share of the stock of the Missouri Pacific Railway Company procured a controlling share of the stock of the Construction Company, notably Jay Gould, Russell Sage, George J. Gould, and Sidney Dillon; that at the date of said contracts the directors of the Construction Company were as follows: John Fitzgerald, S. H. Mallory, S. S. King, T. M. Stewart, and Edward A. Temple, who were the directors at the time the said contracts were made and entered into; that after they had obtained control of this stock they demanded the resignation of all the directors except Fitzgerald and S. H. Mallory, and on November 3, 1886, the said board of directors was changed, and in place of Messrs. King, Stewart, and Temple were elected George J. Gould, Russell Sage, and Richard Cross; that two of said directors, complainant afterward found out, were directors in the Missouri Pacific Railway Company, and that said Richard Cross was a member of a firm which were bankers for the Missouri Pacific Railway Company, and that the directors were absolutely under the control of the Missouri Pacific management; that this board of directors has not been changed, except that George J. Gould has gone out and Sidney Dillon, another Missouri Pacific director, and one of its largest stockholders, has been elected in his stead, and that now the said three directors have assumed and had the management in all important matters of said Construction Company, and have managed its affairs in the interest of the Missouri Pacific Railway Company, and have

been, as will hereinafter more clearly appear, under the control of Jay Gould, the president of the Missouri Pacific Railway Company, the largest owner of its stock, and who controls it. ` * * * That the payment of only $10,000 per mile in five per cent bonds for the first one hundred and fifty miles was brought about by the fraudulent acts of the Missouri Pacific, as follows : That by the contract with the Denver, Memphis & Atlantic Railroad Company the Construction Company was to build a rail-road from the east line of Kansas to the west line thereof and equip the same as to be thereafter located, and properly grade the line according to the engineer's survey of the same."

Plaintiff alleged that the first one hundred and fifty miles of the line of the Denver, Memphis & Atlantic Rail-road was constructed according to contract and fully completed, but that by reason of the refusal of the Missouri Pacific Railway Company to allow its engineer to accept the said one hundred and fifty miles with a view to its acceptance in accordance with the terms of the contract, the Construction Company was unable to secure its acceptance by the Missouri Pacific Railway Company, and that to secure payment for the said one hundred and fifty miles the Construction Company was compelled to accede to the proposition of Jay Gould, the president of the Missouri Pacific, and to accept $10,000 per mile, which, as plaintiff alleged, had already been fully earned. The petition alleged that the pretense upon which the president of the Missouri Pacific Railway Company founded the claim of that company to a reduction of payment per mile was, that the road was not completed, and, as plaintiff alleged, this was untrue in fact, and that the road was then fully completed according to the terms of the contract, as would have been found had the civil engineer of the Missouri Pacific inspected the road as was contemplated by the contract between the Construction Company and the Missouri Pacific Railway Company, and

that for these reasons the reduction of $1,000 per mile exacted and compelled was wholly without consideration, for which reason, as the plaintiff alleged, the Missouri Pacific Railway Company was still indebted to the Construction Company to the amount of the discount aforesaid with interest thereon.

Plaintiff further alleged that on or about the middle of February, and just before the first bonds of the Missouri Pacific Railway Company for $1,500,000 were issued and delivered to the Construction Company, the Missouri Pacific Railway Company issued $4,666,000 par value of its bonds and sold them to its president, Jay Gould, at par, so that afterwards, when the $1,500,000 were delivered to the Construction Company, the president of the Missouri Pacific Railway Company held the amount already stated and had entire control and could manipulate as he pleased the price and issue of bonds of the said Missouri Pacific Railway Company.

The petitioner further alleged that the Missouri Pacific directors, Sidney Dillon and Russell Sage, together with R. J. Cross, who acted with them, had control of the Construction Company, and that the management of the Missouri Pacific Railway Company controlled the Construction Company the same as it controlled the Missouri Pacific Company, hence it placed the bonds at once in the hands of Jay Gould and others in the management of and stockholders in the Missouri Pacific Railway Company; that on the 29th day of July, 1887, there were earned and due by the completion of the road under contract to the Construction Company, from the Missouri Pacific Railway Company, nearly $4,171,000 worth of the five per cent bonds which were undelivered (except $1,500,-000 of the same); that on that date, or the day before, the Missouri Pacific management, in order to injure and violate the contract it had made with the Construction Company, and in order to bankrupt and make said Construction Com-

pany worthless, took the action shown by the record of the Construction Company, hereinafter fully set out, with reference to the discount of ten per cent on $5,000,000 par value of bonds of the Missouri Pacific Railway Company owned by the Construction Company. In reference to the meeting at which the action was had as described in the record referred to, the plaintiff alleged that he and S. H. Mallory, two of the directors and stockholders of the Construction Company, had no notice. That in accordance with said resolution the said three directors, combining with Jay Gould, proceeded to sell or dispose of said bonds, or of all said bonds that had been issued to the Construction Company, and the $2,500,000 borrowed of Jay Gould. The petition then in detail stated the manner in which the bonds of the Missouri Pacific Railway Company were disposed of on the basis of ninety cents on the dollar, the recipients being Morton, Bliss & Co., and certain named holders of stock of the Missouri Pacific Railway Company. The amount of bonds distributed is shown by this detailed statement to have reached in the aggregate the sum of $8,200,000. In the petition the plaintiff used the following language:

"Complainant further alleges that the withholding of the delivery of the bonds by the Missouri Pacific Railway Company; that the pressing of spurious accounts that did not exist; that the loaning of $2,500,000 by Gould when there was more than that due from the Missouri Pacific Railway Company, was a conspiracy in which the Missouri Pacific was the principal actor, and done for the purposes and benefit of the Missouri Pacific, and particularly for the benefit of its management, and to the great damage of the Construction Company in the sum of at least $700,000, and that this does not include $62,500 of interest that the Construction Company was forced to pay on account of the failure of the Missouri Pacific to deliver bonds due, and the unlawful acts of the directors in borrowing. Com-

plainant submits that the act of July 28, 1887, when the meeting was called and action taken without notice to either Mr. Mallory or your complainant, was null and void, and was not binding upon complainant.

"Complainant further says that without their knowledge the Missouri Pacific management, in taking stock in the Construction Company, that is, the persons who governed both companies, to-wit, Jay Gould, George J. Gould, Russell Sage, and Sidney Dillon, who owned a majority of the stock of the Missouri Pacific, and likewise a majority of the stock of the Construction Company, so arranged that they owned such stock proportionately to the amount of the stock in each company, so that any act which would injure or damage the Construction Company, and which would benefit the Missouri Pacific Company, would not in any way affect them, and that their acts were done for the purpose of bankrupting and injuring the Construction Company to its great injury.   *   *   *

"Complainant further says that the Construction Company was the owner of three town sites and a great body of real estate along the entire line of the Denver, Memphis & Atlantic railroad and the Pueblo & State Line railroad, which it is of great interest to the Missouri Pacific to get control of, and that the acts of oppression and wrong and of fraud, and of violation of the contract, have been for the sole purpose of getting control of the same and of freezing out all stockholders except the management of the Missouri Pacific; and as a part of the scheme by which this was to be done, about the time the work was finished and the contracts completed, that it had to do for the Missouri Pacific Railway Company, the Missouri Pacific Railway directors who had control of the Construction Company had in fact peremptorily refused to raise money to pay off the contractors, laborers, and persons who had done the work, but allowed the debts of some $70,000 or $80,000 for that purpose to accumulate, know-

ing at the time that Mr. Mallory and Mr. Fitzgerald had personally obligated themselves to pay said debts, and as soon as they found out that they were personally obligated to pay the same they refused to take any steps toward paying the debts which had been contracted, and they were forced to pay the same, and that your complainant was forced to sue the Construction Company individually, and that the Missouri Pacific tried every means to defeat these just claims and put your petitioner to large expense, but that he now holds a judgment against the said Construction Company in round numbers of $52,000, with interest, amounting to $55,000; that there are other debts and other judgments against the Construction Company which the said directory in New York refuses to make any provision for, and has refused to allow any settlement to be made, and that on the last of May, 1888, they refused to allow any salaries to any officers to settle up the business of the Construction Company out of the salaries of the officers.  This was done for the purpose that the heavy burden placed upon your complainant should be borne by him, with the hope of crushing and bankrupting the concern and making him pay the same and freezing him out of the Construction Company; that there are other debts, amounting in all to probably $100,000, which are unpaid and which the directory of the Construction Company, under the control of the Missouri Pacific, have refused to take any steps to pay, but that the directory, in order to bankrupt the Construction Company, have commenced spurious cases in Kansas, alleging that the company was about bankrupt, and assuming the right, and with an attorney employed by Sidney Dillon and Russell Sage, to go into court and make an accounting with the Missouri Pacific; that since the commencement of this suit the said stockholders of the Construction Company, namely, Jay Gould, George J. Gould, Sidney Dillon, and Russell Sage, who hold a majority of the stock, have sent their proxies to the attorney of the

Missouri Pacific Railway Company with instructions for him to elect another director of the Missouri Pacific, A. L. Hopkins, who is and has been an employe of the Missouri Pacific, and who has always acted with them, and is a director and large stockholder of the Missouri Pacific Company. The stockholders, by this action, and by the election of the directors of the Missouri Pacific Railway Company, making a majority of the board and controlling all the directors of it but one, have incapacitated themselves to act in any matters where the Missouri Pacific is concerned, and makes it an absolute necessity that a receiver be appointed for the purpose of paying the debts and winding up the affairs of the corporation."

The petition closed with a prayer for such a judgment in favor of the Construction Company against the Missouri Pacific Railway Company as upon an accounting it should be found entitled to, and for other equitable relief. This lengthy and perhaps tedious quotation from the petition of the plaintiff has been rendered necessary, in order that it might appear what averments have been made, with a view to accounting for the failure of the directory of the Construction Company to seek the relief demanded for said Construction Company against the Missouri Pacific Railway Company in this action; and furthermore, to show in what manner the plaintiff excuses the commencement of this suit by himself as a stockholder, for the enforcement of the aforesaid rights of the Construction Company, since neither the findings of the court nor the evidence adduced showed a demand to have been made prior to suit brought as alleged in the petition for the commencement of an action for the relief herein prayed.

2. In argument it was insisted, with great tenacity, that it was necessary in every case to show that a demand had actually been made by the stockholder, upon the directors that they move for the protection of the corporation, and that their refusal be shown before an action might be com-

menced on the relation of a stockholder to enforce the rights of such corporation.   Ordinarily, perhaps, this contention is correct.   In the case at bar, however, it was sufficiently shown and found that the directors of the Construction Company were so immediately under the control of the management of the Missouri Pacific Railway Company, against whom suit must be brought, and had in connection with that management shown such a disposition to betray the interest of the company in favor of which they owed their best endeavors, that an application to them as directors to act was altogether unnecessary.

In section 886 of Beach on Private Corporations the following language occurs: " Where a request that the corporation itself bring the desired suit is apparently useless, it is excused, and need not be made.   Accordingly, where the directors of a corporation having the authority to direct its litigation are themselves guilty of the wrong complained of, a court of equity will interfere at the instance of the stockholders without a demand and refusal upon the part of the directors to bring the suit, for it would be against the plainest principles of justice to permit the perpetrators of the wrong to conduct a litigation against themselves."

In *Barr v. New York, L. E. & W. R. Co.*, 96 N. Y., 444, Miller, J., delivering the opinion of the court, said: "We are referred by the learned counsel for the appellants to the case of *Hawes v. Oakland* (14 Otto [U. S.], 450) as authority for the doctrine that no action can be maintained by a stockholder of a corporation under the allegations contained in the complaint in the action at bar.   We do not think the case cited sustains the position contended for. It is there laid down that where the board of directors of a corporation is acting in a manner destructive of the rights of the other shareholders, or where the majority of the shareholders themselves are oppressively and illegally pursuing a course in the name of the corporation which is in violation of the rights of the other shareholders, and which can

only be restrained by the aid of a court of equity, an action to obtain relief may be maintained by a stockholder."

In Cook·on Stock and Stockholders and Corporation Law, section 741, we find this statement of the rule: " There are occasions when the allegation that the stockholder has requested the directors to bring suit, and they have refused, may be omitted, since the request itself is not required. This occurs when the corporate management is under the control of the guilty parties. No request need then be made or alleged, since the guilty parties would not comply with the request, and even if they did the court would not allow them to conduct the suit against themselves." This is believed to be a correct statement of the rule. · At least, in no case cited has it transpired that under allegations like those in the petition under consideration, relief has been denied. The action was, therefore, properly commenced and prosecuted by John Fitzgerald as a stockholder of· the Construction Company, for the enforcement of its rights against its co-defendant, the Missouri Pacific Railway Company. The prayer of the petition was for judgment in favor of said Construction Company against its co-defendant, the Missouri Pacific Railway Company. The findings of the court and its judgment were in accordance with that prayer.

In the further consideration of this case it must be borne in mind that while John Fitzgerald, as a stockholder, has a standing to allege the grounds of indebtedness as between the Construction Company and its co-defendant, and to pray for proper relief, such relief is in no way prayed on his own behalf individually, but on behalf of the Construction Company as a corporation; as much so as if the action had been begun by authority of its directors and in its own name.

3. Incidentally it was stated in the petition that a receiver had been appointed for the Construction Company in a court of general jurisdiction ·in Kansas; and it also

appears from the record that another receiver was appointed for the same company in a court of general jurisdiction in Iowa. The appellees insist that, it having appeared that a receiver had been appointed, such receiver is an indispensable party in this case.

In Beach on Receivers, section 680, the following language occurs: "The general rule as to the right of a receiver to bring suits in the courts of other states than that in which he is appointed is well settled. It has been stated by Mr. Justice Wayne in a leading case to be, 'that he has no extra-territorial power of official action; none which the court appointing him can confer with authority to enable him to go into a foreign jurisdiction to take possession of the debtor's property; none which can give him, upon the principle of comity, a privilege to sue in a foreign court or another jurisdiction, as the judgment creditor himself might have done where his debtor may be amenable to the tribunal which the creditor may seek;' [citing *Booth v. Clark*, 17 How. [U. S.], 322–338]. The rule thus laid down by the supreme court of the United States has been followed by other courts with essential unanimity, and can hardly be said to be seriously questioned. [In support of this proposition there are cited many authorities.] Applying this rule, it was held that a receiver of the effects of a debtor, appointed by a court in New York, had no right to file a bill in the District of Columbia for the purpose of obtaining possession of funds due to the debtor, the appellate court affirming the action of the court below in dismissing the bill."

This rule is thus discussed in section 47 of High on Receivers: "Questions of much nicety have sometimes arisen in this country as to the extent to which the courts of one state will recognize the functions and powers of a receiver appointed in another state, and as to the right of such receivers to act beyond the territorial jurisdiction of the court appointing them. The better doctrine upon this

subject undoubtedly is, that the legal authority of a receiver is co-extensive only with the jurisdiction of the court appointing him, and that as a matter of strict right, the courts of one state are not bound to recognize a receiver appointed in a foreign state. The rule is founded upon the recognized principle that the laws of one state have no force *proprio vigore* beyond the territorial limits of such state, although, upon considerations of courtesy or comity, they may be permitted to operate in another state for the promotion of justice, when neither the latter state nor its citizens will suffer any inconvenience from the application of the foreign law."

This rule, which is laid down with so much confidence by the two text-writers from which quotations have been made, is doubtless correct.

4. The relations, rights, and duties between the Denver, Memphis & Atlantic Railroad Company and the defendants in this action are created and defined by written contracts which are in the words and figures following:

"This agreement, made this 28th day of April, 1886, by and between the Fitzgerald & Mallory Construction Company, of the state of Iowa, party of the first part, and the Denver, Memphis & Atlantic Railway Company, a corporation duly organized under the laws of the state of Kansas, party of the second part, witnesseth: Now, therefore, it is agreed between the parties hereto as follows: The party of the first part agrees to furnish all materials and money and to construct as rapidly as may be determined, from time to time, between the parties hereto a line of railroad from the east line of Kansas to the west line thereof, and equip the same as the same may be hereafter located; to properly grade the line according to the engineer's survey of the same; to furnish oak ties on curves not less than thirty-six hundred to the mile, and steel of not less than fifty-six pounds to the yard; to build such depots and stations as may be determined upon by the party of the

second part; to build all necessary sidings and turn-outs, and generally to construct the same equal to the railroads now being built in southern Kansas; and upon the completion thereof, to equip the same with, at least, one thousand dollars ($1,000) of rolling stock per mile. In consideration thereof, and in payment therefor, the party of the second part agrees to pay to the party of the first part sixteen thousand dollars ($16,000) per mile of its full paid capital stock for every mile of completed road to be constructed, and sixteen thousand dollars ($16,000) per mile in its first mortgage bonds per mile of single track of road, and said bonds to be of the denomination of one thousand dollars ($1,000) each, or of such denomination as may be agreed upon by the parties hereto, and bearing interest at the rate of —— per cent per annum, payable in the city of New York and state of New York, where the principal is also payable. Said bonds to be issued for the construction of said road under this contract shall be dated January 1, 1886, and run thirty years from date, and to be secured by first deed of even date herewith, duly executed by the party of the second part to the —— Company, therein named, of the aforesaid line and branches thereof. The said Denver, Memphis & Atlantic Railway Company hereby agrees to issue and deliver to said party of the first part the said stock and bonds at the rate hereinbefore set forth, at such times and in such settlements as the said Fitzgerald & Mallory Construction Company require in order to obtain the money necessary to perform this contract; and also to deliver to said first party all municipal and county bonds voted and to be voted in aid of said railroad, and all donations thereto, as soon as earned and delivered to said second party; and said Fitzgerald & Mallory Construction Company covenants and agrees to proceed forthwith in the execution of this agreement and to construct said line as rapidly as possible according to the surveys now made or to be hereafter determined upon; and the said party of the second part

agrees to procure, or cause to be procured, the right of way of said line of railroads at the proper time in advance of the work so as not to impede or delay construction, which right of way shall be paid for by said Construction Company.

"In witness whereof, the said Fitzgerald & Mallory Construction Company, by their president, has hereto set their hand and seal, and said party of the second part has caused its corporate name to be signed by its president and its corporate seal to be attached by its secretary the day and year first above named.

"FITZGERALD & MALLORY CONSTRUCTION COMPANY,
    "By its President, S. H. MALLORY.
"THE DENVER, MEMPHIS & ATLANTIC RAILWAY,
    "By J. J. BURNS, *Its President.*
"Attest:
    "CHAS. C. BLACK, *Secretary.*

"Memorandum of an agreement, made on this 4th day of May, 1886, between the Missouri Pacific Railway Company, party of the first part, and the Fitzgerald and Mallory Construction Company, party of the second part, witnesseth: Whereas, the party of the second part has made a contract with the Denver, Memphis & Atlantic Railway Company to construct its road from Chetopa across the state of Kansas, on a line heretofore agreed upon (a copy of which is hereto attached and made a part of this agreement); and, whereas, the Missouri Pacific Railway Company is desirous of obtaining control of the said line of road, it is agreed as follows:

"First—The party of the second part will sell to the party of the first part all of the securities which the said party of the second part is to receive under the terms of the contract dated April 28, 1886, between the said Fitzgerald & Mallory Construction Company and the Denver, Memphis & Atlantic Railway Company, for the construction of its road, and said securities amounting to sixteen

thousand dollars ($16,000) per mile of stock, and sixteen thousand dollars ($16,000) per mile of first mortgage bonds, less the amount of stock that has to be given for municipal and county aid (estimated at about thirty-five hundred dollars ($3500) per mile), and receive in full payment for the same twelve thousand dollars ($12,000) per mile of Missouri Pacific Railway five per cent bonds, to be secured by a deposit of the securities above referred to with a trustee.

"Second—The party of the second part further agrees that the said railroad to be constructed, and heretofore described, shall be of standard gauge, of not less than fifty-six pounds (56) steel rails, twenty-six hundred (2,600) ties to the mile, with stations not more than eight (8) miles apart, * * * and shall be equal in its general character to the roads now being constructed by the Missouri Pacific Railway Company in the state of Kansas, all to be subject to the approval of the chief engineer of the party of the first part.

" In witness whereof, the Missouri Pacific Railway Company and the said Fitzgerald & Mallory Construction Company, parties hereto, have executed this agreement the day and year first above written.

"THE MISSOURI PACIFIC RAILWAY COMPANY,
"[SEAL.]   By JAY GOULD, *President.*

"Attest:
. "GUY PHILLIPS, *Second Ass't Secretary.*
"THE FITZGERALD & MALLORY CONSTRUCTION
COMPANY,
"By S. H. MALLORY, *President.*"

"ADDENDA TO CONTRACT.

"It is further agreed that the party of the first part shall make payments for the sixteen thousand (16,000) dollars per mile of first mortgage bonds and sixteen thousand (16,000) dollars per mile of stock, referred to in the first clause of this contract, as follows: On the completion

of each ten miles of road according to the contract from not more than two points connecting with the road of the party of the first part, and on receipt of the sixteen thousand (16,000) dollars per mile of first mortgage bonds and sixteen thousand (16,000) dollars per mile of stock appertaining thereto (less the amount paid out for aid), the party of the first part will deliver to the party of the second part twelve thousand (12,000) dollars per mile of its five per cent bonds according to the above agreement.

"The party of the first part also agrees that all men and materials used by the party of the second part in the construction of the said railroad shall be transported at actual cost over such portions of the road as may be turned over to the party of the first part during the construction of the same.

"THE MISSOURI PACIFIC RAILWAY CO.,
"By JAY GOULD, Pres't.
"FITZGERALD & MALLORY CONSTRUCTION CO.,
"By S. H. MALLORY, Pres't."

The Denver, Memphis & Atlantic Railway Company was originally incorporated for the purpose of constructing a railroad from Denver to Memphis, through the state of Kansas. Its authoritized capital stock was $10,000,000, but by its articles of incorporation the value of its property was estimated at only $10,000. This railroad company was distinguished not so much for its possessions as for its capacity, as readily appears from the figures just given, as well as from the additional consideration that in the future it could exercise the right of eminent domain, and in exchange for its stock receive municipal aid along its proposed line through the state of Kansas. It is possibly true that the laws of the state last named should not have permitted this exchange, and yet it is not within the province of this court to pass upon the wisdom of the statutes of another state. The municipalities whose bonds were voted to aid this enterprise were fully apprised by

the articles of incorporation of the proposed donee that its
authorized capital was $10,000,000, while it was patent that
its property was of the value of but $10,000.   Under these
circumstances, if the Kansas municipalities coveted an inter-
est in this authorized capital stock, and the laws of that state
sanctioned the acquisition of a part of such stock by an
exchange therefor of municipal bonds, this court cannot
interpose a veto to such transactions, no matter upon what
scale they may have been carried on.   We have neither
jurisdiction to question the law, nor do the municipalities
concerned ask us so to do.   With more courage than judg-
ment, perhaps, Messrs. Fitzgerald & Mallory attempted to
secure control of the leverage offered by the railroad com-
pany to obtain bonds of the municipalities of the state of
Kansas lying along the route of the railroad, but later
they found their means inadequate to this undertaking.
Under stress of financial difficulties, Messrs. Fitzgerald &
Mallory applied to the managing officers of the Missouri
Pacific Railway Company for assistance.   As a condition
precedent to the Missouri Pacific Railway Company's com-
pliance, its officers required that a construction company
should take the place of Messrs. Fitzgerald & Mallory as
contractors.   The memorandum of agreement of May 4,
1886, was thereupon entered into between the substituted
construction company and the Missouri Pacific Railway
Company.   A significant part of the preambles with
which this contract began was the recitation of the desire
of the Missouri Pacific Railway Company to obtain control
of the line of railroad to be constructed.   As the construc-
tion of the railroad line progressed, stock of the Denver,
Memphis & Atlantic Railway Company at the rate of
$16,000 per mile, less $3,500 per mile intended to be ex-
changed for municipal aid bonds, and $16,000 per mile of
its bonds secured by first mortgage on its line, were issued
and delivered to the Construction Company in payment
for such construction.   Exclusive of $1,000 per mile for

the purchase of rolling stock equipment (which provision was afterwards abandoned), the above contract between the Fitzgerald & Mallory Construction Company and the Missouri Pacific Railway Company provided that full payment should be made to the Construction Company in the Missouri Pacific Railway Company's bonds, bearing five per cent annual interest, issued at the rate of $11,000 per mile of constructed railroad. It is possible that at one time the municipalities which issued their bonds might have been relieved in a proper forum as against the inadequacy between the stock issued to them and the aid bonds given in exchange for them. These dealings, at most, authorized the election to treat the bonds as voidable, not necessarily void, provided the right of election was exercised in due time and before other rights had accrued. In so far as our action should be governed by considerations of public policy, it seems quite clear that the inadequacy referred to should not be given great prominence, not only on account of what has already been said, but because of the fact that on the 1st day of January, 1887, the Missouri Pacific Railway Company executed a trust mortgage to secure its negotiable five per cent bonds to be issued in the aggregate not in excess of fifteen million dollars, and as part of "the underlying securities" for the payment of these bonds, there were deposited with the trustee named in the mortgage, the bonds of the Denver, Memphis & Atlantic Railway Company, and other companies whose lines of railroad were constructed under much the same contracts as those above set out, made between the same parties. After the lapse of several years, it is fair to assume that these negotiable bonds have passed into the hands of innocent purchasers for value, whose rights should not unnecessarily be ignored. It seems to the writer hereof that an inquiry into the original motives and conduct of the parties not involved in this litigation is unnecessary, and in view of the rights of the holders of the bonds of

the Missouri Pacific Railway Company such an inquiry
might be very mischievous.    There are no pleadings in the
record upon which questions of public policy, as affecting
the status of the parties to this controversy, are presented.
The building of railroad lines were legitimate enterprises—
possibly there may have been too great a margin for the
work undertaken with its incidental risks.    The roads have
been built and no one questions that this is so.    To us are
presented simply questions as to the rights of the parties to
the proceeds earned under contracts which in their inception
at most were not void, but voidable only.    No one con-
cerned elects to treat them as void; we should hesitate long
before becoming the moving party in that direction.

Due issues were made up as to all claims asserted by each
party, upon the trial of which the district court made special
findings as to each subject of controversy, and rendered a
judgment, from which both parties appeal—the Construc-
tion Company by John Fitzgerald, however, having first
completed its appeal, has hereinbefore been styled the ap-
pellant.    The pleadings in this case are very voluminous,
and as the gist of the controversy is for all practicable pur-
poses sufficiently set out in the findings of the district
court, they, rather than the averments of the pleadings,
will be hereinafter resorted to for a statement of the mat-
ters of difference between the parties litigant.

5. In a review of the issues joined it is evident that the
liability of the Missouri Pacific Railway Company for such
acts as were charged against its officers in the discharge of
their duties, as such, should first receive attention, since it
is insisted by defendants that these acts cannot be imputable
to the railway company itself.

The following apt language is employed by Harlan, J.,
in the opinion of the supreme court of the United States,
in *Denver & R. G. R. Co. v. Harris*, 122 U. S., on page 607:
"In *Philadelphia, W. & B. R. Co. v. Quigley*, 21 How.
[U. S.], 202, this court held that a railroad corporation was

responsible for the publication by them of a libel in which the capacity and skill of a mechanic and builder of depots, bridges, station houses, and other structures for railroad companies were falsely and maliciously disparaged and undervalued. The publication in that case consisted in the preservation in the permanent form of a book for distribution among the persons belonging to the corporation, of a report made by a committee of the company's board of directors, in relation to the administration and dealings of the plaintiff as a superintendent of the road. The court, upon a full review of the authorities, held it to be the result of the cases 'that for acts done by the agents of a corporation, either *in contractu* or *in delicto*, in the course of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances.' In *State v. Morris & E. R. Co.*, 23 N. J. Law, 369, it was well said that if the corporation has itself no hands with which to strike, it may employ the hands of others; and it is now perfectly well settled, contrary to the ancient authorities, that a corporation is liable *civiliter* for all torts committed by its servants or agents by authority of the corporation, express or implied.  *  *  *  The result of the modern cases is that a corporation is liable *civiliter* for torts committed by its servants or agents precisely as a natural person, and that it is liable as a natural person for the acts of its agents done by its authority, express or implied, though there be neither a written appointment under seal nor a vote of the corporation constituting the agency or authorizing the act. (See, also, *Salt Lake City v. Hollister*, 118 U. S., 256–260; *New Jersey Steamboat Co. v. Brockett*, 121 U. S., 637; *First Nat. Bank of Carlisle, Pennsylvania, v. Graham*, 100 U. S., 699–702.)"

In *Booth v. Farmers & Merchants Bank*, 50 N. Y., on page 400 *et seq.*, is found the following language: "When an officer does an act which is within the general scope of his powers, although circumstances may exist which render

the particular act a violation of his duty, the corporation is nevertheless bound by his act as to persons dealing in ignorance of those circumstances, and is responsible to innocent third parties who have sustained damages occasioned by such act. And the liability of the corporation for the consequences of acts of its officers done within the scope of their general powers is not affected by the fact that the act which the officer has assumed to do is one which the corporation itself could not rightfully do. A corporation may do wrong through its agents as well as a private individual. (*New York & N. H. R. Co. v. Schuyler*, 34 N. Y., 30; *Farmers & Mechanics Bank of Kent County, Maryland, v. Butchers & Drovers Bank*, 16 N. Y., 125; *Bissell v. Michigan S. & N. I. R. Co.'s*, 22 N. Y., 258; *Bank of Genesee v. Patchin Bank*, 13 N. Y., 309.)"

In *Hussey v. King*, 3 S. E. Rep. [N. Car.], on page 926, Davis, J., delivering the opinion of the court, said : "It was long thought that as the corporation had no mouth with which to utter slander, or hand with which to write libels or commit batteries, or mind to suggest malicious prosecutions or other wrongs; as it was an artificial person and could speak and act only through and by the agency of others, it was therefore not liable for any torts except such as resulted from some act of commission or omission of its agents or servants while acting within the scope of granted powers, or wrongfully omitting or neglecting some duty imposed by its charter or by law; and, consequently, it was necessary to allege that the act committed was while acting within the scope and power of the company; or that the act omitted was required to be performed. Whether it was wise to depart from this rule that exempted corporations from liability for the acts of agents in cases where the character of the act depended upon motive or intent, seems no longer an open question. The old idea that because a corporation had no 'soul' it could not commit torts or be the subject of punishment for tortious acts, may now be

31

regarded as obsolete.    The rights, the powers, and the du-
ties of corporate bodies have been so enlarged in modern
times, and these 'artificial persons' have become so numer-
ous and enter so largely into the every-day transactions of
life, that it has become the policy of the law to subject
them, as far as practicable, to the same civil liability for
wrongful acts as attach to natural persons, and this lia-
bility is not restricted to acts committed within the scope
of granted powers, but a corporation may be liable to an
action '.for false imprisonment, malicious prosecution, and
libel.'  (Pierce, Railroads, 273.)"

In *Miller v. Burlington & M. R. R. Co.*, 8 Neb., 219, it
was said that a corporation is liable the same as a natural
person for the tortious acts of its servants and agents in the
course of their employment, but to make a corporation lia-
ble for such acts, they must be connected with the transac-
tion of the business for which the company was incorpo-
rated, for the officers themselves are the mere agents of the
corporation, and their powers are necessarily limited within
the scope of the purposes of the corporation.    The stock-
holders, however, by electing officers, assume the risk of
the faithful or unfaithful management of the corporation,
and cases may arise when if one of two innocent persons
has to suffer, the one who has created the power and se-
lected the persons to enforce it must sustain the loss.

The citation of other authorities upon a point which
may now be considered settled would be a work of super-
erogation, in no way rendering more clear the principles
established by the consensus of the above adjudicated cases.
A fuller and more elaborate consideration · of the subject
could easily be had by mere quotation from the language
of section 698 of Cook on Stock and Stockholders and
Corporation Law, but the space thereby occupied would be
needlessly so taken up, for the result reached in each in-
stance is the same as that enunciated in the opinions from
which quotations have already been made.

6. In *Worthington v. Worthington*, 32 Neb., 338, 339, NORVAL, J., said: "It is well settled in this state that the finding of the district court on conflicting evidence is conclusive on appeal to the supreme court, unless there is a clear preponderance of evidence against the finding. (*Brown v. Hurst*, 3 Neb., 353; *Helling v. New England Mortgage Security Co.*, 10 Neb., 611; *Courtnay v. Price*, 12 Neb., 188; *Jennings v. Simpson*, 12 Neb., 558; *Aultman v. Patterson*, 14 Neb., 57; *McLaughlin v. Sandusky*, 17 Neb., 110.)"

A patient and careful examination of all the testimony adduced upon the trial before Judge Tibbets serves to justify the confidence in the trial judge which this rule implies, as well as to place us under great obligations for his thorough analysis of the evidence adduced, and his comprehensive findings of the facts thereby established. No other apology or explanation is deemed necessary to account for the free use which shall be made of the findings of fact thus made by the trial court. Referring to the contracts, which have already been copied, the twelfth finding of fact was as follows:

"(12.) That said agreements were, by all the parties thereto, subsequently modified and changed to the effect that the furnishing of the equipment for the road to be constructed was waived by the railroad company, and the amount to be received by the Fitzgerald & Mallory Construction Company from the Missouri Pacific Railway Company was reduced to eleven thousand ($11,000) dollars per mile, to be paid in Missouri Pacific five per cent bonds."

Immediately succeeding this are the following findings of fact:

"(13.) That under the said contract the said Fitzgerald & Mallory Construction Company constructed in the state of Kansas four hundred and ten and forty-eight hundredths miles of railroad, extending from Chetopa, in eastern Kansas, west to Larned, a distance of two hundred and seventy-two and two-hundredths miles, and from McCracken west

to the state line, a distance of one hundred and thirty-eight and forty-six hundredths miles; that the said road was constructed by the said Construction Company in every respect in compliance with the terms of said contracts.

"(14.) On the 15th day of June, 1886, the said Construction Company had ten miles of said road completed and ready for delivery to the Missouri Pacific Railway Company; that on the 15th day of July, 1886, the Construction Company had thirty miles of said road completed and ready for such delivery; that on the 14th day of February, 1887, the Construction Company had one hundred and fifty miles of said railroad completed and ready for delivery, with the exception of some finishing work upon the road-bed, bridges, and cattle guards; that on August 1, 1887, said road was entirely completed.

"(15.) That said railroad was turned over and delivered to the defendant, the Missouri Pacific Railway Company, by the defendant, the Fitzgerald & Mallory Construction [Company], as follows: One hundred and fifty miles on the 14th day of February, 1887; twenty-nine and eighty-three hundredths miles on the 11th day of August, 1887; ninety-three and fifty-seven hundredths miles on the 11th day of August, 1887; one hundred and twenty-four and forty-two hundredths miles on the 1st day of October, 1887; twelve and eighty-two hundredths miles on the 15th day of December, 1887.

"(16.) That for the purpose of extending the line of railroad heretofore recited in these findings to be built from the western line of the state of Kansas to the city of Pueblo in the state of Colorado, the said Fitzgerald & Mallory Construction Company and the said the Missouri Pacific Railway Company on the —— day of ——, 1887, caused to be incorporated, under the laws of the state of Colorado, the Pueblo and State Line Railroad Company, with power to construct and operate a line of railway from the western line of Kansas to said city of Pueblo.

"(17.) That on the 16th day of August, 1887, the Fitzgerald & Mallory Construction Company entered into a contract with the Pueblo & State Line Railroad Company, wherein the said Construction Company agreed to furnish all material and construct a railway commencing at or near the city of Pueblo, state of Colorado, thence running eastward to the state line of Kansas, and to furnish and pay for the right of way for the said railway, the work and construction of said railway to be done in accordance with the terms of said contract, and to the satisfaction of the resident engineer of the Missouri Pacific Railway Company, and subject to his approval; buildings and yard tracks to be according to plan to be furnished by the Missouri Pacific Railway Company. In consideration whereof the Pueblo & State Line Railroad Company agreed to turn over and pay to the said Construction Company fifteen thousand ($15,000) dollars of first mortgage bonds and ten thousand ($10,000) dollars stock for each mile of road so constructed, the same being all the bonds and all of the stock of said railroad.

"(18.) That on the 16th day of August, 1887, the Fitzgerald & Mallory Construction Company and the Missouri Pacific Railway Company entered into a written contract, wherein it was recited that the said Construction Company had, on the 16th day of August, 1887, entered into a contract with the Pueblo & State Line Railroad Company for the construction of a line of railroad from Pueblo to the state line of Kansas, and wherein it was recited that the contract with the Pueblo & State Line Railroad Company was annexed and made a part thereof. That therein it was agreed that the Fitzgerald & Mallory Construction Company should sell to the Missouri Pacific Railway Company all of the stock and bonds of the said Pueblo & State Line Railroad Company that should be received from the construction of the road, to-wit, fifteen thousand ($15,000) dollars in bonds, and ten thousand ($10,000),

dollars of stock for each mile of completed road, and therein it was agreed that the said the Missouri Pacific Railway company should pay to the said Fitzgerald & Mallory Construction Company for said bonds and stock the sum of twelve thousand ($12,000) dollars per mile of completed road, payable in the bonds of the Missouri Pacific Railway Company, drawing interest at the rate of five per cent per annum. And in said contract it was further agreed that the Missouri Pacific Railway Company should furnish and deliver to the said Construction Company at the west line of the state of Kansas all the ties, rails, and fastenings to be used by the Construction Company in the construction of the said road, at a certain price, in said contract specified, and if delivered at any other place than above named the additional amount of three-fourths of a cent as freight per ton per mile to be charged. It was further provided in said contract that the said Missouri Pacific Railway Company should transport over its system of railway such material and men as should be required by the Construction Company in the construction of the said road at the rate of three-quarters of a cent per ton per mile for materials, and one cent per mile for men. And to transport over any portion of the said State Line & Pueblo railroad that may be operated by the Missouri Pacific Railway Company materials and men used and required as aforesaid at the actual cost of train service.

"(19.) That under the said contracts so made for the construction of the Pueblo & State Line railroad the Fitzgerald & Mallory Construction Company constructed and completed a line of railway commencing at the terminus of the Denver, Memphis & Atlantic railway on the state line between Kansas & Colorado, running thence in a westerly direction to the city of Pueblo, in the state of Colorado, a distance of one hundred and fifty-one and thirty-four hundredth miles, and on the 15th day of December, 1887, delivered said road and the possession and

control of the same to the defendant the Missouri Pacific Railway Company. That said road was constructed in every respect in accordance with the terms and conditions of the said contracts.

"(20.) That prior to the 3d day of May, 1887, the Fitzgerald & Mallory Construction Company, under contracts in all respects similar to the contracts in connection with the construction of the said Denver, Memphis & Atlantic railway, constructed a line of railway known as the Kansas & Southwestern railway, extending from Iuka in the state of Kansas, in a northeasterly direction, to a junction with the Denver, Memphis & Atlantic railway, a distance of twenty-four and eighty-four hundredths miles, and on the 3d day of May, 1887, the said Construction Company delivered said road so constructed, together with the possession and the control of the same, to the defendant the Missouri Pacific Railway Company; that the said road was constructed in all respects in accordance with the terms and conditions of the said contracts.

"(21.) That prior to the 11th day of August, 1887, the Fitzgerald & Mallory Construction Company, under a contract similar to that named in finding number 20, constructed a line of road known as the Winfield, Texas & Gulf, running from Winfield, in the state of Kansas, south a distance of two miles, and on the 11th day of August, 1887, the said Construction Company delivered the said road so constructed and the possession and control of the same to the defendant the Missouri Pacific Railway Company; that said road was constructed in all respects in accordance with the contract.

"(22.) That each and all of the several railroads, and the parts of the same constructed by the Fitzgerald & Mallory Construction Company and delivered to the Missouri Pacific Railway Company, as heretofore recited in these findings, have, at all times, since the said several deliveries,

been in the possession and under the control of the defendant the Missouri Pacific Railway Company, and have been operated by the said railway company.

"(23.) That by virtue of and through the above named arrangements and contracts the Fitzgerald & Mallory Construction Company assumed the relation of contractor with the Missouri Pacific Railway Company to build the several lines of railroad so named above in the findings, and a direct contract relation in reference to the building of said railroads was established between the two companies.

"(24.) The court finds that each and all of the above named contracts for the construction of the several roads named were in nowise unconscionable contracts, but were fair and reasonable contracts in which the interest of all the parties to the several contracts were properly protected, and at the time of the execution of the said contracts the officers of the Fitzgerald & Mallory Construction Company who executed said contracts on behalf of the Construction Company acted in good faith in the interests of the Construction Company, and the officers of the Missouri Pacific Railway Company, who executed said contracts on behalf of said railway company acted in good faith in the interest of the said railway company.

"(25.) The court finds that from the 28th day of April, 1886, to the 6th day of April, 1887, the officers and directors of the Denver, Memphis & Atlantic Railway Company were the friends and favorable to the interest of the Fitzgerald & Mallory Construction Company, and of the plaintiff herein, and were under the pay of said Construction Company; that since said 6th day of April, 1887, the organization of the said Denver, Memphis & Atlantic Railway Company has been under the control of the Missouri Pacific Railway Company, and its officers and directors have acted in the interests and under the direction of the said Missouri Pacific Railway Company.

"(26.) The court further finds that the defendant the

Missouri Pacific Railway Company, in connection with the several contracts above referred to, assumed the right to prepare the bonds of the Denver, Memphis & Atlantic Railway Company, and the Pueblo & State Line Railroad Company, and to prepare the mortgages that were to secure the said bonds, and to retain the said bonds, both before and after execution, in its possession, and under its control; that said bonds were never in the possession or under the control of the Denver, Memphis & Atlantic Railway Company, or the Fitzgerald & Mallory Construction Company; that on the 22d to the 28th days of October, 1886, the president and secretary of the Denver, Memphis & Atlantic Railway Company executed three million two hundred thousand ($3,200,000) dollars of said bonds in the office of the defendant railway company in New York city.

"(27.) On the 22d day of February, 1887, the board of directors of the Denver, Memphis & Atlantic Railway Company authorized the trustee to certify to bonds covering one hundred and fifty miles of completed road; on the 23d day of May, 1887, the board of directors authorized the certification of bonds covering thirty additional miles of road; that on the 18th day of July, 1887, the said board further authorized the certification of bonds covering two hundred miles of additional road; that on the 1st day of October, 1887, the said board authorized the further certification of bonds covering thirty and seven-tenths miles of additional road.

"(28.) The court further finds that at all times from the date of the organization of the Fitzgerald & Mallory Construction Company up to April 17, 1889, the plaintiff herein, John Fitzgerald, was a director of said Construction Company; that the directors of said company were five in number; that prior to November 3, 1886, a majority of said directors were friendly to the interest of the plaintiff; that since said 3d day of November, 1886, three of said five directors, together with the treasurer, have been

directly or indirectly interested in the defendant railway company; have acted in the interest of said railway company in all matters concerning the management of said Construction Company, where the interest of the railway company and the Construction Company have come in conflict.

"(29.) The Missouri Pacific Railway Company failed to act in the authorization of the issuance of its bonds to pay over as provided in its contracts with the Construction Company until December 10, 1886, when, by its board of directors, it authorized the issuance of five million ($5,000,-000) dollars of Missouri Pacific five per cent trust bonds, and said bonds were issued in pursuance of said authorization under date of January 1, 1887.

"(30.) The court finds that under the contract for the construction of the Denver, Memphis & Atlantic railway, the Kansas Southwestern railway, and the Pueblo & State Line railroad, the defendant the Missouri Pacific Railway Company delivered to the Fitzgerald & Mallory Construction Company, Missouri Pacific trust bonds as follows:

"February 14, 1887............................. $1,500,000
"July 28, 1887, (through Jay Gould) ......... 2,500,000
"September 22, 1887 ............................. 2,500,000
                                                 _____
        "Making a total of....................... $6,500,000

" That the said bonds so delivered had never been bought and sold upon the market and had not acquired a fixed market value, but were reasonably worth par at the several times of said several deliveries; that the said bonds were secured by the deposit with the trustee of the first mortgage bond of said different railway companies, including the Denver, Memphis & Atlantic and the Kansas and Southwestern Railway Companies, and were not secured by the deposit of the stock of any companies whatever.

"(31). That under said contracts there would be due and payable from the Missouri Pacific Railway Company to

the Fitzgerald & Mallory Construction Company, in Missouri Pacific five per cent bonds, for the construction of the Denver, Memphis & Atlantic railway, the Pueblo & State Line railroad, and the Kansas & Southwestern railroad, the sum of six million six hundred and four thousand six hundred ($6,604,600) dollars.

"(32.) That on the 7th day of February, 1887, the Missouri Pacific Railway Company and the Fitzgerald & Mallory Construction Company modified and changed the contract for the construction of the Denver, Memphis & Atlantic railway to the effect that one hundred and fifty (150) miles of the road then completed should be paid for by the said railway company at the rate of ten thousand ($10,000) dollars per mile, instead of at the rate of eleven thousand ($11,000) per mile, the same to be paid in Missouri Pacific five per cent bonds, as above provided."

The fortieth, forty-first, forty-second, forty-third, and forty-fourth findings were as follows:

"(40.) The court further finds that on the 28th day of July, 1887, at a meeting of the board of directors of the Fitzgerald & Mallory Construction Company held at New York city, where were present Russell Sage, R. I. Cross, and Sidney Dillon, and absent S. H. Mallory and the plaintiff herein, it was resolved to sell four million ($4,000,000) dollars. Missouri Pacific railway five per cent bonds to the stockholders of the said Construction Company at ninety per cent of face value, and Jay Gould, the president of the Missouri Pacific Railway Company, furnished two million five hundred thousand ($2,500,000) dollars in bonds to add to one million five hundred thousand dollars ($1,500,000) bonds then possessed by the Construction Company, for the purpose of completing the required amount to make the sale; that under said resolution all the stockholders, with the exception of John Fitzgerald and S. H. Mallory, took their *pro rata* share of said bonds and in the amount of three million two hundred

thousand ($3,200,000) dollars; that when informed of said transaction the said Fitzgerald and Mallory protested against the same.

"(41.) That on said July 28, 1887, the full amount of said two million five hundred thousand ($2,500,000) dollars, additional bonds furnished by Jay Gould, was due the Construction Company from the defendant the Missouri Pacific Railway Company, and the same should be treated as a payment by the said railway company to the Construction Company and the said railway company should pay all charges made by the said Gould on account of said advancement.

"(42.) That on the 23d day of September, 1887, R. I. Cross, the treasurer of the Construction Company, paid from the funds of the said company the sum of sixty-two thousand five hundred ($62,500) dollars to Jay Gould on account of interest on the two million five hundred thousand ($2,500,000) dollars bonds delivered to the Construction Company July 28, 1887; that the said sixty-two thousand five hundred ($62,500) dollars, so paid, is a proper charge against the Missouri Pacific Railway Company and in favor of the Fitzgerald & Mallory Construction Company in this action, and the same is allowed.

"(43.) That on the 22d day of September, 1887, at a meeting of the directors of the Fitzgerald & Mallory Construction Company, held in New York city, where all of the directors were present, a sale of bonds in the amount of one million eight hundred thousand ($1,800,000) dollars (not) already sold (was) ordered made to the New York stockholders of the Fitzgerald & Mallory Construction Company pro rata, said sale being made at ninety per cent of par value; that it was further ordered at said meeting of directors that one million five hundred thousand ($1,500,000) dollars of Missouri Pacific bonds be distributed among the stockholders of the Construction Company as a declared dividend upon stock.

"(44.) That the plaintiff herein acquiesced in the sale of bonds of July 28 and September 22, and the declaration of said dividend to stockholders, and acquiesced in the reduction of one thousand dollars ($1,000) per mile on one hundred and fifty (150) miles of road made by the meeting of the board of directors February 7, 1887."

7. Before consideration in detail of the several items involved, the effect of the acquiescence by stockholders of the Construction Company in acts detrimental to that company as creating an estoppel should receive consideration. The last quoted finding of fact (forty-fourth) led the trial judge to the conclusion that as to neither item therein referred to could relief be granted. Whether or not this result followed is the question now to be considered. It will be borne in mind that S. H. Mallory and John Fitzgerald owned one-fifth of the capital stock of the Fitzgerald & Mallory Construction Company, and the findings of the court are, therefore, that by the acquiescence by one-fifth in amount of the stockholders in wrongs which were found to have been perpetrated upon the Construction Company, the Construction Company was barred of its right to relief. The plaintiff alleged that there was due from the Construction Company something like $100,000 of indebtedness, for which there was available nothing but the amounts due said Construction Company from its co-defendant, the Missouri Pacific Railway Company. The fourteenth paragraph of the answer of the defendant specifically alleged the existence of one debt due from the Construction Company of the sum of $2,500; of another of $52,000 in amount, and of a third of $5,148.48, the last two of which were in judgment, besides in general terms asserting that there were other debts equaling in the aggregate the sum of about $50,000, in respect of which the Missouri Pacific Railway Company had been duly garnished as a supposed debtor of said Construction Company. It is difficult to conceive why the acquiescence of

stockholders in the wrong found by the court, whereby its
ability to pay its debts was greatly impaired, should pre-
clude the right of the Construction Company to relief as
against such wrong. The trial court found that aside from
the acquiescence of Fitzgerald and Mallory there had been
the active commission of the wrong by the holders of the
other four-fifths of the Construction Company's stock. Of
what greater avail should be the mere acquiescence of the
other fifth?

In *Quincy v. Steel*, 120 U. S., 244, it was said that a
suit brought by a stockholder for the benefit of the corpo-
ration was in fact a suit for the corporation itself. That
the acquiescence of stockholders, merely as such, could be
held to imply more than by an affirmative act such stock-
holder, as such, could perform, can scarcely be seriously
argued.

In the brief of the defendants is found the following
quotation from the language of Field, J., in *Humphreys v.
McKissock*, 140 U. S., 311, 312: "The property of a cor-
poration is not subject to the control of individual mem-
bers, whether acting separately or jointly. They can
neither incumber nor transfer that property, nor authorize
others to do so. The corporation—the artificial being
created—holds the property, and alone can mortgage or
transfer it; and the corporation acts only through its offi-
cers, subject to the conditions prescribed by law." In this
brief it is also stated that Justice Field, in the case cited,
approved the language of Chief Justice Shaw in *Smith v.
Hurd*, 12 Met. [Mass.], 385, where he says: "The indi-
vidual members of the corporation, whether they should
all join or each act severally, have no right or power to in-
termeddle with the property or concerns of the bank, or
call any officer, agent, or servant to account, or discharge
them from any liability. Should all the stockholders join
in a power of attorney to any one, he could not take pos-
session of any real or personal estate, any security or chose

in action : could not collect a debt or discharge a claim, or
release damage arising from any default, simply because
they are not the legal owners of the property, and damage
done to such property is not an injury to them. Their
rights and their powers are limited and well defined." If
all the stockholders, by joining in a power of attorney for
that purpose, could not release damage arising from any
default, upon what principle could such release be inferred
from the mere acquiescence in such release by one-fifth in
amount of the stockholders? Most manifestly such an
anomaly cannot be tolerated, much less enforced by judicial
tribunals. In argument it is tenaciously contended, how-
ever, that the long acquiescence of the Construction Com-
pany effected the same result. There was no finding of
such acquiescence by the court. Indeed, there could not
be, consistently with the finding that the Construction
Company was dominated in all things by the officers of the
Missouri Pacific Railway Company.

8. Having divested the inquiry of this matter of acqui-
escence, let us consider the history of these transactions;
and first,—of the reduction in compensation from $11,000
per mile to $10,000. In the thirty-second finding, above
quoted, the trial court found established as a fact, by the evi-
dence, that on February 7, 1887, the Missouri Pacific Rail-
way Company and the Fitzgerald & Mallory Construction
Company modified and changed the contract for the con-
struction of the Denver, Memphis & Atlantic railway so that
150 miles of the road, when completed, should be paid for by
the said railway company at the rate of $10,000 instead of
at the rate of $11,000 per mile, the same to be paid in Mis-
souri Pacific five per cent bonds. This finding of the com-
pleted condition of 150 miles of the line of railroad of the
Denver, Memphis & Atlantic Railway Company on Feb-
ruary 7, 1887, is somewhat modified by the concluding part
of the fourteenth finding, which was: "That on the 14th
day of February, 1887, the Construction Company had

one hundred and fifty miles of said railroad completed and ready for delivery, with the exception of some finishing work upon the road-bed, bridges, and cattle-guards; that on August 1, 1887, said road was entirely completed." The fifteenth finding establishes the fact that the 150 miles of railroad under consideration was accepted by the Missouri Pacific Railway Company on February 14, 1887, although the road was not then completed according to contract. The minutes of the meeting of the directors of the Construction Company, held on February 7, 1887, read as follows:

"195 BROADWAY, NEW YORK CITY,

"Feb. 7, 1887.

"An adjourned meeting of the directors of the Fitzgerald & Mallory Construction Company was held this day, at which there were present Messrs. S. H. Mallory, George J. Gould, R. J. Cross, and R. Sage and also Jay Gould.

"The minutes of the previous meeting were read, and on motion of Mr. Sage, were approved.

"Mr. Jay Gould, on behalf of the Missouri Pacific Railway Company, stated that certain portions of the Denver, Memphis & Atlantic railway were unsatisfactorily constructed, and for that reason the Missouri Pacific Company would decline to pay more than $10,000 per mile for the 150 miles already built, and that the Missouri Pacific Company was ready to take the 150 miles named at that price, that is the line from Chetopa to Cedarville, and enough line from Belle Plaine to make out the 150 miles.

"On motion of Mr. Cross, duly seconded, it was voted that the proposition of the Missouri Pacific Railway Company to receive the 150 miles of the road and give Missouri Pacific Railway Company trust five per cent bonds for the same at the rate of $10,000 per mile in full settlement be accepted.

"On motion, the meeting adjourned.

We concur with the court in its conclusion that the reduction from $11,000 per mile to $10,000 should be sustained. As already indicated, however, the fact that all the stockholders of the Construction Company acquiesced in this reduction is not a sufficient ground upon which alone the settlement at the rate of discount named can be sustained. The court found that the 150 miles was not, when accepted, completed according to the terms of the contract under which its construction was undertaken. The resolution quoted shows on what grounds the reduction was based and assented to. While the evidence is very conflicting as to the degree of non-compliance with the terms of said contract which existed when this reduction was made, neither party introduced evidence of full compliance. A settlement was made by way of compromise of these differences, and we do not find warrant in the record for disturbing the concessions made.

From a consideration of the thirty-third finding of fact of the trial court, there arises a necessity for criticism by reason of the difference between the thirteenth and fifteenth findings as to the mileage constructed. If there is allowed $10,000 a mile for the first 150 miles of the Denver, Memphis & Atlantic railroad constructed, $11,000 a mile for the remainder of that road and the Kansas & Southwestern, and $12,000 a mile for the Pueblo, we find that the Construction Company earned upon its contract $6,456,360, payable in Missouri Pacific five per cent bonds at par. The trial court found $6,454,600. The difference between these findings, amounting to $1,760, is due to the circumstances to which we have referred. Between the thirteenth and fifteenth findings there is a conflict to the extent of sixteen one-hundredths of a mile, and we have accepted the detailed statement of the fifteenth finding rather than the general statement of the thirteenth, there being support in the evidence for either finding. Instead, therefore, of the Missouri Pacific Railway Company

32

being entitled to a credit on account of overpayment in bonds to the amount of $45,400, the credit should in fact be but $43,640.

In the closing part of the thirty-third finding of facts it seems that there was a confusion of items to the disadvantage of the Missouri Pacific Railway Company, for the court having found due the above discussed item to the Missouri Pacific Railway Company, established the same as in "full settlement of the item of $82,000, assigned by Jay Gould to the said railway company under date of September 1, 1888." This item of $82,000, assigned by Jay Gould, has received mention in no other finding by the trial court. This item was assigned by Jay Gould to the Missouri Pacific Railway Company, and by that company is urged as a set-off to the claims made on behalf of the Construction Company. The treasurer of the Construction Company, R. J. Cross, in his evidence, explained that this item arose out of the loan to the Construction Company of $2,500,000 Missouri Pacific bonds; that on January 31, 1888, he, as treasurer, returned to Jay Gould $1,800,000 bonds issued by the Missouri Pacific Railway Company, which lacked $156,000 of repaying Mr. Gould his said loan of bonds. Mr. Cross further testified that of the $156,000 there was returned to Mr. Gould by the Construction Company on April 6, 1888, the sum of $74,000 in bonds. The difference between the sum of $156,000 and $74,000 equals the $82,000 claimed by the Missouri Pacific Railway Company by virtue of an assignment thereof from Jay Gould. It required no assignment to make the Missouri Pacific Railway Company a party to this transaction, for the trial court found that the alleged loan of $2,500,000 of bonds of the Missouri Pacific Railway Company was not in fact a loan by Jay Gould, but was, and should be treated as, a payment upon a still larger amount already due from the Missouri Pacific Railway Company to the Construction Company. While the

trial court made no special finding as to this remnant of $82,000, its status was fixed by the general finding as to the alleged loan of $2,500,000 Missouri Pacific bonds out of which it grew, and it cannot, therefore, be allowed as a credit in favor of the Missouri Pacific Railway Company, claiming as assignee of Jay Gould. It was but a part payment of a large amount due the Construction Company from, and wrongfully withheld by, the Missouri Pacific Railway Company, and no assignment or manipulation can entitle it to a different status or more consideration than in its true character it was entitled to receive.

The thirty-fourth finding of fact was as follows: "The court further finds that on or about the 22d day of March, 1887, S. H. Mallory, the then president of the Fitzgerald & Mallory Construction Company, consented to a further reduction in the contract price for the construction of the Denver, Memphis & Atlantic railway of one thousand ($1,000) dollars per mile for thirty-six miles of the said road; that the said consent of said Mallory was beyond the power of the president of said company; that the same was never at any time consented to or ratified by the said Construction Company or the plaintiff herein, and cannot be allowed as a credit to the defendant railway company." The facts recited were fully sustained by the evidence. The reasons assigned were amply sufficient to justify the conclusion reached as to this item. In addition to these, however, another occurs to us, and that is that the contract for the discount of $36,000 was without consideration. (*Fire Insurance Association v. Wickham,* 141 U. S., 577; *United States v. Bostwick,* 94 U. S., 53; *Lingenfelder v. Wainwright Brewery Co.,* 15 S. W. Rep. [Mo.], 847; *Ayres v. Chicago, R. I. & P. R. Co.,* 52 Ia., 478; *Sherwin v. Brigham,* 39 O. St., 137; *Laidlow v. Hatch,* 75 Ill., 11; *Wilmer v. Overseers of Poor of Worth Township,* 104 Pa. St., 307; *Vanderbilt v. Schreyer,* 91 N. Y., 392; *Boyce v. Berger,* 11 Neb., 399.)

9. Let us now consider the history of the transactions of July 28 and September 22, referred to in the forty-fourth finding of facts. The fortieth finding established as facts that on July 28, 1887, at a meeting of the board of directors of the Construction Company, at which were present Russell Sage, R. J. Cross, and Sidney Dillon (S. H. Mallory and John Fitzgerald being absent), it was resolved that $1,500,000 of Missouri Pacific bonds, then in the Construction Company's possession, and $2,500,000 of said bonds to be borrowed of Jay Gould by said Construction Company, should be sold to the stockholders of the Construction Company at the rate of ninety per cent of their face value, and that under said resolution $3,200,000 of said bonds, reckoned at their par value, were taken by the stockholders of the Construction Company other than Mallory and Fitzgerald, and that the last named parties, when informed of this transaction, protested against it. It is worthy of note that by the forty-first finding the Missouri Pacific Railway Company is found to owe this $2,500,000 to the Construction Company, by which company, nevertheless, bonds to the amount of $2,500,000 were borrowed of Jay Gould. The above finding of protest is reconcilable with the acquiescence stated in the forty-fourth finding upon the assumption that, notwithstanding their protest upon being informed of the transaction, Fitzgerald and Mallory afterward, on September 22, acquiesced in it. The action of the board of directors of the Construction Company appears in the records of the Construction Company in the following language:

"NEW YORK CITY, July 28, 1887.

"Mr. Cross stated that the company is indebted to its stockholders to the extent of $1,500,000, being money borrowed, and that it is indebted to the Missouri Pacific Railway Company for $772,856.27, and to Messrs. Morton, Bliss & Co. to the extent of $600,000. Mr. Cross also stated that at least $500,000 would be required to complete

the company's contract with the Missouri Pacific Railway Company. In view of these facts, the following resolution was offered by Mr. Cross and unanimously adopted:

"*Resolved*, That the treasurer is hereby instructed to sell a sufficient amount of the Missouri Pacific Railway Company's five per cent bonds at not less than ninety, to provide funds to pay off the amount borrowed, amounting to, say, $1,500,000 and interest. The treasurer is authorized to sell other amounts of the same bonds at the same price, to the extent of, say, $4,000,000 in all, to the shareholders, with the understanding that the *pro rata* share of these bonds of any stockholder who is not prepared to take his share within ten days from this date shall be first offered to the other stockholders *pro rata*.

"On motion of Mr. Cross, it was voted that the treasurer is hereby authorized to borrow from Mr. Jay Gould about $2,500,000 of the Missouri Pacific Railway Company's five per cent bonds, to be returned to him when the Construction Company receives the bonds due under its contract with the Missouri Pacific Railway Company.

"On motion of Mr. Sage, the meeting adjourned."

The first notice Mr. Fitzgerald had of this meeting was given him by the following letter:

"JULY 28, 1887.

"*John Fitzgerald, Esq., Winfield, Kansas*—DEAR SIR: I hand you herewith a copy of minutes of a meeting of the stockholders of the Fitzgerald & Mallory Construction Company held here today. From it you will see that it was resolved to distribute $4,000,000 of Missouri Pacific five per cent first bonds among the shareholders of the company at ninety, in order to raise necessary funds. Your interest on this distribution amounts to $400,000 bonds, and it will be necessary for you to arrange for this amount to be taken up within ten days from date, otherwise I am instructed to distribute the bonds *pro rata* among the other shareholders. Yours truly,    R. J. CROSS,

"*Treasurer Fitzgerald & Mallory Construction Co.*"

At a meeting of the board of directors of the Construction Company at which were present S. H. Mallory, Russell Sage, John Fitzgerald, and R. J. Cross, on September 20, 1887, it was voted that the treasurer of said company be, and he was thereby, authorized to sell $2,000,000 of the Missouri Pacific Company's five per cent bonds at ninety per cent to provide funds for the completion of the work of the Construction Company, and to give the stockholders *pro rata* the first option of buying the same. On September 22, 1887, there were present the same directors as were present on the 20th, and, in addition, there was present Sidney Dillon, another director, upon whose motion it was unanimously voted that the resolution passed on the 20th of September, providing for the sale of $2,000,000 of bonds, should be amended so as to read as follows:

"*Resolved*, That the treasurer of this company be, and he is hereby, authorized to sell $1,800,000 of the Missouri Pacific Railway Company's five per cent bonds at ninety per cent, to provide funds for the completion of the work of the Construction Company, and that the said bonds be sold to the following stockholders of the company (who were ready to buy the same) as follows:

| | |
|---|---|
| "Russell Sage ............................. | $375,000 |
| "Morton, Bliss & Co............................ | 300,000 |
| "Jay Gould............................ | 675,000 |
| "H. G. Marquand ........................ | 150,000 |
| "Sidney Dillon............................ | 150,000 |
| "George J. Gould............................ | 75,000 |
| "J. & S. Warmser ........................ | 75,000 |
| | "$1,800,000" |

Referring back to the transaction as to sale of bonds of July 28, 1887, there is presented the fact that $4,000,000 in bonds of the Construction Company were by its board of directors ordered sold at ninety per cent of their face

value, and that at that time there was taken by the stock-holders of the Construction Company (other than Fitzgerald and Mallory), $3,200,000 of these bonds, the proportion of Fitzgerald and Mallory ($800,000) not being taken. On September 20th and 22d the sale was authorized by the said board of directors when S. H. Mallory and John Fitzgerald were present, it therefore was peremptorily ordered to the associates of Fitzgerald and Mallory so as to include such portion as Messrs. Fitzgerald and Mallory had been entitled to take under the sale of July 28. These two sales of $4,000,000 and of $1,800,000, aggregating $5,800,000, twice includes the sale of $800,000 in bonds. The amounts actually taken were $3,200,000 of the sale of July 28th, and $1,800,000 on September 22, a total of $5,000,000; $1,800,000 of the last sale including the $800,000 Fitzgerald and Mallory allotment ordered sold on July 28.

The minutes of said meeting of September 22 continued in this language: "On motion of Mr. Dillon, voted that a dividend of one hundred per cent on outstanding stock of the company, payable in Missouri Pacific Railway Company five per cent bonds, be, and is hereby, declared, and that said dividend be paid by the treasurer of the company on and after the 23d day of September, 1887, at his office, No. 28 Nassau street, New York city." This action of the board is merely recited in the trial court's forty-third finding of facts. It deserves more extended notice as part of the *res gestæ* and as indicative of the motives and methods of the parties who were directly responsible for these proceedings. Reverting again to the action of the board of directors of the Construction Company at its meeting of date July 28, 1887, it will be remembered that the bonds ordered sold were $2,500,000, borrowed of Jay Gould, and $1,500,000 held by the Construction Company. In the interim between July 28, 1887, and the above declared dividend there is not shown in the record the payment of a single cent on account of the purchase of $1,500,000

Missouri Pacific bonds held by the Construction Company..
By virtue of the dividend above declared there was placed
to the credit of the stockholders of the Construction Com-
pany, with its treasurer, the amount necessary to pay at
par for the $1,500,000 of the bonds purchased.    In the
letter of R. J. Cross, treasurer of the Construction Company,
addressed to George J. Gould, and written just after the
action of the board referred to, Mr. Cross said : "I am in-
structed to inform you that on to-morrow, July 29, I will
deliver to you your share of said bonds, say $133,000, and
receive from you in settlement therefor, as per the written
statement, after crediting with interest the $50,000 ad-
vanced by you on the 9th of March last, $68,533.33, it
being understood that the said bonds are to be held subject
to my order with a view to making a satisfactory sale of
the whole amount of the block."    From the context of the
letter it is not open to question that the block referred to
was the $4,000,000 in bonds previously mentioned in the
said letter.    On the same day the above named treasurer of
the Construction Company wrote to Jay Gould a statement
as to the mutual items of account between said Gould and
the Construction Company, ending with the same signifi-
cant language which closed the letter to George J. Gould,
to-wit, "it being understood that the said bonds are to be
held subject to my order with a view to making a satisfac-
tory sale of the whole amount in one block."    In the ac-
counts given in evidence as between the Construction
Company and each of the Goulds, of date July 29, 1887,
the bonds are charged at the rate of ninety cents on the
dollar.    On the 22d day of September, 1887, John Fitz-
gerald and S. H. Mallory gave an order on R. J. Cross,
treasurer of the Construction Company, requiring him to
deliver to Jay Gould 213 Missouri Pacific bonds due them
on account of their 3,000 shares of the Construction Com-
pany stock.    On September 23, 1887, S. H. Mallory and
John Fitzgerald gave an order on the treasurer of the Con-

struction Company directing him to deliver twenty Missouri Pacific bonds to C. C. Black, who on the same day indorsed said order to Sidney Dillon. On September 23, 1887, S. H. Mallory and John Fitzgerald receipted to the treasurer of the Construction Company for sixty-seven Missouri Pacific bonds, which closed out their share of the so-called dividend of one hundred per cent upon 3,000 shares of Construction Company stock held by them. In the evidence of R. J. Cross, treasurer of the Construction Company, there is given the following account of the disposition of the Missouri Pacific bonds:

Q. Did the Missouri Pacific Railway Company subsequent to that [February 7, 1887] deliver to you, as treasurer of the Construction Company, $1,500,000 of the trust five per cent bonds provided for in the contract?

A. It did.

Q. So far as you know, did each, John Fitzgerald and S. H. Mallory and the other stockholders of the Construction Company, have notice of this settlement, and this delivery of these bonds?

A. They did.

Q. What was done with the $1,500,000 in bonds thus delivered to you?

A. My recollection is that at first money was borrowed on the bonds from the different stockholders, or from some of them, and that later on the bonds were divided as a dividend on the stock.

Q. Why was the money borrowed from the stockholders at that time?

A. Because it was required to carry on the construction. The Construction Company required money and that was considered the best way of getting the money at that time.

Q. And these bonds were held as collateral security for the advance made by the stockholders?

A. They were.

Q. How was the money thus obtained from the stockholders repaid to them?

A. It was repaid to them by selling the bonds held as collateral.

Q. Was that sale made in pursuance of the authority of the board of directors of the Construction Company?

A. It was.

Q. Was the sale made upon a discount?

A. It was made at ninety cents on the dollar.

The purpose of this dividend has now been made clear. Ordinarily, the term "dividend" is applied to profits apportioned among shareholders. (*Vide* Webster's Dictionary.) In this case, there were no profits; nothing but such a dearth of funds that these bonds had been of necessity pledged as collateral for advances necessary to continue the operations of the Construction Company. In this condition of affairs, these bonds were sold to its favored stockholders by the Construction Company at the rate of ninety cents on the dollar. A fictitious dividend of one hundred per cent on the stock was declared in favor of each purchaser of bonds, which dividend was credited to him at par on the books of the treasurer of the Construction Company. This enabled the purchaser of the bonds to obtain several substantial advantages in addition to the discount of ten per cent under the resolution of July 28. By means of the first discount the favored stockholders were enabled to insure the payment by the Construction Company to themselves of the advances which had previously been made by them,—a very prudent measure in view of what followed, —for on September 22 a fictitious dividend was declared on Construction Company stock of one hundred per cent, which was ratably placed to the credit of each stockholder with the treasurer of the Construction Company, thereby enabling each purchaser to take and therewith pay for the greater portion of the $1,800,000 Missouri Pacific bonds on that day ordered sold privately to the stockholders of the Construction Company. Incidentally, the sale and distribution of the bonds placed to the credit of Mr. Fitz-

gerald and of Mr. Mallory, respectively, a sufficient amount
to enable Jay Gould to obtain therefrom payment of the
amount due him from these two gentlemen, leaving to each
a small sum as a residue.    Neither Mr. Fitzgerald nor Mr.
Mallory is a party to this action, in such a sense that any
relief can be afforded them individually, even though, not-
withstanding his acquiescence, each could claim relief,—a
proposition upon which no opinion is herein ventured.  As
has already been said, this action is, for all practical pur-
poses, to be treated as though the Construction Company
was plaintiff and the Missouri Pacific Railway Company
was defendant.   The thirtieth finding of the trial court,
upon conflicting evidence it is true, but still with sufficient
proof to sustain it, was that the bonds, at the time of the
several deliveries ·of them, were worth par.   This must,
therefore, be accepted as conclusive upon that point.   The
evidence of Mr. Black, president of the Denver, Memphis
& Atlantic Railroad Company, was, that the bonds of that
railroad company were all signed at the office of Mr. Gould,
by himself (Mr. Black) and the secretary of said railroad
company, and turned over to Mr. Phillips (Jay Gould's
private secretary, and assistant secretary of the Missouri
Pacific Railway Company), by whom receipts were given
for the safe keeping of said bonds during the time they
were there, and that after that time that he (Mr. Black) saw
them no more and had no knowledge what became of them.
Mr. Burns testified that, as secretary, he signed the bonds
above referred to, and that receipts were given as above
stated for the bonds which remained in the possession of
Mr. Phillips.   The receipts referred to were signed "Guy
Phillips, Assistant Secretary."   The first of these receipts,
dated October 22, 1886, was for 100 bonds, Nos. 1–100.;
the second was of date October 23, 1886, and was for 400
bonds, Nos. 101–500; the third was of date October 25,
1886, and was for 750 bonds, Nos. 501–1250; the fourth
was of date October 26, 1886, and was for 1,000 bonds,

Nos. 1251–2250; the fifth was of date October 27, 1887, and was for 750 bonds, Nos. 2251–3000; the sixth was of date October 28, 1886, and was for 200 bonds, Nos. 3001–3200. These bonds were for the sum of $1,000 each. Each recited that all coupons were attached to such bonds as were described in said receipt, and that the certificate of the trustee was not signed. These receipts cover bonds of the par value of $3,200,000 in the aggregate, and, at the rate of $16,000 per mile, were issued upon 200 miles of railroad. There is no proof as to the time and manner of the subsequent issue of bonds of the Denver, Memphis & Atlantic Railroad Company—an omission probably accounted for by the subsequent change of officials of that road,—neither is there any evidence as to what became of the coupons above referred to, and as to the shares of stock in exchange for a part of which counties and cities in Kansas voted subsidies to the amount of about $1,200,000 in the aggregate, the record is just as silent.

The trial court found in the thirtieth finding that "under the contract for construction of the Denver, Memphis & Atlantic railway, the Kansas Southwestern railway, and the Pueblo & State Line railroad, the Missouri Pacific Railway Company delivered to the Fitzgerald & Mallory Construction Company, Missouri Pacific trust bonds as follows:

"February 14, 1887...............................$1,500,000
"July 28, 1887 (J. Gould)...................... 2,500,000
"September 22, 1887............................. 2,500,000

"Making a total of......................$6,500,000"

As to these, this finding also was that, while they had no fixed market value, they were reasonably worth par at the time of said several deliveries. In this finding is mentioned three railroads as to which there were contracts of construction. In respect to this it is only necessary to state that they were constructed under substantially the same

contract, and that in relation to each the parties to this controversy sustained a like relation as to every other of said railroads.    The rule which must be enforced, as applied to the officers of the Construction Company, is aptly stated in *Gorder v. Plattsmouth Canning Co.*, 36 Neb., 548, by Post, J., in the following language: "There is no doubt that the relation of directors to the corporation of which they are officers is of a fiduciary character, and their contracts and dealings with respect to the corporate property will be carefully scrutinized by the courts.    There are to be found cases in which it is asserted that such contracts are absolutely void,   *   *   *   but the decided weight of authority, as well as the more satisfactory reasoning, sustains the view that they are voidable only.    It is frequently said in the reports and text-books that contracts between corporations and their directors will be set aside by courts of equity at the election of the stockholders, but such statement is not strictly accurate.    Not every purchase of corporate property by the directors of the corporation will be adjudged void in an action by the stockholders, even by courts of equity.    On the contrary, the relation of directors to the stockholders of a corporation is not essentially different from that ordinarily existing between trustee and *cestui que trust*.    Courts of equity will set aside such contracts on the ground of fraud, and generally upon slight showing of fraud or bad faith by the trustee."

The liability of a corporation for the acts of its officers and agents within the scope of their employment has already been discussed.    It was insisted on the trial, and is still urged, that the Missouri Pacific Railway Company was in no respect a participant in the proceedings which resulted in the discount of ten per cent on its bonds, and, therefore, that it cannot be held answerable to the Construction Company for this discount.    It will be seen, by a reference to the addenda to the contract between the Missouri Pacific Railway Company and the Construction Com-

pany, that payments were to be made in time and manner following, to-wit: "On the completion of each ten miles of road according to the contract from not more than two miles connected with the road of the party of the first part, and on the receipt of the sixteen thousand ($16,000) dollars per mile of the first mortgage bonds and sixteen thousand ($16,000) dollars per mile of stock appertaining thereto (less the amount paid out for aid), the party of the first part will deliver to the party of the second part twelve thousand ($12,000) dollars per mile of its five per cent bonds according to the above agreement." The evidence of Mr. Black and Mr. Burns, one the president and the other the secretary of the Denver, Memphis & Atlantic Railway Company, hereinbefore referred to, shows that as such officers they signed 3,200 bonds of the company last named, as shown by contemporaneously given receipts of dates between October 21 and October 28, 1886, and that these bonds were turned over to Guy Phillips, who was at that time the private secretary of Jay Gould, president of the Missouri Pacific Railway Company, as well as assistant secretary of the railway company last named. The receipts for these bonds were signed by Guy Phillips as such assistant secretary. Mr. Calef, the secretary of the Missouri Pacific Railway Company, suggested that assistant secretary Phillips would give these receipts for the safe keeping of the bonds, and it was accordingly so arranged. The officers of the Denver, Memphis & Atlantic Railway Company were given no alternative, the bonds must be retained in the office of the secretary of the Missouri Pacific Railway Company.

The trial court found that "since April 6, 1887, the organization of the said Denver, Memphis & Atlantic Railway Company has been under the control of the Missouri Pacific Railway Company, and its officers and directors have acted in the interests and under the direction of the said Missouri Pacific Railway Company. It is very im-

portant, in view of this domination of the Denver, Memphis & Atlantic Railway Company by the Missouri Pacific Railway Company, to note that the trial court found that the board of directors of the Denver, Memphis & Atlantic Railway Company, on February 22, 1887, authorized the trustee to certify to bonds of the Denver, Memphis & Atlantic Railway Company covering 150 miles of completed road, and that on May 23, 1887, the said board of directors authorized the certification of bonds covering 30 additional miles of road, and that on the 18th day of July, 1887, the said board further authorized the certification of bonds covering 200 miles of additional road. Omitting the first 150 miles as having been settled for by a compromise arrangement, we find that there were authorized to be certified by the trustee 260 miles of railroad as completed before July 18, 1887, a date very important to be kept in mind. No reference need be made in this connection to the 150 miles completed in February of 1887; for our purposes it is sufficient to note the finding of the trial court, that on May 3, 1887, there were turned over and delivered to the Missouri Pacific Railway Company 24.84 miles; on the 11th day of August, 1887, 123.40 miles; on October 1, 1887, 124.42 miles, and on December 15, 1887, 12.82 miles. The settlement in February, 1887, gave to the Construction Company $1,500,000 in bonds of the Missouri Pacific Railway Company, which were disposed of as has just been stated. Notwithstanding the certificate to the trustee that on July 18, 1887, there were completed 260 miles of road, there had been before that date turned over and delivered to the Missouri Pacific Railway Company but 24.84 miles of railroad, and the Missouri Pacific Railway Company accepted as completed no more miles of railroad until August 11, following, when it received 123.40 miles. There was no more road turned over to the Missouri Pacific Railway Company until October 1, at which time the transactions

under comment had been fully consummated.   If the Missouri Pacific Railway Company had paid according to the terms of its contract (modified to $11,000 per mile as it was), there would have been paid to the Construction Company, on and before July 18, 1887, for 260 miles of railroad, the sum of $2,860,000 in bonds, exclusive of the $1,500,000 settled for in February preceding.   These payments, however, were held back, and on the 28th day of July, ten days afterward, Jay Gould, the president of the railroad company in default, offered to, and as a matter of accommodation as it is claimed, did, loan to the Construction Company $2,500,000 Missouri Pacific bonds.   It will readily be seen that this amount, treated as a payment, which the trial court very properly declared it to be, still left due from the Missouri Pacific Railway Company to the Construction Company a balance of $360,-000 fully earned.   When it is remembered that not only the $2,500,000 of bonds which Jay Gould pretended to loan,·but the $1,500,000 earned for the first 150 miles constructed, were discounted at the rate of ten per cent when worth par, the enormity of this transgression against the rights of the Construction Company is fully apparent.   Of these bonds the associates of John Fitzgerald and S. H. Mallory took $3,200,000.   It has already been demonstrated how, by the use of a fictitious dividend of one hundred per cent upon the stock of the Construction Company, the $800,000 in bonds which Fitzgerald and Mallory had been unable to take, and $1,000,000 more in bonds, were wrested from the Construction Company.   The trial court found, as we have seen, that since the 6th of April, 1887, the organization of the Denver, Memphis & Atlantic Railroad Company had been under the control of the Missouri Pacific Railway Company, and that its officers and directors had acted in the interests and under the direction of the said Missouri Pacific Railway Company To complete the responsibility of the Missouri Pacific Rail-

way Company for the unwarranted discount of $500,000 enforced against the Construction Company, it is necessary to note but another finding of the court, which was, that since November 3, 1886, three of the directors of the Construction Company, together with its treasurer (R. J. Cross), "have been directly or indirectly interested in the defendant railroad company; have acted in the interests of said railroad company in all matters concerning the management of the said Construction Company where the interests of the railroad company and the Construction Company came in conflict." This finding is of course upon conflicting evidence, but it has ample support. It would subserve no useful purpose to fortify these facts as to the domination of the Missouri Pacific Railway Company over the Denver, Memphis & Atlantic Railway Company by an extended analysis of the testimony, which would be indispensable for that purpose, but which, while scattered through an immense volume, when gathered and considered, fully sustains the findings made. Under the pleadings, proofs, and findings, the Missouri Pacific Railway Company must be held liable to the Fitzgerald & Mallory Construction Company for this discount of ten per cent exacted upon the purchase of $5,000,000 of Missouri Pacific bonds with interest, after deducting the overpayment of $43,640 found in the corrected thirty-third finding of fact to have been made in bonds by the Missouri Pacific Railway Company to the said Construction Company as hereinbefore stated. The forty-second finding of fact is that $62,500 interest, which fell due on the $2,500,000 bonds delivered by Jay Gould to the Construction Company July 28, 1887, was paid to said Gould by the treasurer of the Construction Company on September 23, 1887. That for this amount, with interest from the date last named, the Missouri Pacific Railway Company is liable to the said Construction Company as a necessary corollary results from the propositions heretofore discussed.

33

10. Between the Missouri Pacific Railway Company and the aforesaid Construction Company there was a protracted introduction of evidence as to liability for certain material. The ultimate facts properly deducible from that evidence were settled to our satisfaction in the forty-fifth finding, which was in the following language: "(45.) The court further finds that in September, 1888, it was agreed between the Fitzgerald & Mallory Construction Company and the Missouri Pacific Railway Company that certain track material, the property of the Construction Company, should be sold and delivered to the said railway company as the same should be needed for use; that in accordance with said agreement an invoice of the said material was taken by the said construction and the said railway companies, and in the month of October, 1888, there was delivered to the said railway company of the agreed value of sixteen thousand two hundred and forty-one dollars and sixteen cents ($16,241.16); that subsequently there was delivered further material of the agreed value of nineteen thousand six hundred and eighty dollars ($19,680); that before any further delivery was made the remaining track material, of the value of sixteen thousand nine hundred and ten dollars and fifty cents ($16,910.50), was sold for taxes duly and regularly levied against the Construction Company, and the railway company purchased the same at tax sale, and the material came into the possession of the said railway company; that said railway company paid at such tax sale the sum of three thousand and fifty dollars and forty cents ($3,050.40), and is entitled to the same." It is perhaps true that technically there is ground for the argument made that title had not passed because delivery could not justly be made, nevertheless the relations of the parties were such that the Missouri Pacific Railway Company should not by purchase at a tax sale be permitted to acquire title as against the Construction Company.

11. The forty-sixth finding of fact is satisfactory to us.

It is as follows: "(46.) The court finds that at the several times of the delivery of the roads constructed, certain items of right of way remained unsettled, and that prior to the commencement of this action the defendant railway company paid out, to secure the said right of way, the sum of fifty-eight thousand seven hundred and fifty-eight dollars and thirty-nine cents ($58,758.39); that since the commencement of this action the said railway company has paid out the further sum of six thousand six hundred and one dollars and ninety-one cents, and that the said sums are true and correct charges against the said Construction Company, and in favor of the defendant the Missouri Pacific Railway Company."

12. The forty-seventh finding of fact is in the following language: "(47.) "That about fifteen miles of railroad were laid out over government land; that no maps were filed with the secretary of the interior, showing the lines of way over said government land in the state of Kansas, but maps were filed with local land officers of the United States at Wakeeney, Kansas, duly certified to, showing said right of way." In the case of *Real v. Hollister*, 20 Neb., 112, it was held that, "in an action on a warranty deed for a breach of the covenant for quiet enjoyment, the plaintiff must allege and prove that he has been turned out of the possession of the granted premises or of some part thereof, or has yielded possession thereof to the paramount title." (See, also, *Anderson v. Buchanan*, 20 Neb., 272.) The finding quoted fully and fairly states all that was pleaded and proved; hence, no allowance of a counterclaim can be made as to the alleged failure to comply with such requirements as were necessary to acquire a railroad right of way across government lands.

13. The forty-eighth finding of fact was as follows: "(48.) The court further finds that under the said contracts for the construction of roads, and under the direction and request of the defendant the Missouri Pacific Railway Com-

pany, the Fitzgerald & Mallory Construction Company made surveys for lines not built, and expended for the same the sum of four thousand nine hundred and twenty-three dollars and six cents ($4,923.06), and the same is allowed as a correct charge against the said defendant railway company." We cannot concur in this conclusion reached by the trial court, for the reason that there was not sufficient evidence to sustain it. There was evidence of other railroad schemes and of conversations between some of the officers of the Missouri Pacific Railway Company and some of the officers of the Construction Company in respect to the schemes proposed, which all seem to have had reference to obtaining subsidies rather than promoting legitimate railroad enterprise. As no more worthy object than this was in view in the preliminary surveys, a court of equity should hardly be called upon to help foster such a questionable spirit of enterprise. These surveys have been paid for by the Construction Company, and courts might as well be called upon to compel contribution among the promoters of any other scheme to rob the taxpayers as to enable the Construction Company to reimburse itself as to these surveys. From the record in this case, it appears that in Kansas it is required that for the bonds voted in aid of railroad enterprises there shall be issued stock of the railroad company at its par value, by virtue of which stock it is of course assumed that the donors are insured a representation on the board of directors of the railroad company to which the bonds are voted. The Denver, Memphis & Atlantic Railroad Company's articles of incorporation provided for fifteen directors elected by holders of stock issued at the rate of $16,000 per mile, of which it was assumed by parties to the contracts above referred to that $3,500 would be used in exchange for aid bonds. The articles of incorporation also provided for the issue of the bonds of the Denver, Memphis & Atlantic Railroad Company, secured by a first mortgage on the railroad line,

at the rate of $16,000 per mile.   Its stock was issued on a like liberal scale, so that plenty of margin should exist for the acquisition of aid bonds in exchange for a comparatively small portion of the stock.   For the first mortgage five per cent bonds of the Missouri Pacific Railway Company, at the rate of $11,000 per mile, both the $16,000 per mile of bonds and whatever of the $16,000 per mile of stock which had not been exchanged for aid bonds (estimated at $3,500 per mile) were gladly exchanged by the Construction Company.   Even this was claimed to be more than an equivalent for the line carrying $16,000 per mile in stock and $16,000 per mile in bonds, so that $1,000 per mile of Missouri Pacific bonds were thrown off, and then for cash this $10,000 per mile of Missouri Pacific bonds was shrunk ten per cent more.   If the aid bonds, estimated at $3,500 per mile, were worth par, the net cost of this railroad, without considering profits of construction, was $5,500 per mile.   The cost of these preliminary surveys not being contemplated in the original contracts for the construction of the railroads enumerated, and these surveys not being necessary concomitants to the operation thereof, present no equitable reasons for the reimbursement of the Construction Company's expenditures in that behalf.   This claim of $4,923.06 must, therefore, be disallowed, and if there existed the same absence of the rights of creditors of the Construction Company as to other items involved in this case, we should be decidedly inclined to let such items take a like course on the same grounds.

14. In reference to the construction of the telegraph line along the Denver, Memphis & Atlantic railroad there was the forty-ninth finding of the court, which was sufficiently sustained by the evidence.   This finding was as follows: "(49.) The court finds that on the 18th day of August, 1886, under the direction of the defendant the Missouri Pacific Railway Company, the officers of the Denver,

Memphis & Atlantic railroad entered into a contract with the Western Union Telegraph Company for the construction of a telegraph line along the line of the Denver, Memphis & Atlantic; that in pursuance of the said contract the Fitzgerald & Mallory Construction Company furnished labor and material for the construction of said telegraph line, in the amount and value of twenty-five thousand seven hundred and three dollars and three cents ($25,-703.03); that said contract was made with said telegraph company for the use and benefit of the defendant the Missouri Pacific Railway Company, and said labor and material furnished were furnished at the request of said defendant railway company, and is a proper charge against said railway company." Its allowance as above is, therefore, confirmed.

The finding of the court that the Construction Company was entitled to payment for extra ties put in on the line of the Denver, Memphis & Atlantic railroad west of Mc-Cracken, for stock yards and pens, for fencing Chetopa & Conway Springs Division, for turn-tables on Conway Springs Division, and for extra nut-locks on the Denver, Memphis & Atlantic line as extras, was not without the support of sufficient evidence. The amount in each case of these extras is as near exact correctness as the condition of the proofs will admit of, and hence will be accepted as the true amount due. Against these items counsel for the Missouri Pacific Railway Company makes the contention that they were not within the contemplation of the written contracts to which reference has heretofore so frequently been made; in fact, that the allowance of these items must be upon ·evidence incompetent, because not found therein. The liability of the Missouri Pacific Railway Company is not, as to these matters, predicated upon said written contract; it is·owing to the duty of making compensation for such erections made and material furnished and put into and along the line of railroad contemplated by said agreements,

as in the nature of things were necessary to its completion and equipment whether ordered in advance or after construction and used by the Missouri Pacific Railway Company. As to these, the testimony was that they were furnished in compliance with the request of the officers of the Missouri Pacific Railway Company. The question of the admissibility of evidence under such circumstances is very aptly discussed in the following language of COBB, J., in *Delaney v. Linder*, 22 Neb., on page 280: "Upon the point arising upon the refusal of the court to let in evidence to vary the terms of the contract, it is deemed sufficient to say that the contract is sued on, and set out in the petition without any allegation of mistake or failure therein to truly express the terms of the contract, or prayer for its reformation, and it is deemed to be too well settled to call for the citation of authorities that such allegation and prayer are indispensably necessary as a foundation for the admission of such evidence. The following from the opinion of Denman, C. J., in the case of *Goss v. Lord Nugent*, 5 B. & Ad. [Eng.], 64*, cited in the opinion in *McNish v. Reynolds*, 95 Pa. St., 483, is believed to possess the rare merit of being applicable to, if not conclusive of, both the above points: 'By the general rules of the common law, if there be a contract which has been reduced into writing, verbal evidence is not allowed to be given of what passed between the parties, either before the written instrument was made or during the time it was in a state of preparation, so as to add or subtract from, or in any manner to vary or qualify the written contract; but after the agreement has been reduced into writing it is competent for the parties, at any time before breach of it, by a new contract not in writing, either altogether to waive, dissolve, or annul the former agreement, or in any manner to add to, or subtract from, or vary or qualify the terms of it, and thus to make a new contract; which is to be proved, partly by the written agreement, and partly by the subsequent verbal terms en-

grafted upon what will be thus left of the written agree-
ment."

15. The thirty-fifth, thirty-sixth, thirty-seventh, thirty-
eighth, and thirty-ninth findings of fact were in reference
to alleged overcharges, and were as follows:

·"(35.) The court further finds that prior to May 4,
1886, the Fitzgerald & Mallory Construction Company
and the Missouri Pacific Railway Company, in contempla-
tion of the contract of May 4, 1886, entered into an oral
agreement wherein it was agreed that the defendant railway
company should transport over its line all men and mate-
rial to be used in the construction of the roads contemplated
at the regular construction rates of the said railway com-
pany, the same being the rate charged the several constit-
uent companies of the said Missouri Pacific Railway
Company, intermediate in the transportation of company
material and men used in construction; that subsequent to
May 4, 1886, the said agreement was confirmed and rati-
fied by the parties thereto; that the said construction rate
was at a rate of three-fourths of one cent per mile for all
distances more than two hundred miles, and specified rates
for distances less than two hundred miles, and one cent per
mile for the transportation of men. That said freight and
passenger rates were intended by the said parties to be
about the actual cost of transportation.

"(36.) That said construction rate continued to be the
established construction rate of the Missouri Pacific Rail-
way Company up to and including December 15, 1887,
and during the entire period of shipment by the said Con-
struction Company over the lines of the said railway
company.

"(37.) That prior to April 5, 1887, the Missouri Pacific
Railway Company overcharged the Fitzgerald & Mallory
Construction Company on freight the sum of seventeen
thousand seven hundred and sixty-nine dollars and forty-
five cents ($17,769.45); that subsequent to April 5, 1887,

and prior to August 1, 1887, it overcharged the said Construction Company on freight the sum of seventeen thousand seven hundred and sixty-nine dollars and forty-five cents ($17,769.45); that subsequent to April 5, 1887, and prior to August 1, 1887, it overcharged the said Construction Company on freight the sum of two hundred and ninety-two thousand nine hundred and ninety-four dollars and sixty-two cents ($292,994.62); that prior to December 15, 1887, the said railway company overcharged the Construction Company the further sum of seven thousand nine hundred and ninety-nine dollars and forty-nine cents ($7,999.49) on material for the construction of the Pueblo & State Line railroad. The total amount for overcharge of freights being three hundred and eighteen thousand seven hundred and sixty-three dollars and fifty-six cents ($318,763.56), the same being upon interstate shipments.

"(38.) That upon demand of the defendant the Missouri Pacific Railway Company, the treasurer of the Fitzgerald & Mallory Construction Company paid over to the said railway company the full amount of said overcharge for freights from the funds of the Construction Company; that said payments were made by the treasurer without authority, and the acts of the said treasurer in making said payments have never been ratified by the Construction Company, and the said Construction Company is entitled to recover the same from said railway company.

"(39.) That the said overcharges were based, for the most part, upon a commercial tariff rate of three cents per ton per mile; that said rate was unreasonable and unfair."

The finding that there was given by the Missouri Pacific Railway Company to the Construction Company a rate of three-fourths of a cent per ton per mile on material for all distances where the transportation was for more than 200 miles was supported by sufficient evidence. It might admit of doubt whether the conversation between Jay Gould and Mr. Mallory was of sufficient definiteness, and of

itself competent to establish the existence of such a rate. This rate, however, as sufficient evidence shows, was acted upon by the parties from the first until April 5, 1887. Under these circumstances, the trial court was justified in acting upon the understanding of the parties to these transactions. (*School District v. Estes*, 13 Neb., 52; *Harbach v. Miller*, 14 Neb., 9; *Rathbun v. McConnell*, 27 Neb., 239; *District of Columbia v. Gallagher*, 124 U. S., 510.) The Construction Company is, therefore, entitled to repayment, with interest, of the sum of $17,769.45 on account of overcharges for transportation of material previous to April 5, 1887.

On the last date named the act of congress entitled "An act to regulate commerce," approved February 4, 1887, took effect. For overcharges on account of exacting payment for transportation of material at the rate of three cents per ton per mile after April 5, 1887, instead of at the rate of three-fourths of a cent per ton per mile, the trial court found the Missouri Pacific Railway Company liable to the Construction Company in the sum of $300,-994.11, notwithstanding the provisions of the above mentioned act of congress. There was a finding of the trial court that the last named overcharges were based for the most part upon a commercial tariff rate of three cents per ton per mile, and that said rate was unreasonable and unfair. Assuming that these conclusions were justified by the evidence, we are confronted with the proposition that these overcharges cannot be recovered because of the existence of the act of congress above referred to. Section 1 of the act in question defined what corporations, etc., were subject to its terms, within which definition is clearly included the Missouri Pacific Railway Company, and the class of transportation now under consideration. Section 2 is in the following language: "That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge,

Fitzgerald v. Fitzgerald & Mallory Construction Co.

demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful." There was published and sufficiently promulgated the following notice on March 14, 1887:

"THE MISSOURI PACIFIC RAILWAY COMPANY.—LEASED AND OPERATED LINES.

"Circular No. A 1.

"ST. LOUIS, March 14, 1887.

"*To Agents, Shippers, and Connections:* Notice is hereby given that all special rates or contracts providing for the transportation of any character of freight over any portion of this company's road, or its owned, controlled, leased, or operated lines, unless sooner terminating, will be void on and after April 1, 1887. All existing junction tariffs, division sheets, and special rates applying on interstate freight interchanged with connecting lines will be discontinued on that date. New tariffs will be issued on April 1, 1887, to apply on shipments between interstate points located on these roads, and arrangements with connecting lines for the continuance of interchange of shipments upon agreed through rates and divisions will be taken up and adjusted at the earliest practicable date. After April 1, 1887, agents will not, under any circumstances, issue through bills of lading for freight destined to interstate points located upon connecting lines, unless they have joint through rates, effective on and after the date above named. Station masters will post a copy of this notice in a con-

spicuous place at their stations, and also furnish a copy to
all parties interested.          OSCAR G. MURRAY,
                                          "*Frt. Traffic Mgr.*

  "Approved: W. H. NEWMAN,
        "*General Traffic Mgr.*"

    After the interstate commerce act went into effect there
was charged for the transportation of the Construction
Company's material a freight rate of three cents per ton
per mile, and the Construction Company was requested and
required to pay this rate in the same manner as payments
had before April 5, 1887, been customary with respect to
the rate prevailing between these parties. In all the evi-
dence introduced upon this subject the rate of three-fourths
of a cent per ton per mile is spoken of as a special rate ap-
plicable to material to be used in the construction referred
to. This rate of three-fourths of a cent per ton per mile
was, therefore, within the terms of the notice above set out,
and of which it cannot be claimed there was not full no-
tice. By section 6 of the act of congress under consider-
ation (as said section stood until 1889, in which interim it
is alleged were collected the overcharges complained of) it
was provided: "That every common carrier subject to the
provisions of this act shall print, and keep for public in-
spection, schedules showing the rates and fares and charges
for the transportation of passengers and property which
any such common carrier has established and which are in
force at the time upon its railroad, as defined by the first
section of this act. The schedules printed as aforesaid by
any such common carrier shall plainly state the places upon
its railroad between which property and passengers will be
carried, and shall contain the classification of freight in
force upon such railroad, and shall also state separately the
terminal charges and any rules or regulations which in any-
wise change, affect, or determine any part or the aggregate
of such aforesaid rates and fares and charges. Such schedule
shall be plainly printed in large type, of at least the size

of ordinary pica, and copies for the use of the public shall be kept in every depot or station upon any such railroad, in such places and in such form that they can be conveniently inspected." It is further provided in said section 6: "And when any such common carrier shall have established and published its rates, fares, and charges, in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force. Every common carrier, subject to the provisions of this act, shall file with the commission, hereinafter provided for, copies of its schedules of rates, fares, and charges which have been established and published in compliance with the requirements of this section, and shall promptly notify said commission of all changes made in the same." The complaint of plaintiff seems to be that the tariff schedules were not brought to the notice of the officers of the Construction Company. It is not claimed that there was any lack of knowledge of the notice abrogating all special rates, which, as before remarked, covered the rate contended for. This special rate having been canceled by this order, it was clearly the duty of the officers of the Construction Company to apply at some place designated by section 6 of said act as a repository for the schedules therein provided if such officers desired information as to the rates embodied in the schedules. There is no showing, and there can be entertained no presumption, that inquiry at the proper place would not have secured an examination of schedules of rates kept for public inspection as required by law. A claim for equitable relief can hardly be predicated upon a technicality so narrow or a presumption so violent as this. That the act to regulate commerce was, in this respect, sufficiently complied with,

seems clearly established upon the undisputed evidence in this case; and accepting that the conclusion as fixed, attention will be devoted to another question which incidentally arises.    This question is, whether or not the act to regulate commerce abrogated existing special rates based upon that contract.

In *Southern Wire Co. v. St. Louis Bridge & Tunnel R. Co.*, 38 Mo. App., on page 191, the language of Thompson, J., delivering the opinion of the court, is as follows: "But it is argued that the statute, not being retroactive in its terms, is to be construed as prospective only, and as not having the effect of abrogating existing contracts in conflict with its prohibitions.    We do not, of course, question the general principle that courts uniformly refuse to give to statutes a retrospective operation whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room for doubt that such was the intention of the legislature.    This principle has been affirmed so often by the supreme court of the United States that it must be conceded to be a well settled principle to be applied in the interpretation of federal statutes. (*Chew Heong v. United States*, 112 U. S., 536, 559; *United States v. Heth*, 3 Cranch [U. S.], 398, 413; *Murray v. Gibson*, 15 How. [U. S.], 421, 423; *McEwen v. Den*, 24 How. [U. S.], 242, 244; *Harvey v. Tyler*, 2 Wall. [U. S.], 328, 347; *Sohn v. Waterson*, 17 Wall. [U. S.], 596, 599; *Twenty Per Cent Cases*, 20 Wall. [U. S.], 179, 187.)    It is possibly of more peculiar application in the interpretation of federal than of state statutes, since no prohibition rests upon congress from passing laws impairing the obligation of contracts, such as the federal constitution imposes upon the legislatures of the states.    But notwithstanding this, we are clear of all doubt that it was the purpose of congress, in enacting this statute, to put an end to all existing contracts and arrangements, producing unjust discrimination among shippers upon interstate rail-

ways. It is a most important general police regulation, designed to prohibit and suppress great abuses which had sprung up among interstate public carriers, whereby preferences were given to wealthy and favored shippers, which had the effect of driving out of business and destroying those who were not thus favored. It would greatly impair its effect to hold that it does not operate to abrogate existing contracts which are opposed to its prohibitions. Such a holding would open the door to fraudulent evasions of it by the making of contracts creating unjust discriminations and antedating them so as to place them seemingly beyond its reach."

The supreme court of Montana in *Bullard v. Northern P. R. Co.*, reported in 45 Am. & Eng. R. Cas., made use of the following language, which will be found on pages 244, 245 of the volume just named: "If the contract mentioned in the complaint has been fulfilled, it is plain that, after the act of congress became effective, and during the period specified in the pleadings, there would have been a discrimination in favor of the respondent by the appellant in the sum of $590.95 on account of the transportation of his goods. In other words, the patrons of the Northern Pacific Railroad Company, who had no special agreement, would pay this amount for the same service in excess of what would be demanded of the respondent. It has been adjudged in many cases that when these circumstances arise, the contract, which was entered into by the parties in this action, is contrary to public policy, and cannot be enforced. (*Messenger v. Pennsylvania R. Co.*, 36 N. J. Law, 407, affirmed 37 N. J. Law, 531; *Schofield v. Lake Shore & M. C. R. Co.*, 43 O. St., 571, 23 Am. & Eng. R. Cas., 612; *Christie v. Missouri P. R. Co.*, 94 Mo., 453, 32 Am. & Eng. R. Cas., 413; *Chicago & A. R. Co. v. People*, 67 Ill., 11; *Indianapolis, D. & S. R. Co. v. Ervin*, 118 Ill., 250, 27 Am. & Eng. R. Cas., 8.)"

In *Fitzgerald v. Grand Trunk R. Co.*, 22 Atl. Rep.,

on page 77 *et seq.*, is found the following language of Powers, J., delivering the opinion of the supreme court of Vermont: "In this case it is to be noted that the contract called for a transportation of the lumber through three states; such carriage, therefore, is commerce between the states within the meaning of article 1, section 8, of the federal constitution. Such commerce is solely regulated by congress, and when parties make contracts to engage in interstate commerce, they are held to do so on the basis and with the understanding that changes in the law applicable to their contracts may be made. There can, in the nature of things, be no vested right in an existing law which precludes its change or appeal, nor vested right in the omission to legislate upon a particular subject which exempts a contract from the effect of subsequent legislation upon its subject-matter by competent legislative authority. (Cooley, Const. Lim., 284, 574; *Thorpe v. Rutland & B. R. Co.*, 27 Vt., 140; *Ogden v. Saunders*, 12 Wheat. [U. S.], 214; *State v. Holmes*, 38 N. H., 225.) The power to regulate commerce between the states is one given expressly in the constitution to congress. The interstate act was called into being by reason of the making of contracts like the one at bar. Unjust discrimination was one of the chief evils in transportation which congress attempted to end by this act, and we see no reason why the act could not as properly put an end to a contract already working the mischief as to prohibit the making of one in the future. The case then comes to this: The plaintiffs seek to enforce a contract which is prohibited by law. The doctrine is elementary that whenever the plaintiff is compelled, in order to make out his case, to show the illegal contract, he cannot recover."

The following language of Judge Cooley is reported in *Kentucky & Indiana Bridge Co. v. Louisville & N. R. Co.*, 34 Am. & Eng. R. Cas., on page 653: "The slightest examination of the act to regulate commerce will make it

evident that congress has not undertaken thereby to med-
dle with contracts or to affect them in any way except as
they may incidentally be affected by the rules it lays down
and the regulations it prescribes. Those rules and regula-
tions are in the nature of police laws. They are prescribed
that facilities created for the public benefit may not be
abused, that right may be done and public conveniences of
a certain class made as useful as possible. It is not one of
the purposes of congress that contracts shall be abrogated,
much less that the obligation of this particular contract now
brought to our attention, and which the act in no way re-
fers to, shall in any particular be impaired or interfered
with. But the act to regulate commerce is a general law,
and contracts are always liable to be more or less affected
by general laws, even when in no way referred to. This
is the case with state laws as well as with federal. There
probably was never an act passed in restraint of the sale of
intoxicating drinks which did not affect some contracts
and render their literal enforcement impossible. The same
may be said of the federal revenue laws. Nothing is more
likely than that a considerable change in customs, regula-
tions, or custom duties, or in the provisions made for en-
forcement of excise laws will deprive some party of a right
he supposed he had secured by contract. But this inci-
dental effect of the general law is not understood to make
it a law impairing the obligation of contracts. It is a nec-
essary effect of any considerable change in the public laws.
If the legislature had no power to alter its police laws
when contracts would be affected, then the most important
and valuable reforms might be precluded by the simple de-
vice of entering into contracts for the purpose. No doc-
trine to that effect would be even plausible, much less
sound and tenable."

We have been cited to no case in conflict with the views
expressed in the opinions from which liberal quotations
have just been made. The conclusions arrived at and the

reasons given are indorsed by all the authorities of which we have any knowledge or of which any citation has been made; and of the latter class, there are a great number which it has been deemed inexpedient to embrace within the limits of this discussion. It follows, therefore, both upon authority and principle, that the contract for the special rate of three-fourths of a cent per ton per mile cannot be held to obtain unimpaired by the act of congress entitled "An act to regulate commerce," much less can it be tolerated that the enforcement of that rate should be made the basis of recovery of amounts paid in excess thereof, but which were charged and collected upon the tariff rate of the Missouri Pacific Railway Company.

Some stress seems to have been laid upon the finding that the rate of three cents per ton per mile was unreasonable and unfair. Section 9 of the act to regulate commerce is as follows: "That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act may either make complaint to the commission, as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any district or circuit court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt. In any such action brought for the recovery of damages the court before which the same shall be pending may compel any director, officer, receiver, trustee, or agent of the corporation or company defendant in such suit to attend, appear, and testify in such case, and may compel the production of the books and papers of such corporation or company party to any such suit; the claim that any such testimony or evidence may tend to criminate the person giving such evidence shall not excuse such witness from testifying, but

such evidence or testimony shall not be used against such person on the trial of any criminal proceeding." It will be observed that this section provides that application may be made for the redress of grievances either to the interstate commission provided for in the act, or to any district or circuit court of the United States of competent jurisdiction. There is no provision in the act which authorizes suit to be commenced in the state courts, as was provided in the act for the recovery of the penalty for the exaction of usury by national banks. Even under this act last referred to, which provided specially that such jurisdiction might be exercised by state courts, it was strenuously insisted, and by some courts even held in the teeth of the language of the act itself, that the jurisdiction to enforce the provisions of that act was, from the nature of the case, limited to the federal courts alone. It would seem, from an examination of the "Act to regulate commerce," that as to the particular form of grievance alleged in this action congress has provided a commission, to which application should have been made, after April 5, 1887, for the adjustment of rates, if, as found by the courts, those exacted from the Construction Company were unreasonable and unfair; or the aggrieved party might sue, in a district court of the United States having jurisdiction, for damages occasioned by such unfair exaction.

The view which we take as to the federal jurisdiction, being exclusive in regard to the matter now under consideration, is not without the support of very respectable authorities.

In *Copp v. Louisville & N. R. Co.*, the supreme court of the state of Louisiana, in 46 Am. & Eng. R. Cas., employed the following language, which is found on page 634: "In the instant case the right asserted by the plaintiff is claimed under an act of congress, which specifies the remedy for its enforcement. This circumstance suffices to evidence that congress saw fit to give the federal courts ex-

clusive jurisdiction. The motive which induced such leg-
islation may have been, and no doubt is, to create one en-
tire and complete system and provide for the necessary
uniform machinery to make it effective on an important
and vital subject of national interest. (See further, Suther-
land, Stat. Const., sec. 399; *Dudley v. Mayhew*, 3 N. Y., 9;
*The Moses Taylor*, 4 Wall. [U. S.], 429; *Martin v. Hunter*,
1 Wheat. [U. S], 334; *Ex parte McNiel*, 13 Wall. [U. S.],
236.)"

In *Coxe Brothers v. Lehigh Valley R. Co.*, 4 Interstate
Commerce Commission Reports, on page 578, is found the
following language: " The act to regulate commerce, which
declares every unjust and unreasonable charge to be unlaw-
ful, and requires its provisions to be enforced by the com-
mission, confers the power to determine, and imposes on the
commission the duty of determining, what are the reasona-
ble rates which the charges may not exceed, as well as
what are unreasonable."

In *Swift v. Philadelphia & R. R. Co.*, 58 Fed. Rep.,
858, and in three other cases of the same nature submitted
at the same time in the circuit court of the United States
for the northern district of Illinois, in an opinion filed No-
vember 28, 1893, Grosscup, J., said: "The courts of the
United States have had many occasions to enforce the com-
mon law, but in every instance it has been as the munici-
pal law of the state by which the subject-matter was
affected. Outside of the interstate commerce act there is
no enactment of congress and no self-operating provision of
the federal constitution which expressly or by implication
evidences a command or purpose to interfere with the free-
dom of interstate commerce or lay any restraint upon the
rights of carriers or shippers engaged therein. ( *Welton v.
State of Missouri*, 91 U. S., 282; *Brown v. Huston*, 114
U. S., 822.) The question then arises, is the municipal law
of the state applicable to the transaction set forth in the
declaration? Is the act or contract of the carrier who ac-

cepts goods for carriage from one state into another subject to that particular provision of the municipal law of the several states where the goods are taken, or through which they are conveyed, which prohibits the exaction of unreasonable rates? There can be no doubt that to congress is given, by the constitution, the absolute power to regulate commerce between the states. This power, independently of legislation, is not necessarily exclusive of the right of the states to reasonably regulate such incidents of interstate commerce lying within their respective jurisdictions, as wharves, pilots, harbors, roads, bridges, etc. A wharf, harbor, or bridge lying within a state is a tangible entity over which the laws of the state extend. The cost of their creation and the expenses of their maintenance make the imposition of tolls and charges not only reasonable but necessary. These must be enforced by, and subject to, some law, and in the absence of congressional legislation there is no law except that of the state. The application of the state law in such cases is not inconsistent with the general power conferred upon congress, and does not introduce into commerce between the states either confusion or restraint. Such regulations may exist harmoniously with regulations imposed by other states upon wharves, harbors, and bridges within their territorial limits. But the fixing of a rate for the carriage of goods from one state to another is not simply an incident of, or appurtenance to, commerce, but is the very core and essence of interstate commerce. It is not a physical entity within the limits of a state, and it cannot be subject to regulation in one state without coming into interference with the equally rightful regulations of other states, and thus producing hopeless contradiction and confusion. How can Illinois determine what is a reasonable charge for carriage across Indiana, Ohio, or Pennsylvania? The reasonableness of such rate depends, among other things, upon the cost of construction and wages paid beyond her

jurisdiction; the amount of capitalization allowed, and taxes and assessments exacted by other jurisdictions; the terms of contracts for the interchange of freight between carriers made and allowed under the laws of other states, and the amount of traffic carried which may, in turn, be affected by the laws of the other states governing the acquisition of or consolidation with other lines. These and many others are the elements of the cost of carriage, and before the reasonableness of a rate can be determined, the cost must be ascertained. The reasonableness of rates for such long distances and over different methods of conveyance can only be approximately ascertained at best by men of special learning and equipment in such matters. Is it possible that the constitution contemplates that such learning can be found in the courts and juries of every county traversed by a line one thousand miles long? I am of the opinion that a rate for the carriage of interstate commerce, dependent, as it is, for its reasonableness upon so many different considerations of expenditure, business, and interpretations of the laws of different states, is essentially a national affair, and its regulation is, therefore, exclusively national. The rate of carriage is the heart pulse of commerce, and can be subject safely to a single source of restraint only; many restraints themselves, entirely different and inconsistent with each other, would destroy the very possibility of uniformity or fixedness of rates. It follows, therefore, that, in my opinion, the local municipal law of the several states is not applicable to the reasonableness of these rates, and cannot be appealed to as a basis for suits such as these." In the latter part of this opinion, Grosscup, J., said: "The right to question the reasonableness of an interstate commerce rate is a matter of primary as well as of exclusive jurisdiction in the federal courts. It does not reside in the jurisdiction of the state courts, or of the federal courts acquired by the fact of diverse citizenship." This decision was upon the question of the right of

removal from a state to a federal court, it is true, as indicated in the sentence last quoted, but the principles enunciated are fairly applicable to the question which we have under consideration. Upon the general principle which we have been discussing, the language of COBB, J., as found in *Keith v. Tilford*, 12 Neb., on page 273, is as follows: "There can be no doubt of the correctness of the proposition to which plaintiffs in error cite numerous authorities, that where the statute confers a right and prescribes adequate means of protecting it, the proprietor of the right is confined to the statutory remedy." (See, also, *Tecumseh Town Site Case*, 3 Neb., 284, and *Richards v. Commissioners, Clay County*, 40 Neb., 45, and cases therein cited.) It necessarily follows that the interstate commerce act required the abrogation of all special rates by railroads affected by its provisions, and that though the uniform rate put in operation by the railroad company under stress of the act to regulate commerce may be unreasonable and unfair, yet that the federal authorities named in the act itself have exclusive jurisdiction to inquire into and redress grievances on that score. We are, therefore, constrained to disallow the item of overcharges, for the repayment of which subsequent to April 5, 1887, the trial court found the Missouri Pacific Railway Company liable.

16. The trial court found that the Missouri Pacific Railway Company had paid out for right of way necessary for the construction of the railroads contemplated by the contracts hereinbefore referred to, the sum of $58,758.39 before this suit was begun, and $6,601.91 since, and that the defendant was entitled to recover that sum from the Construction Company. As between the Construction Company and the Denver, Memphis & Atlantic Railroad Company, as well as between the Construction Company and the other roads of which the building was undertaken by the Construction Company, the contract required in each case that the Construction Company should pay for

the necessary right of way. There exists neither in the evidence nor in the pleadings any grounds proved or alleged for shifting this payment for the right of way so that the Missouri Pacific Railway Company should be liable for it, and as the last named railway company has been compelled to pay the above amounts, it is entitled to a reimbursement thereof with interest.

The last item allowed by the trial court was of interest at the rate of six per centum per annum on the sums found due respectively. Section 2, chapter 44, Compiled Statutes, provides: "Interest upon the loan or forbearance of money, goods, or things in action shall be at the rate of seven dollars per year upon one hundred dollars, unless a greater rate, not exceeding ten per cent per annum, be contracted for by the parties." Clearly in this state the rate upon such items as we have considered should be reckoned at the rate of seven per cent per annum from the date that each cause of action arose. There might be such controlling facts that resort would be had to the laws of another state to determine what rate of interest should be allowed between the parties. No showing has been made, however, as to such facts; neither has there been submitted any evidence of a different rate of interest from that of Nebraska prevailing elsewhere. We must, therefore, presume that the laws of other states are the same as our own. (*Ruth v. Lowrey*, 10 Neb., 260; *Lord v. State*, 17 Neb., 526.) Interest upon the several items found due will, therefore, be reckoned from the commencement of this action, for want of a more satisfactory basis, at the rate of seven per cent per annum.

It is unnecessary to note in detail the several items as to which there is no controversy between the parties; these will, therefore, be accepted as fully established. There is due on account of these items, and based upon the several matters which have been discussed at length, as between the Fitzgerald & Mallory Construction Company and the

Missouri Pacific Railway Company, the amounts herein-after set forth.

From the Missouri Pacific Railway Company to the Construction Company aforesaid there is found due the following items:

| | | |
|---|---:|---:|
| For refund of passenger fares.................. | $4,538 | 51 |
| For labor.......................................... | 93 | 50 |
| For material furnished.......................... | 11,396 | 75 |
| For water furnished ............................. | 3 | 00 |
| For coal furnished............................... | 11 | 00 |
| For rails and ties furnished .................... | 7,098 | 17 |
| Engine supplies................................... | 536 | 69 |
| Labor and material (account bridges)......... | 1,194 | 57 |
| Taxes .............................................. | 1 | 00 |
| Mail service....................................... | 1,055 | 41 |
| Construction Verdigris Valley R. R......... | 36,869 | 01 |
| Construction Winfield, Texas & Gulf R. R.. | 18,028 | 84 |
| Overcharges on merchandise .................. | 1 | 66 |
| Equipment purchased (cars and engines)..... | 132,735 | 03 |
| Overcharges on material (Horace)............ | 163 | 72 |
| Miscellaneous items.............................. | 12,988 | 87 |
| Overcharges on freight prior to April 1, 1887.............................................. | 17,769 | 45 |
| Interest paid Jay Gould, Cr. September 1, 1887.............................................. | 62,500 | 00 |
| Additional stall roundhouse, Chivington.... | 1,000 | 00 |
| Extra grading at Chivington.................... | 6,000 | 00 |
| Material at Chivington, October, 1888...... | 16,241 | 16 |
| Material at Chivington since November, 1888.............................................. | 19,680 | 00 |
| Material at Chivington, tax sale............... | 16,910 | 59 |
| Ten per cent discount on $5,000,000......... | 500,000 | 00 |
| Reduction of $1,000 per mile on 36 miles... | 36,000 | 00 |
| Miscellaneous material at Chivington........ | 5,000 | 00 |
| Telegraph line..................................... | 25,703 | 03 |
| Extra ties on D., M. & A...................... | 23,192 | 07 |

| | |
|---|---:|
| Stock yards and pens............................ | $11,800 00 |
| Fencing, Chetopa & Conway Springs division........................................ | 1,522 98 |
| Turn-tables, Conway Springs division....... | 4,522 01 |
| Extra nut-locks, D., M. & A.................. | 2,223 92 |
| Interest to December 24, 1893, 7 per cent... | 341,873 33 |
| Total......................................$1,318,654 27 | |

There is due the Missouri Pacific Railway Company from the Fitzgerald & Mallory Construction Company:

| | |
|---|---:|
| For freight charges.............................. | $28,766 17 |
| Tickets furnished ................................ | 881 54 |
| Water furnished ...................... ........... | 45 50 |
| Taxes paid.............................,........... | 1,021 38 |
| Coal furnished.................................... | 3,197 38 |
| Cars destroyed.. ................................. | 334 63 |
| Cars repaired.................................... | 1,117 49 |
| Rent of cars ...........................,......... | 20 00 |
| Cross-ties furnished............................. | 110,776 49 |
| Overcharges on freight transported........... | 413 07 |
| Labor and material furnished.................. | 1,921 76 |
| Recording deeds ................................. | 13 80 |
| Judgment and cost of right of way prior to suit............................................. | 58,758 39 |
| Paid T. J. Prosser & Co........................ | 26,766 39 |
| Loss and damage on shipments ............... | 47 13 |
| Stoves, etc......................................... | 113 59 |
| Bridge materials furnished........ ............ | 186 00 |
| Labor and material (account bridges)......... | 23,673 00 |
| Drawbacks (overcharge and shortage)........ | 839 59 |
| Expenses paid on right of way................. | 5,521 05 |
| Paid M. S. Carter & Co........................ | 513 90 |
| Paid J. B. Colt & Son.......................... | 18,830 31 |
| Paid T. J. Hillard ............................. | 13,106 44 |
| Cash, Russell Sage, December 28, 1887 ..... | 10,000 00 |
| Cash, Jay Gould, December 28, 1887........ | 20,000 00 |

| | | |
|---|---:|---:|
| Cash, George Gould, January 23, 1888...... | $10,000 | 00 |
| Cash, A. H. Calef, January 25, 1888........ | 20,000 | 00 |
| Paid taxes at Chivington tax sale........... | 3,050 | 40 |
| For right of way since suit.................... | 6,601 | 91 |
| September 22, 1887, overpayment on bonds, | 43,640 | 00 |
| Interest to December 24, 1893, at 7 per cent, | 143,554 | 88 |
| Total .................................... | $553,712 | 19 |

On the 24th day of December, 1893, there was due upon an accounting between the parties named a balance of seven hundred and sixty-four thousand nine hundred and forty-two dollars and eight cents ($764,942.08), the difference between the above totals, from the Missouri Pacific Railway Company to the Fitzgerald & Mallory Construction Company, on which sum, from the date last mentioned, interest is to be computed at the rate of seven per cent per annum, and judgment in this court shall accordingly be rendered as of the date of the filing of this opinion, such judgment, when rendered, to draw interest at the same rate.

It is further ordered, that upon the rendition of judgment, as aforesaid, this cause be remanded to the district court of Lancaster county, Nebraska, with instructions to that court to enforce the collection of such judgment; and that upon its collection a receiver be appointed by said district court, who shall be authorized to collect, receipt for, and pay out the proceeds of the judgment above provided for (also, such other assets of said Construction Company as may be within the jurisdiction of said court), under such regulations, rules, and proceedings as by said district court shall be judged equitable and proper.

The judgment of the district court is reversed and a judgment in favor of the Fitzgerald & Mallory Construction Company against the Missouri Pacific Railway Company is directed.

JUDGMENT ACCORDINGLY.

RAGAN and IRVINE, CC., dissenting.

We cannot concur in the conclusion adopted by the court. In our opinion the judgment should be very different, and for reasons which we shall proceed to state.

The Denver, Memphis & Atlantic Railroad Company (hereinafter referred to as the "Denver Company") was incorporated in Kansas for the purpose of constructing a railroad from Denver to Memphis, extending through the state of Kansas. This company made a contract with the plaintiff and S. H. Mallory for the construction of a portion of its road. The terms of the contract are not material to this case. Fitzgerald & Mallory proceeded under the contract to the extent of grading about sixty miles of the road-bed, when funds seem to have been exhausted, and it became necessary to adopt some new plan of construction. Mr. Mallory and an officer of the Denver Company proceeded to New York for the purpose of interesting some large railroad company in the enterprise. Negotiations were begun with the officers of the Missouri Pacific Railway Company, chiefly with Mr. Jay Gould, its president; Mr. Fitzgerald also being in New York and taking part in the negotiations in some of their stages. As a result of these negotiations it was agreed between certain officers of the Missouri Pacific and Messrs. Fitzgerald & Mallory that a construction company should be incorporated, the stock of which should be taken by Messrs. Fitzgerald & Mallory, and certain other persons, most of whom were interested in the Missouri Pacific. Accordingly the Fitzgerald & Mallory Construction Company (hereinafter referred to as the "Construction Company") was incorporated under the laws of the state of Iowa, the expressed object of the corporation being the construction of railroads by contract, and the operation thereof, mining for coal or other minerals, quarrying stone and other materials. It does not seem to have ever been contemplated that the

Construction Company should do a general business, but merely that it should construct the Denver road and other roads in connection therewith. This Construction Company had a board of five directors, composed of Mr. Fitzgerald, Mr. Mallory, and three other gentlemen closely associated in business with the two named, and presumably friendly to their interests. The capital stock of this company was at first one million dollars, but was afterwards increased to one million and a half. Of this Mr. Fitzgerald and Mr. Mallory never owned more than one-fifth; almost all of the remainder being taken by persons who were directors of the Missouri Pacific. Upon April 26, 1886, soon after the Construction Company was incorporated, a contract was entered into between the Denver Company and the Construction Company whereby the Construction Company agreed to furnish materials and money and to construct the Denver Company's road. In consideration thereof the Denver Company agreed to pay the Construction Company its stock and all its bonds, being $16,000 per mile of each, at such times and in such settlements as the Construction Company might require. The Denver Company also agreed to deliver to the Construction Company all municipal and county bonds and all donations that might be voted to the Denver Company and to procure the right of way, but the Construction Company was to pay therefor. Upon the completion of the road the Construction Company was to equip it with at least $1,000 per mile of rolling stock. The road was to be built as it might be thereafter located, properly graded according to the engineer's survey, furnished with oak ties, on curves not less than 2,600 to the mile, and steel rails not less than fifty-six pounds to the yard. There were also to be such depots and stations as the Denver Company might determine, all necessary siding and turn-outs, and the road generally was to be constructed "equal to the roads now being built in southern Kansas." The foregoing states the substance of the whole contract.

Upon May 4, 1886, a contract was entered into between the Construction Company and the Missouri Pacific referring to that between the Construction Company and the Denver Company and making it a part of the new agreement, and reciting further that the Missouri Pacific "is desirous of obtaining control of the said line of road." The agreement then follows that the Construction Company shall sell to the Missouri Pacific all of the securities to be received from the Denver Company, less the amount of stock given for municipal and county aid, estimated at $3,500 per mile, and receive in payment for the same $12,000 per mile of Missouri Pacific five per cent bonds, to be secured by a deposit of the Denver securities with a trustee. The Construction Company also agreed that the railroad should be of standard gauge, of not less than fifty-six pound steel rails, 2,600 ties to the mile, stations not more than eight miles apart, water stations not more than twenty miles apart, and that the road should be equal in its general character "to the roads now being constructed by the Missouri Pacific Railway Company in the state of Kansas, all to be subject to the approval of the chief engineer" of the Missouri Pacific. An addendum to the contract provides for the payment of these securities upon both sides upon the completion of the road in ten-mile sections, and for the transportation of men and materials by the Missouri Pacific, at the actual cost, over such portions of the road as might be turned over to the Missouri Pacific during the period of construction. Afterwards, the provision for settlements as ten-mile sections were completed was waived by the parties, as was also the requirement that the Construction Company should equip the road. This last waiver was through an arrangement between the Construction Company and the Missouri Pacific whereby the Construction Company was to omit the equipment and receive $11,000 instead of $12,000 per mile of Missouri Pacific bonds. The Denver Company was

not a party to this last transaction and there was no rebate made in payments by the Denver Company to the Construction Company on that account.   Upon May 11 the board of directors of the Construction Company approved both these contracts and one of its directors resigned and Mr. Russell Sage, a director of the Missouri Pacific, was elected to take his place.   Upon November 3 two other directors resigned and Mr. George Gould and Mr. Richard Cross were elected in their stead.   Mr. George Gould was then assistant to the president of the Missouri Pacific, and the following year became acting president thereof.   Mr. Cross was a member of the banking house of Morton, Bliss & Co.   The trial court found that he was directly or indirectly interested in the Missouri Pacific, but we find no evidence in the record to sustain that finding.   It does not appear that either he or his firm was so interested, but it does very clearly appear from the evidence that upon every occasion when there was a difference of opinion among the directors Mr. Cross acted with Mr. Gould and Mr. Sage and against Mr. Fitzgerald and Mr. Mallory.   It may be well to state here that the directory of the Denver Company was at first composed of men whose business and personal relations, and whose conduct as directors indicate that they were friendly to the interests of Mr. Fitzgerald and Mr. Mallory, but as soon as the Missouri Pacific had, by virtue of the contracts referred to, obtained an instalment of stock in the Denver Company, a meeting of that company was held and a board of directors elected, a majority of whom were closely connected with the Missouri Pacific.   Under these contracts there was eventually constructed a line of railroad from Chetopa, near the southeastern corner of Kansas, in a generally northwesterly course to Larned, on the Arkansas river, and another line from McCracken, a short distance west of the center of the state, in an almost westerly course to the Colorado line.   There was also constructed, under contracts substantially similar to those already set

forth, a line of railroad known as the Kansas & South-western, about twenty-five miles in length, and under still another contract about two miles of road known as the Winfield, Texas & Gulf. No controversy arises out of the construction of the last named road and the Construction Company's compensation therefor appears in the account below as an admitted item. During the progress of the work in Kansas a company known as the Pueblo & State Line Company was incorporated under the laws of the state of Colorado. This company will be hereinafter referred to as the "Pueblo Company." It seems to have been incorporated in the interest of the Missouri Pacific and by officers of that company. Upon August 16, 1887, the Pueblo Company entered into a contract with the Construction Company for the construction of a line of road from Pueblo easterly to a connection with the Denver road, and upon the same day the Missouri Pacific contracted with the Construction Company for the purchase of the stock and bonds of the Pueblo road and payment therefor in Missouri Pacific bonds. These contracts were very similar to those relating to the Denver road. They were somewhat more specific in their provisions, contained no requirement for equipping the road, and provided for bonds upon the Pueblo road at $15,000 per mile and stock at $10,000 per mile, for which stock and bonds the Missouri Pacific agreed to give $12,000 per mile of its five per cent bonds. This line of road was built by the Construction Company. Controversies having arisen out of various transactions under the foregoing contracts, or connected therewith, this action was brought by Fitzgerald, for himself and all the other stockholders of the Construction Company, for an accounting between the Construction Company and the Missouri Pacific.

The fundamental principle to be observed should be the discovery of the real nature, purposes, and results of these transactions and proceedings. Upon their face the con-

tracts appear to be grouped as follows: One class between
railroad companies and the Construction Company, con-
templating the construction of lines of railroad and the
payment therefor in stock and bonds, a transaction reason-
able and legitimate in its nature when unaccompanied by
elements of fraud.    Second, another series of contracts
between the Construction Company and the Missouri Pa-
cific, whereby the Construction Company sells the stock
and bonds so obtained and receives in exchange bonds of
the Missouri Pacific.    This also seems upon its face to be
a legitimate and reasonable transaction.    It is the duty of
a court, especially in the exercise of its equitable powers,
to look behind the form of contracts and transactions and
reach their substance.    When an *effort is made to do so in*
this case, an entirely new light is thrown upon the whole
enterprise, and facts are disclosed which, in our opinion,
call upon the court to apply to the case a fundamental and
familiar maxim of the law which should dispose of the
whole controversy, at least so far as the interposition of
courts is concerned.

Examining the contracts and proceedings thereunder in
this light, the following observations are made: (1.) The
originally contracting railroad companies were scarcely
more than paper concerns, without property, without *bona
fide* stock, without financial responsibility, without any re-
sponsibility except to the sovereign power of the states
creating them.    (2.) The Construction Company, out of
its board of five directors, at all times had at least two
members of the directory of the Missouri Pacific, and for
a third member a man who at all times voted with the
Missouri Pacific interests.    The large majority of the
stock of the Construction Company was owned by Missouri
Pacific directors and stockholders.    (3.) It never seems to
have been contemplated that the Construction Company
should do a general business, but its organization and op-
eration was a device to assist in the construction of these

35

particular lines of railroad. (4.) The plain, and indeed the express, object of the Missouri Pacific in contracting with the Construction Company was to obtain control of the railroads so to be constructed by the acquisition of all their stock and all their bonds. (5.) It is just as plainly inferable that the accomplishment of this object was one motive which led the Missouri Pacific stockholders and directors to subscribe to the stock of the Construction Company. (6.) The control so obtained of the original corporations enabled the Missouri Pacific in some manner to arrange with those companies to obtain not only a directing control of the corporations themselves, but actual possession and right to operate their tangible property as rapidly as it was brought into existence. (7.) Each one of these original companies issued capital stock and bonds vastly in excess of the cost of creating, and presumably of the value of its property. To illustrate: The stock of the Denver Company was $16,000 a mile, and its bonds $16,000 a mile. The stock of the Pueblo Company was $10,000 a mile, and its bonds $15,000 a mile. The other companies show similar figures. The evidence is not altogether harmonious as to the cost of construction, but it may safely be said that a figure between $10,000 and $12,000 a mile would amply cover the whole cost of construction, including the procurement of the right of way and the purchase of material, the erection of telegraph lines, the construction of stations, side tracks, stock pens, and all other things possessed by the companies. (8.) The bonds of the Missouri Pacific with which these securities were bought were not worth at the outside estimate much more than par; in fact, they were sold by the Construction Company at ninety cents. (9.) The Missouri Pacific was careful to contract in all cases that the stock and bonds which it should receive should be issued by the original companies, except that in regard to the Kansas roads an exception was made of so much of the stock as

might be issued in payment for local aid bonds. This feature will be hereinafter referred to. (10.) The stock of these companies being delivered to the Missouri Pacific, and there being no evidence as to any future disposition thereof, it is to be presumed that the Missouri Pacific still holds it for the purpose of maintaining its "control" of the original companies. (11.) The bonds were deposited with a trustee to secure the Missouri Pacific bonds with which they and the stock were purchased, but the Missouri Pacific receives the interest thereon from time to time. (12.) While the arrangements between the Missouri Pacific and the companies so passed under its "control" do not appear from the evidence, in view of the fact that the bonds of these companies amount in their aggregate to more than the cost of the roads and that they bear six per-cent interest, it is fair to presume that any sums paid to the original companies by way of rentals or otherwise in payment for the privilege of holding and operating these roads is absorbed in the payment of interest on the bonds and so pass directly back to the Missouri Pacific. If any surplus remains, it is, of course, disposed of by way of dividends to the stockholders, —that is, the Missouri Pacific,—except to the extent of stock in the Kansas roads held by the municipalities which saw fit to impose the burden of taxation upon their citizens for the purpose of aiding this enterprise. (13.) So far as the evidence shows what became of the Missouri Pacific bonds after they reached the Construction Company, it appears that nearly all of them were sold at a discount to directors of the Missouri Pacific, who were also stockholders in the Construction Company. It therefore follows that all the sources of income created by these complex arrangements have been so manipulated that the income passes either directly to the Missouri Pacific or to such of its directors as seem to control its operations and also those of the Construction Company.

From these observations and from facts upon which they

are based the following conclusions seem inevitable: The whole scheme amounted to a device of the Missouri Pacific, or those having its control, to construct certain railroads in Kansas and Colorado, issue stocks and bonds vastly in excess of the value of the property, so manipulate them that whatever earnings might accrue would pass to the Missouri Pacific or to favored stockholders therein, so that the Missouri Pacific and those stockholders should receive all possible benefits from the transaction, and at the same time assume no burdens, leaving all the financial responsibility upon the Construction Company and all the legal responsibility devolving upon a railroad company in favor of the state upon those local corporations which have been heretofore styled the original companies, and which it is perfectly fair to characterize as purely paper and fictitious concerns and irresponsible devices for the purpose of exercising the rights granted by the states and assuming the obligations imposed upon such corporations by the states, and so relieve the real projector and promoter of the scheme from all actual responsibility. The overissue of stock and bonds is in itself a serious and probably sufficient reason for characterizing the transaction as fraudulent.

The courts, wherever the subject has arisen, as well as the text-writers, have announced the general doctrine that stock certificates purporting to be paid up should be actually so, and that the issuing of stock gratuitously at a discount, or in exchange for property taken at a known and intentional overvaluation, is a fraud. The fraud has been variously characterized as one against *bona fide* stockholders, against creditors, against the corporation itself, against the public and upon the law. It is not often that a remedy exists for such a fraud, and in many of the cases the courts, while insisting that the issue of fictitious stock is a fraud, have been compelled to deny relief against it, either because the parties seeking relief were estopped, or because they were not the sufferers. This result does not, however,

render the language of the courts regarding the nature of such transactions less significant.

In *Re Ambrose Lake Tin & Copper Mining Co.*, L. R. 14, Ch. Div. [Eng.], 390, it was said in regard to such a transaction : "Whether a fraud upon which any action can be taken has been committed in this case, I am not at present prepared to say, but that a fraud was intended I have not the least doubt. The transaction has all the badges of fraud."

In *Barnes v. Brown*, 80 N. Y., 527, the court said: "The directors assuming to issue stock in that way (without consideration) would perpetrate a wrong upon the corporation and its stockholders and a fraud upon every person who took such stock as full paid stock, relying upon the appearance, and deceived thereby." .

In *Lorillard v. Clyde*, 86 N. Y., 384, the court sustained the formation of a corporation whose stock was issued in payment for steamers purchased from the stockholders at an agreed valuation which was not shown to be excessive, but it was said: "If it had appeared that the organization of the corporation in this way was a device to defraud the public by putting valueless stock on the market having an apparent basis only, a different question would be presented."

*Gilman, C. & S. R. Co. v. Kelly*, 77 Ill., 426, was a case presenting many features like the one now before us. The court said: " In this case certificates of stock to the amount of $1,400,000, being a majority of all the stock, have been issued without any real consideration, with the evident purpose to deprive the other stockholders of any influence in the election of directors or in the management of the affairs of the company. * * * Whatever may have been the motive, the disposition of the stock was such the directors could not rightfully make."

In *Tobey v. Robinson*, 99 Ill., 222, the court said in regard to stock issued without consideration : " Its issue was

in violation of law and in fraud of the rights of the stock-holders of the Erie Company."

In *Osgood v. King*, 42 Ia., 478, it was said: "It is a gross fraud for the officers of such a corporation to issue to stockholders paid up certificates of stock in consideration of real estate conveyed at a price known and understood to be many times its real value, but such a fraud is greatly intensified when the officers of a corporation deal with themselves as stockholders and accept such a conveyance in payment of their own stock." This language is peculiarly applicable to the facts of the case under consideration.

As early as 1858 the issuance of fictitious stock was denounced by Mr. Justice McLean in *Sturges v. Stetson*, 1 Biss. [U. S.], 246, and in *Fosdick v. Sturges*, 1 Biss. [U. S.], 255, as "fraud upon law and upon the stockholders." The manner in which relief can be obtained from such a fraud is not material in this case. The only important principle is that the willful and intentional issuing of ficti-tious stock is unlawful. We can only surmise some of the motives which led to it in this case. One purpose on the part of the Missouri Pacific is plain enough. The trust indenture under which the Missouri Pacific bonds were is-sued restricted the issuance of such bonds to the amount of $10,000 per mile of roads whose underlying bonds were pledged to secure the same, with one exception in favor of the St. Louis, Fort Scott & Wichita road, which was $15,-000 per mile. So far as the railroad companies in this controversy are concerned, $12,000 per mile much more than covered the average cost of construction; but these Missouri Pacific bonds were given a fictitious value by the pledge of bonds having a nominal value of $15,000 or $16,000 per mile to secure them. The advantages from an overissue of stock and bonds are manifest to any one who has been called upon to investigate contracts of corpora-tions, and those familiar with questions lately arising in regard to the reasonableness of rates fixed by the legisla-

ture, or by commissioners, for the carriage of freight and passengers. Such overissues are pernicious in effect and indefensible upon principle. No honest motive can be ascribed to such acts when knowingly committed. Such instruments partake of the nature of false tokens. They are the instruments of deception and fraud. They are intended to, and do usually, find their way into the hands of innocent purchasers, who ultimately find that they have parted with their money in exchange for depreciated securities whose actual value, owing to the gigantic nature of the enterprises upon which they are based and usually the remoteness of the field of operations, these purchasers were unable to investigate. They lead to corporate bankruptcy and often to the bankruptcy and distress of investors. They form at once the urgent motive and plausible excuse for excessive and unreasonable charges upon the patrons of the road in order to secure sufficient earnings to pay interest and dividends upon securities in excess of the productive capital invested. They afford a motive and an opportunity for directors—whose interests should be, as their legal and moral duty is, to conduct the operations of the road for the benefit of all its creditors and stockholders—to deviate from this duty and so act as to receive for themselves a profit, coming first from unfortunate and misguided investors and ultimately from the stockholders whose interests it was their duty to protect.

In the gradual advancement of the law of corporations the courts have been slow in appreciating the enormity of the fraudulent issue of stock and bonds. The devices first resorted to for this purpose were simple and transparent and were easily corrected. The ingenuity of promoters has since devised more subtle schemes, until we have, in this case, a fraud of this kind shielded under such a complexity of corporate creations, contracts, and transactions that it has been necessary to review the whole history of the enterprise and to brush aside the forms of contracts in

order to discover its real nature. It is said that such schemes are common, that certain states are grid-ironed with railroads constructed in pursuance thereof, and so charged with indebtedness that no earnings could be expected to meet their obligations as they accrue, without regard to the payment to stockholders of the profits which they have a right to expect from their investment. At the same time a cry goes up from certain classes of patrons that the passenger and freight charges of these railroads are exorbitant and ruinous, and a demand, which some states have seen fit to meet, has gone out for legislative action to control and reduce such charges. While investors in railroad securities declare that they receive no income, that depreciation has occurred, and that failure threatens, other classes declare, with equal vehemence, that exorbitant charges by railroads render their business unproductive. This state of affairs is largely caused by just such operations as have given rise to this lawsuit, and it is high time for the courts to enforce the same rules in regard to fraudulent practices carried on upon this gigantic scale and followed by these enormous results as they enforce with regard to the same transactions where the magnitude of the scheme and the intricacies of its details tend less to obscure the vision. The foregoing remarks apply to both the Kansas and Colorado roads, but with regard to those in Kansas there are other more direct and probably clearer reasons why this transaction should be deemed fraudulent. The law of Kansas was not directly put in evidence by production of the statutes or other usual methods of proof. It appears, however, that counties and municipalities of that state are permitted, upon vote of the electors, to issue their bonds to aid in the construction of railroads, and that they receive in exchange for such bonds capital stock of the railroad companies at par valuation. About $1,000,- 000 of bonds were received by the railroad companies to aid in the construction of these roads. These bonds went.

to the Construction Company. Obviously it was contemplated by the law that the stock which these bonds went to purchase should be genuine stock, but we find the property of these companies incumbered by mortgages to secure bonds in themselves greatly in excess of the cost of the roads. Then there is issued, on top of this mortgage indebtedness, stock in itself greatly in excess of such cost. The result is that these confiding municipalities have incurred obligations which have for their security the full force of the taxing power, and have received in exchange certificates of stock which are utterly worthless, so weighed down with other stock as not even to give the municipalities any effective voice in the control of the corporations, and the whole matter so manipulated in this case that the property of the corporation is turned over at once upon its creation to a different organization, in which the municipalities have no voice at all, and under such arrangements that whatever earnings might otherwise accrue to the original corporations are immediately absorbed by the other. A review of the evidence, indeed, must convince any candid reader that a chief, if not the principal, object in this enterprise, so far as the construction in Kansas was concerned, was to obtain the greatest amount possible of this local aid, with the further purpose always in view of so manipulating affairs that nothing should be given in return therefor. (See on this feature, *Gilman, C. & S. R. Co. v. Kelly*, 77 Ill., 426.) Enough has been said to demonstrate that the whole enterprise was of an unlawful character, at least so far as the Missouri Pacific and those officers who took an active part are concerned.

The question will now be asked, how does that fact affect the rights of the Construction Company? · The answer is that the Construction Company was an essential part of the unlawful scheme. It was organized for the purpose of rendering the scheme feasible, and was as necessary to it as the original paper corporations themselves.

Had the contracts been directly between these two compa-
nies and the Missouri Pacific, it is probable that they
would have been *ultra vires* of the Missouri Pacific.   It
had the right to build railroads for itself and to purchase
and lease roads, but probably not to construct roads for
other companies.   Then it must be kept in view that the
Missouri Pacific stockholders, who were also stockholders
in the Construction Company, so manipulated affairs as to
reap an individual profit to themselves.   They undoubt-
edly had this object in view from the beginning.   Then in
a direct transaction the Missouri Pacific would have in-
curred a direct financial responsibility which it was more
convenient to form the Construction Company to assume.
In short, the Construction Company was a mere device to
assist in the unlawful enterprise.   Its two stockholders who
were not interested in the Missouri Pacific had full knowl-
edge of the relations of the other stockholders to that
company.   They knew all the details of the scheme.   They
are chargeable with the knowledge of its legal result.   It
is not a case where a third person has innocently assisted
in the accomplishment of an illegal design, but one where
the party seeking relief was a party to that design.   By
way of illustration: If A and B concoct a scheme whereby
they contract with C to do a certain work, and by virtue
of that contract defraud C, or a third person, the working
of that fraud being their object in making the contract, and
to carry out the fraud employ men to do the work, these
workmen should undoubtedly recover from A and B for
their services, if they were not aware of the unlawful
character of the enterprise.   Possibly they might recover
even if they had notice of its illegality.   But if A should
pay these workmen, no court would hold that he could
compel B to contribute or account.   Such is the situation
here.   The Missouri Pacific and the Construction Com-
pany were practically partners for the purpose of carrying
out an unlawful scheme.   The court will not enforce such

a contract when executory, and when executed the court will leave the parties where they have placed themselves and refuse all relief. The general principles upon which this conclusion has been reached are founded upon public policy and are as old as the common law itself and require no argument for their establishment. There are, indeed, many cases holding that the mere knowledge of one party that the other proposes to illegally use the fruits of the contract will not prevent a recovery. This doctrine seems to have taken its rise from the opinion of Lord Mansfield in the case of *Holman v. Johnson*, 1 Cowp. [Eng.], 341, where it was held that there could be a recovery for goods sold at Dunkirk, the vendor knowing that the vendee intended to smuggle them into England; but in *Lightfoot v. Tenant*, 1 B. & P. [Eng.], 551, it was held that there could be no recovery upon a sale of goods to be disposed of by the vendee contrary to an act of parliament, where the vendor participated in the unlawful design, the court saying: "The plaintiffs do not merely assist another, they must be taken to be principals in the illicit transaction." The following forcible illustration is used: "The man who sold arsenic to one he knew intended to poison his wife with it, would not be allowed to maintain an action upon his contract." In *Hobbs v. Henning*, 17 C. B., n. s. [Eng.], 819, the court distinguishes the two cases last cited and attempts to reconcile them, overlooking the fact that in *Lightfoot v. Tenant* the inference of participation was drawn chiefly from the fact of the vendor's knowledge, and overlooking the further fact that in *Langton v. Hughes*, 1 Man. & Sel. [Eng.], 593, and in *Cannan v. Bryce*, 3 Barn. & Ald. [Eng.], 179, the doctrine of *Holman v. Johnson* had been overruled and no recovery permitted. We think that we have shown that the Construction Company was a principal and a participant in the illegal transaction, so that, measured by either rule, there can be no recovery. The language of Lord Mansfield in *Holman v. Johnson*, in

which he states the general rule, has been frequently approved and followed, while the conclusion reached in that case has been overruled. His language is as follows : "The objection, that a contract is immoral or illegal as between plaintiff and the defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may say so. The principle of public policy is this : *Ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa,* or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes ; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, *potior est conditio defendentis.*"

That the manipulation of the roads in Kansas was a gross and deliberate fraud upon the municipalities is clear, and that the organization of the Construction Company put it within the power of the common stockholders, in the first place, to earn for themselves and their coadjutors in the Construction Company a profit out of the Missouri Pacific, towards which they occupied fiduciary relations, and then in turn to take these profits from the Construction Company and put them into their own pockets, is equally clear. If the case is not parallel upon the facts, it is fairly within the principle of *Wardell v. Railroad Company,* 103 U. S., 651; *Anderson v. Carkins,* 135 U. S., 483; *Gould v. Ken-*

*dall,* 15 Neb., 549, and many other cases of a similar nature. In both *Wardell v. Railroad Company* and *Anderson v. Carkins* there is a dictum that in an appropriate action there might probably be a recovery upon a *quantum meruit,* but if that be so, it must be upon grounds independent of the contract and not in an action founded thereon. Relief was altogether refused in the cases cited, and should be refused here.

It may be said that the Construction Company is indebted and that its creditors should not suffer. Some indebtedness does appear in the record, most of it, however, to individuals who were parties to the scheme; but no creditors are here to enforce their rights, and this suit does not affect their rights. Their remedies against either or both of these companies are not before the court for consideration; and if in a direct proceeding between the parties to an unlawful contract the creditors of either must be protected, the courts could probably never apply the maxim, "*ex dolo malo non oritur actio,*" and illegal contracts would always have to be enforced. There is no pleading of the illegality of the contract, at least upon the ground herein discussed; but where upon the trial it is apparent, from evidence material to the issues, that the cause of action rests upon an agreement against public policy, the court will of its own motion refuse to enforce such agreement or grant any relief where the parties are *in pari delicto.* But conceding that the subject-matter of this suit is one which the courts should entertain, we can see neither reason nor consistency in accepting some portions of the transaction as it appears on its face and rejecting other portions as subterfuges—measuring some liabilities by the terms of the contracts and others by a rule obtained by disregarding those terms. If the case is to be entertained at all we think it should be resolved as follows:

First—Fitzgerald's right to maintain the action. The Missouri Pacific contends that the plaintiff has not es-

tablished a sufficient foundation for maintaining a stock-
holder's bill.   The allegations of the petition upon this
point are, briefly, that the persons interested in the Mis-
souri Pacific have a controlling interest in the stock of the
Construction Company; that a majority of the board of
directors of the Construction Company are interested in
the Missouri Pacific and have manipulated the affairs of
the Construction Company to its own disadvantage and
to the advantage of the Missouri Pacific.   These matters
are set out at length and in detail.   The evidence shows
that prior to the commencement of the suit the plaintiff
requested Mr. Mallory, the president of the Construction
Company, to institute the action, and that Mr. Mallory re-
fused to do so.   No demand was made upon the board of
directors.   It is claimed in defense that in every case such
a demand must be made as a condition precedent to the in-
stitution of a suit by a stockholder, or if there be an ex-
ception, it is confined to cases where the action is against
the directors individually.   The findings of the trial court
and the overwhelming weight of evidence show that a
majority of the board of directors in all of the transac-
tions where there was a conflict of interests have acted in
accordance with the interests of the Missouri Pacific or
expressed wishes of Mr. Jay Gould, its president; that in
all the matters complained of the Construction Company has
been placed in the position it now occupies by acts of that
same majority, and it is perfectly clear that a demand
upon the board of directors to institute the suit would have
been fruitless, or if it had been complied with, that the
action would have been conducted as all the past affairs of
the Construction Company had been,—not adversely to the
Missouri Pacific, but in accordance with its wishes.   We
do not think that in any case presenting a similar state of
facts has relief been denied to a stockholder.   While the cases
holding that a demand is unnecessary are generally actions
against the persons upon whom if demand were necessary

it must be made, the principle established in those cases is
that the demand is not necessary where it would be useless.
(*Barr v. New York, L. E. & W. R. Co.*, 96 N. Y., 444;
Beach, Private Corporations, 886; Cook, Stockholders,
741.)

Second—Is there a defect of parties?  It appears inci-
dentally in the pleadings and distinctly by the evidence that
Fitzgerald brought an action in Iowa against the Construc-
tion Company for the purpose of winding up its affairs, and
that in that action a receiver was appointed of the effects of
the Construction Company.  It is urged that Fitzgerald
cannot now maintain this action, at least without joining
the receiver as a party defendant.  We think it is clear
that the receiver could not himself have maintained the
action in this state.  The point was considered and dis-
cussed with great care by Mr. Justice Wayne in *Booth v.
Clark*, 17 How. [U. S.], 321, and it is there said: "Our
industry has been tasked unsuccessfully to find a case in
which a receiver has been permitted to sue in a foreign
jurisdiction for the property of the debtor.  So far as we
can find, it has not been allowed in an English tribunal;
orders have been given in the English chancery for re-
ceivers to proceed to execute their functions in another
jurisdiction, but we are not aware of its ever having been
permitted by the tribunals of the last.  We think that a
receiver has never been recognized by a foreign tribunal as
an actor in a suit.  He is not within that comity which
nations have permitted, after the manner of such nations
as practice it, in respect to the judgments and decrees of
foreign tribunals."  Inasmuch as the receiver could not be
recognized in this state and could not have been permitted
to maintain the action, it would seem to follow that the
courts of this state must proceed independently of the re-
ceivership.  As a foreign receiver he would have no interest
in the controversy, and is neither a necessary or proper
party thereto.  The case relied upon by the defendants

upon this point is that of *Porter v. Sabin,* 149 U. S., 473. It was there held that after a state court had appointed a receiver of property of a corporation, stockholders could not bring suit against the officers in a court of the United States of the same territorial jurisdiction without making the receiver a defendant. The decision was based upon the ground that when a court of competent jurisdiction appoints such a receiver it assumes the administration of the estate, and it is for that court to determine whether it will adjudicate claims for or against the receiver, or allow them to be litigated elsewhere, and in that case the court appointing the receiver and the court in which the stockholders' bill was filed having the same territorial jurisdiction, the state court had already obtained jurisdiction over all the property and rights of action which would otherwise be within reach of the federal court. The facts which influenced the decision in *Porter v. Sabin* do not exist in this case and the general doctrine applies.

Third—The accounting. Both parties have appealed from the decree of the district court, and we are now brought to a review of the findings of that court in the accounting between the parties defendant.

1. The trial court finds, in accordance with the evidence, that the railroads were constructed and turned over to the Missouri Pacific as follows: Denver, Memphis & Atlantic —February 14, 1887, 150 miles; August 11, 1887, 29.83 miles; August 11, 1887, 93.57 miles; October 1, 1887, 124.42 miles; December 15, 1887, 12.82 miles; total, 410.64 miles. Kansas & Southwestern—May 3, 1887, 24.84 miles. Pueblo & State Line—December 15, 1887, 151.34 miles. Total, 586.82 miles.

2. Upon the completion of the first 150 miles a controversy arose as to whether the road had been constructed in accordance with the contract, and the Missouri Pacific at first refused to accept the road. A proposition was then made by Mr. Jay Gould, as president of the Missouri Pa-

cific, to the directors of the Construction Company, that the Missouri Pacific would accept the road at $10,000 per mile. This proposition was accepted by a resolution of the directors and settlement made accordingly. The plaintiff seeks to recover the $150,000 thus withheld. The evidence as to the manner in which this 150 miles had been constructed is very conflicting, but the trial court found upon ample evidence that the road was constructed in accordance with the contract, except as to some details of the work which were afterwards performed. The binding force of the compromise depends not, however, upon what the rights of the parties actually were at the time it was entered into, but upon the question as to whether or not there was, at the time of the compromise, a *bona fide* controversy upon the subject. It is very clear from the evidence that Mr. Gould was dissatisfied with the work of the Construction Company; that he made many objections thereto; that he insisted earnestly that the work did not satisfy the requirements of the contract; and there is so much evidence to support the contention of Mr. Gould and the Missouri Pacific in this regard that a finding by the trial court based upon that evidence would not have been disturbed. We think the evidence shows that an actual controversy existed, that the Missouri Pacific urged it in good faith, and that the resolution was adopted in good faith for the purpose of settling it. A settlement was actually made upon the basis of a compromise, acquiesced in by both parties thereto, throughout all subsequent transactions, and it cannot now be disturbed. The trial court was right in disallowing this item. It is said that the Missouri Pacific paid Gould and others $11,000 per mile for the whole of the Denver road, making these persons its agents to pay the Construction Company. We cannot find any support for this in the evidence. The only thing from which such an inference could possibly be drawn is a report of the directors of the Missouri Pacific to its stockholders, in which the cost of the Denver road is

36

estimated at a little less than $12,000 per mile; but when the admitted items of extras in this account are considered, this statement is easily explained. But did the facts appear as the plaintiff claims, it would not affect the compromise. If A give B $100 to pay C, and a controversy existing as to whether C has earned the money, B settle for $500, his liability for the remainder is to his principal and not to C.

3. A portion of the road, 36.6 miles long, the Missouri Pacific at one time determined should not be constructed. Mr. Mallory urged its construction, and finally agreed to construct it at the rate of $10,000 per mile, if the Missouri Pacific would permit. Mr. Mallory had no authority to so modify the contract, and the directors of the Construction Company never ratified his action. For this section of the road the Construction Company is entitled to $11,000 per mile, and the trial court rightly so held.

4. Allowing, then, $10,000 a mile for the first 150 miles of the Denver road, $11,000 a mile for the remainder and for the Kansas & Southwestern, and $12,000 per mile for the Pueblo road, we find that the Construction Company earned upon its contracts $6,456,360, payable in Missouri Pacific five per cent bonds. The trial court found $6,454,600. The difference, amounting to $1,760, is due to a difference in the findings in regard to the length of the Denver road. The thirteenth and fifteenth findings conflict to the extent of .16 of a mile, and we have accepted the detailed statement of the fifteenth finding, rather than the general statement of the thirteenth, there being support in the evidence for either finding.

5. The trial court found that there had been payments of bonds as follows: February 14, 1887, $1,500,000; July 28, 1887, $2,500,000; September 22, 1887, $2,500,000; total, $6,500,000; and so credited the Missouri Pacific in the account with an overpayment of $45,400. The finding, however, of a payment upon July 28, of $2,500,000,

was a conclusion of the trial court based upon certain other findings.    Upon the date named the Construction Company borrowed of Jay Gould $2,500,000 of these bonds. The trial court found that at that time the Construction Company had earned and that the Missouri Pacific was obliged to pay to it the sum of $2,500,000, and the court concluded that the loan of the bonds made by Gould should be treated as a payment of that date by the Missouri Pacific, and that the Missouri Pacific should be charged against this payment with an item of $62,500, being six months' interest upon the bonds lent by Gould, which Gould afterwards received.    In this we think the.trial court erred.    It should not have treated the loan by Gould as a payment by the railroad company; but if the Missouri Pacific had unreasonably delayed or withheld payments due the Construction Company, the measure of damage would be the interest which the bonds would draw from the time they ought to have been delivered until they actually were delivered.    The transactions between Gould and the Construction Company on the one side and the railroad company and the Construction Company on the other must be kept separate.    The delivery of July 28 must be treated as a loan by Gould, which in fact it was, and the railroad company should only be credited with the bonds actually delivered to the Construction 'Company, or upon its order. The amount of these, as we find it from the evidence, is $6,418,000.

6. It was claimed by the Construction Company that a contract existed between that company and the Missouri Pacific by which the Missouri Pacific was obligated to transport materials to be used by the Construction Company over the Missouri Pacific lines at a rate of three-fourths of a cent per ton per mile.    The Missouri Pacific, however, undertook to charge a rate of three cents per ton per mile, and the treasurer of the Construction Company, Mr. Cross, paid the Missouri Pacific, upon that basis, its

claim without authority. The by-laws of the Construction Company required vouchers to be approved by the president and this payment was made without such vouchers. The Construction Company claims that there should be refunded to it upon this account $318,763.56, and this item was allowed by the district court, the trial court finding the facts substantially as the plaintiff claimed them to exist, and finding that the rate of three cents per ton per mile was unreasonable. All the shipments out of which this account arose were interstate shipments, and the trial court finds specifically that of the whole amount claimed, $17,-768.45 arose out of shipments made prior to April 5, 1887, when the interstate commerce act took effect; the remainder arose subsequently. The evidence as to this contract was conflicting, but the findings of the trial court received substantial support and we think that the item of $17,769.45 was properly allowed. Section 2 of the interstate commerce act is as follows: "That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered in the transportation of passengers or property subject to the provisions of this act than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful." The plaintiff claims that the rate of three-fourths of a cent per ton per mile was the regular rate charged by the company to others for similar material, and that it was never changed. Section 9 of the act referred to is as follows: "That any person or persons claiming to be damaged by any common

carrier subject to the provisions of this act may either make complaint to the commission as hereinafter provided for, or may bring suit, in his or their own behalf, for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any district, or circuit court of the United States of competent jurisdiction. But such person or persons shall not have the right to pursue both of said remedies, and must, in each case, elect which one of the two methods of procedure herein provided for he or they will adopt." There is no provision in the act which authorizes suit to be commenced in the state courts. In this respect the act differs from that in regard to usury exacted by national banks, construing which it has been held that a state court has jurisdiction of a suit to recover the penalty. (*Schuyler Nat. Bank v. Bollong*, 37 Neb., 620.) As to the particular kind of grievance alleged in this case, congress has provided a commission to which application may be made for redress, or the aggrieved party may at his election bring suit for redress in the federal courts. The subject being one upon which the power to legislate is delegated to congress, and congress having enacted laws upon the subject and provided for certain procedure in certain tribunals to obtain redress for a violation of such laws, we think the tribunals so created have exclusive jurisdiction. (*Copp v. Louisville & N. R. Co.*, 46 Am. & Eng. R. Cas., 634; *Coxe Brothers v. Lehigh Valley R. Co.*, 4 Interstate C. C. Rep., 578; *Swift v. Philadelphia & R. R. Co.*, 58 Fed. Rep., 858, in circuit court for northern district of Illinois; *Keith v. Tilford*, 12 Neb., 273.) The matter of overcharges for freight since April 5, 1887, is, therefore, not within the jurisdiction of the court and must be for that reason dismissed from the case without determination.

7. The following items of charges against the Missouri Pacific were allowed by the trial court: Additional stall roundhouse, Chivington, $1,000; extra grading at Chiv-

ington, $6,000; extra ties on D., M. & A., $23,192.17; stock yards and pens, $11,800; fencing, $1,522.98; turntables, $4,522.01; extra nut-locks, D., M. & A., $2,223.92. These were all items which the Construction Company claims were not included in the contracts with the original railroad companies, but were performed and furnished at the instance and request of the Missouri Pacific, and for which the Construction Company should be allowed their reasonable value. The evidence is ample to support the findings of the trial court, which are upon these items affirmed.

8. The Construction Company also seeks to recover upon a *quantum meruit* for a telegraph line constructed along the Denver road. This line was constructed by virtue of a written contract between the Denver Company and the Western Union Telegraph Company, the Denver Company to do the work and the Telegraph Company to furnish the material. But there is much evidence to show that a telegraph line is not a portion of a railroad such as the Construction Company had contracted to build for the Denver Company. The negotiations in regard to this line were conducted between the Construction Company and officers of the Missouri Pacific. The contract was not entered into until after examination and approval by the Missouri Pacific officers, and the Construction Company proceeded with the work at the direction of these officers. Under these circumstances the Missouri Pacific rendered itself liable to the Construction Company and the trial court properly allowed this charge, which amounts to $25,703.03. (*Baltimore & Ohio Telegraph Co. v. Interstate Telegraph Co.*, 4 C. C. A. [U. S.], 184.)

9. Upon the completion of the Pueblo road a large quantity of track material remained unused at Chivington. It was claimed by the Construction Company that the Missouri Pacific agreed to take all of this property as inventoried by representatives of the two companies and at

prices agreed upon. Upon the other hand the Missouri
Pacific claims that it agreed absolutely to take a portion of
the material, to be delivered as it should be needed, and to
take the rest provided it should find use therefor. Two
items of this material are not disputed. The trial court
seems to have found substantially in accordance with the
claim of the Missouri Pacific as to the terms of this ar-
rangement, and allows, in addition to the two items, an
item of $16,910.59. This is the remainder of the track
material which the Missouri Pacific agreed to take abso-
lutely as it should need it; but before it was taken it was
seized for taxes and the Missouri Pacific undertook to buy
it at tax sale, paying therefor $3,050.40. The trial court,
while charging the Missouri Pacific with this third item,
credits it with the amount paid for taxes. Upon the basis
of the finding of fact, which is sustained by the evidence,
we think this is correct. The Missouri Pacific was ob-
ligated to take the material, but at the time of the tax sale
the Construction Company was liable for the taxes, so
while the Missouri Pacific could not, as against the Con-
struction Company, obtain title through the tax sale, it
was entitled to credit for the amount of taxes paid.

10. There is a further charge allowed by the trial court
of $5,000, under the head of miscellaneous material at
Chivington. This would be more correctly described as
freight on material from Chivington to the Verdigris Val-
ley railroad, for the construction of which it was ultimately
used. The charge presents no question of law, and the
evidence sustains the finding of the trial court.

11. The trial court also allowed, under the head of mis-
cellaneous items, the sum of $12,988.87. Besides the
items set forth in detail in the statement of account there
was evidence in the record relating to a large number of
transactions between the companies, resulting in what the
Construction Company claimed to be just charges against
the railroad company. The aggregate of those items which

receive support from the evidence is greater than that allowed by the court. The record does not show the constituent parts of the charge allowed, and error in this record not affirmatively appearing, the finding of the trial court is affirmed as to that item.

12. The following items of charges against the Construction Company allowed by the trial court present no question of law, and receiving support from the evidence are here allowed:

| | | |
|---|---:|---:|
| Taxes paid | $1,021 | 38 |
| Recording deeds | 13 | 80 |
| Loss and damage on shipments | 47 | 13 |
| Overcharges and shortage on way bills | 839 | 50 |
| Expenses paid on right of way | 5,521 | 05 |
| Paid M. S. Carter & Co | 513 | 90 |
| Cash, Russell Sage | 10,000 | 00 |
| Cash, Jay Gould | 20,000 | 00 |
| Cash, George Gould | 10,000 | 00 |
| For right of way since suit | 6,601 | 91 |

13. Each party admits a number of items as correct charges against it by the other, and in the following statement of account all items appearing, which have not already been discussed, are items which are so admitted.

14. There is due from the Missouri Pacific to the Construction Company the following:

| | | |
|---|---:|---:|
| Refund of passenger fares | $4,538 | 51 |
| Labor | 93 | 50 |
| Material furnished | 11,396 | 75 |
| Water furnished | 3 | 00 |
| Coal furnished | 11 | 00 |
| Rails and ties | 7,098 | 17 |
| Engine supplies | 536 | 69 |
| Labor and material (bridges) | 1,194 | 57 |
| Taxes | 1 | 00 |
| Mail service | 1,055 | 41 |
| Construction Verdigris Valley R. R | 36,869 | 01 |

Fitzgerald v. Fitzgerald & Mallory Construction Co.

| | | |
|---|---:|---:|
| Winfield, Texas & Gulf R. R. | $18,028 | 84 |
| Overcharge on merchandise | 1 | 66 |
| Equipment purchase | 132,735 | 03 |
| Overcharge on materials | 163 | 72 |
| Material at Chivington, October, 1888 | 16,241 | 16 |
| Material at Chivington since November | 19,680 | 00 |
| Material at Chivington sold for taxes | 16,910 | 59 |
| Miscellaneous items | 12,988 | 87 |
| Overcharge on freight prior to April 1, 1888, | 17,769 | 45 |
| Additional stall roundhouse, Chivington | 1,000 | 00 |
| Extra grading at Chivington | 6,000 | 00 |
| Freight on material from Chivington | 5,000 | 00 |
| Telegraph line | 25,703 | 03 |
| Extra ties, D., M. & A. | 23,192 | 17 |
| Stock yards and pens | 11,800 | 00 |
| Fencing | 1,522 | 98 |
| Turn-tables | 4,522 | 01 |
| Extra nut-locks, D., M. & A. | 2,223 | 92 |
| Bonds earned under contracts by Construction Company | 6,456,360 | 00 |
| Interest on bonds not paid | 9,590 | 00 |
| Interest on other items | 132,398 | 36 |
| Total | $6,976,629 | 40 |

15. The Missouri Pacific should receive the following credits:

| | | |
|---|---:|---:|
| Freight charges | $28,766 | 17 |
| Tickets | 881 | 54 |
| Water furnished | 45 | 50 |
| Coal furnished | 3,197 | 38 |
| Cars destroyed | 334 | 63 |
| Cars repaired | 1,117 | 49 |
| Rent of cars | 20 | 00 |
| Cross-ties furnished | 110,776 | 62 |
| Overcharges on freight | 413 | 07 |
| Labor and material | 1,921 | 76 |

| | | |
|---|---:|---:|
| For right of way prior to suit................ | $58,758 | 39 |
| Paid to T. J. Prosser & Co.................... | 26,776 | 39 |
| Stoves, etc...................................... | 113 | 59 |
| Bridge material................................. | 186 | 00 |
| Labor and material (bridges)................. | 23,673 | 00 |
| Paid Colt & Son................................ | 18,830 | 61 |
| Paid T. J. Hilliard............................. | 13,106 | 44 |
| Cash A. H. Calef, January 25, 1888......... | 20,000 | 00 |
| Taxes paid...................................... | 1,021 | 38 |
| Recording deeds................................ | 13 | 80 |
| Loss and damage on shipments............... | 47 | 13 |
| Overcharge and shortage on way bills........ | 839 | 59 |
| Expenses paid on right of way................ | 5,521 | 05 |
| Paid M. S. Carter & Co........................ | 513 | 90 |
| Cash, Russell Sage ............................ | 10,000 | 00 |
| Cash, Jay Gould................................ | 20,000 | 00 |
| Cash, George J. Gould......................... | 10,000 | 00 |
| Taxes paid at Chivington...................... | 3,050 | 40 |
| Paid for right of way since suit.............. | 6,601 | 91 |
| Bonds delivered................................ | 6,418,000 | 00 |
| Interest ........................................ | 128,284 | 71 |
| Total....................................... | $6,912,812 | 45 |
| Missouri Pacific, Dr. to balance.............. | 63,816 | 95 |
| | $6,976,629 | 40 |

16. The dates when these different items accrued are in most cases not ascertainable from the evidence. Moreover, the transactions form a running account between the parties, and in calculating interest we do not think any foundation has been laid for the allowance of interest to either party before the commencement of suit. We have, therefore, calculated it from December 1, 1888, to December 1, 1893, at seven per cent, there being no proof of the interest laws of either of the states where the transactions arose, and their law being presumed to be like our own. This does

not apply, however, to the difference between the amount of the bonds earned and the amount delivered. These bonds draw but five per cent interest, and interest upon that difference has been calculated at five per cent.

17. A large amount is claimed on behalf of the Construction Company in the nature of consequential damages arising out of the disposition of the bonds made by the directors of the Construction Company. Most of the bonds were sold by the Construction Company at ninety cents on the dollar, and it is claimed that the Missouri Pacific should be charged with the discount. The evidence relating to this is voluminous, but the contention of the plaintiff may be thus briefly summarized: That the Missouri Pacific unreasonably and wrongfully withheld its acceptance of the roads after they were completed, compelling the Construction Company to resort to devices in the nature of borrowing money and bonds, and that owing to the exigencies arising from the necessity of meeting these debts, the majority of the board of directors was enabled to carry through a scheme by which the bonds were sold by the Construction Company to themselves and to Jay Gould at a discount. We do not think that the evidence shows any such unreasonable or unlawful withholding of the bonds, and the trial court did not find that there had been such. In order to obtain the bonds the Construction Company was required not only to build the road, but to deliver the stock and bonds of the original railroad companies. The provision in the first contracts by which settlements were to be made by ten-mile sections was waived by the Construction Company, and for this provision no definite times were substituted for settlements. The original companies were, until construction had advanced to a considerable extent, under the control of the Construction Company. Their bonds could not be delivered until they directed the trustee to certify them. The first certification was not ordered until a few days before the first instalment of the

Missouri Pacific bonds was delivered, and this at a time before the Construction Company lost control of the railroad company. There is evidence that a number of bonds of the Denver road were executed by its officers and retained in the possession of the Missouri Pacific, but they were not certified, and could not be certified until the directory of the Denver road so ordered. They were no better until certification than blank paper, and had the Missouri Pacific obstructed a settlement, there was nothing to prevent the Construction Company, while it had control of the Denver Company, from causing to be executed other bonds, having them certified, and tendering them to the Missouri Pacific. No such thing was done. In the subsequent operations we cannot find anything in the evidence justifying us in holding that the district court erred in not finding that there had been a wrongful withholding by the Missouri Pacific of its bonds. But aside from this, the bonds were sold at a discount by order of the directors of the Construction Company. The first order gave the stockholders of the Construction Company a preference in proportion to their stock. Fitzgerald and Mallory did not take advantage of this and their proportion was taken by other stockholders. These acts may have been a fraud upon the Construction Company by a majority of its directors who happened to be interested in the Missouri Pacific, but as the Missouri Pacific, as a corporation, was not a party to the proceeding, the directors were acting as directors of the Construction Company and not as directors of the Missouri Pacific. The Missouri Pacific can no more be charged with the consequences of their wrongful acts in this regard than it could be charged for damages sustained by a passer-by in consequence of the unsafe condition of a sidewalk in front of the residence of such a director. The fact that it was Missouri Pacific bonds which were sold was, in this regard, a purely fortuitous circumstance, and the Missouri Pacific can no more be

charged with this than with the loss sustained by a sale of any other property of the Construction Company which had never been in the possession of the Missouri Pacific. The contract of the Missouri Pacific was to pay the Construction Company in Missouri Pacific bonds at specified sums per mile. The undisputed evidence shows that these payments were made as agreed and the Missouri Pacific's outstanding bonded indebtedness was thereby increased to that full amount. Upon what principle of law or equity can an additional sum of $500,000 be charged to that company? The trial court found no evidence whereon to base such a charge. We can find none, and the opinion adopted by the court does not, so far as we can discern, point out any such evidence or any tangible reason for allowing this item.

18. The same conclusions of fact on the question of the withholding of the bonds dispose of plaintiff's contention that the Construction Company should be charged with the item of $62,500 interest received by Jay Gould upon the $2,500,000 of bonds loaned by him to the Construction Company.

19. Interest is claimed upon a payment of $380,000, which it is alleged the treasurer of the Construction Company made to the Missouri Pacific for rails purchased from that company before the rails were delivered. A contract had been made for the purchase of these rails and a voucher approved by the president of the Construction Company. He claims that the approval was made simply to enable payments to be made as the rails were delivered, but the treasurer was authorized upon this voucher to disburse the money upon presentation, and he did so. This bound the Construction Company, and there can be no recovery on account of the prepayment.

20. The Denver contract provided that the Denver Company should procure the right of way, but the Construction Company pay therefor. The Construction Company claims that it was thereby obligated to pay only the pur-

chase price or condemnation money and that the costs of
the proceedings and other expenses were chargeable against
the Denver Company, and upon the theory that the opera-
tion was for the benefit of the Missouri Pacific should be
charged against that company. The object of this pro-
vision in the contract is plain enough. All proceedings
were necessarily in the name of the Denver Company and
the title taken to that company. The proceedings had to
be conducted through the officers of that company, and a
stipulation to that effect was accordingly inserted in the
contract. But it is equally clear that the Construction
Company was to bear the whole expense of constructing
the road, inasmuch as it received all the stock and bonds
of the Denver Company for doing so, and the cost of con-
demnation proceedings and all other items of expense in
procuring the right of way were as much chargeable against
the Construction Company as the condemnation money
itself.

21. The Missouri Pacific claims that there was a failure
of consideration to the extent of some seventeen miles of
railroad built over government land to which it was claimed
no title was obtained. For several reasons nothing can be
allowed on this account. The Missouri Pacific contends
throughout the rest of its argument that it did not buy the
Denver road, but only its stock and bonds, and we cannot
say that any portion of the stock or bonds was without
consideration on this account. Their amount was fixed ac-
cording to the mileage of the road, but the security was
upon the road as a whole. In the next place the Missouri
Pacific obtained possession of the whole road, remained in
possession, and has not been evicted. Even had there been
a conveyance of the road to the Missouri Pacific with cove-
nants of warranty and for quiet enjoyment, there would as
yet be no cause of action upon these covenants. That case
would be much stronger than this.

22. The Construction Company claims large amounts

caused by the failure of the Missouri Pacific to make Chivington a division station.    A part of this claim is because there was a large amount of construction at Chivington based upon the intention of making it a division station. It was the duty of the Construction Company to build the railroad according to the plans.    The plans provided for this construction, and it was entirely immaterial whether the railroad company afterwards used these structures or not.    The remainder of the claim is for losses sustained by the Construction Company on account of speculations in land at Chivington and the erection of a hotel, out of which the Construction Company contemplated making large profits through the division station's being there located.    Such an enterprise was wholly beyond the scope of the Construction Company's powers and objects, and the damages claimed are at once too uncertain, too speculative, and too remote for consideration.

23.  There are a few other items claimed on either side and disallowed by the trial court.    They depend for the most part upon questions of fact which were determined by the trial court upon conflicting evidence, and both upon the law and the facts we think they were correctly determined and they will not here be noticed in detail.

It follows from the foregoing considerations that the decree of the district court should be modified and the judgment entered here in favor of the Construction Company against the Missouri Pacific, if for any sum, should be $63,816.95, with interest from December 1, 1893.